EXHIBIT "A"

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

I.    CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>ELEVENTH</u>   JUDICIAL CIRCUIT, IN AND FOR <u>MIAMI-DADE</u>   COUNTY, FLORIDA

<u>ZAUSNER FOODS CORP., a Delaware corporation</u>
Plaintiff                                             Case # _____

                                                      Judge  _____

vs.

<u>CLAUDE BLANDIN, BRUNO BLANDIN, PATRICK BLANDIN, ARNO LEONI, JOHN DOE</u>
<u>DEFENDANTS 1-10</u>
 Defendant

II.    AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

        III.    TYPE OF CASE      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
       ☐ Business governance
       ☐ Business torts
       ☐ Environmental/Toxic tort
       ☐ Third party indemnification
       ☐ Construction defect
       ☐ Mass tort
       ☐ Negligent security
       ☐ Nursing home negligence
       ☐ Premises liability—commercial
       ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
       ☐ Commercial foreclosure
       ☐ Homestead residential foreclosure
       ☐ Non-homestead residential foreclosure
       ☐ Other real property actions

☐ Professional malpractice
       ☐ Malpractice—business
       ☐ Malpractice—medical
       ☐ Malpractice—other professional
☒ Other
       ☐ Antitrust/Trade regulation
       ☒ Business transactions
       ☐ Constitutional challenge—statute or ordinance
       ☐ Constitutional challenge—proposed amendment
       ☐ Corporate trusts
       ☐ Discrimination—employment or other
       ☐ Insurance claims
       ☐ Intellectual property
       ☐ Libel/Slander
       ☐ Shareholder derivative action
       ☐ Securities litigation
       ☐ Trade secrets
       ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☒ No ☐

**IV.**     **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**     **NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

   <u>3</u>

**VI.**     **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**     **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**     **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.**     **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ David W. Marston Jr.</u>        Fla. Bar # <u>111636</u>
        Attorney or party                 (Bar # if attorney)

<u>David W. Marston Jr.</u>           <u>04/28/2022</u>
  (type or print name)           Date

# IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ZAUSNER FOODS CORP., a Delaware
corporation

      Plaintiff,

v.

CLAUDE BLANDIN, BRUNO BLANDIN,
PATRICK BLANDIN, and ARNO LEONI,
individuals, and JOHN DOE DEFENDANTS
1-10,

      Defendants,

No. _____

## COMPLAINT

Plaintiff Zausner Foods Corp. ("Zausner"), by and through its undersigned counsel, hereby files this Complaint, against Defendants Claude Blandin, Bruno Blandin, Patrick Blandin, Arno Leoni, and John Doe Defendants 1-10 (collectively, the "Defendants").

## INTRODUCTION

Plaintiff Zausner is food production company located in New Holland, Pennsylvania that selected the wrong group of buyers for its cheese distribution business Schratter Foods, Incorporated ("SFI").[1]  Pursuant to a December 6, 2014 Stock Purchase Agreement (the "SPA"), Zausner sold the business to two companies named ECB USA, Inc. ("ECB USA") and Atlantic Ventures Corp. ("Atlantic Ventures"), which are owned and controlled by a notorious French family that resides in Guadeloupe, the Blandin Family.   Claude Blandin, Bruno Blandin, and Patrick Blandin (referred to, at times, as the "Blandins") had no experience in the perishable foods industry generally (let alone the idiosyncratic cheese industry), and ran a previously respectable

---

[1]    Zausner asserts these claims as the successor in interest to ZNHC, a subsidiary that was merged into Zausner shortly after its sale of SFI.

business into bankruptcy.  While companies fail all of the time, Zausner brings these claims against the Blandins personally because the events surrounding the Blandins' destruction and dismantling of SFI were highly unusual and part of an elaborate scheme hatched by the Blandins to avoid paying more than $6.1 million of deferred purchase price payments, while simultaneously lining their pockets with every penny they could squeeze out of SFI before bankrupting it.

This lawsuit seeks damages against the Blandins and their accomplice Arno Leoni, as co-conspirators, for Tortious Interference with Contract and Conspiracy to Commit Tortious Interference with Contract because they concocted a scheme to avoid the obligations of ECB USA and Atlantic Ventures to pay the $6.1 million of deferred purchase price payments (the "Deferred Installment Payments").  Indeed, not only did the Blandins and Leoni cause ECB USA and Atlantic Ventures to fail to pay the Deferred Installment Payments, as part of their scheme, they also destroyed Zausner's collateral under the related January 5, 2015 Stock Pledge Agreement (the "Stock Pledge Agreement"), which created a security interest in 90% of the shares of SFI in the event ECB USA and Atlantic Ventures defaulted on the Deferred Installment Payments.[2]

However, the Blandins and Leoni sold all of the assets of SFI to Atalanta Corporation ("Atalanta") in or around February 2018 for at least $12 million (or more), and despite the influx of those funds, instead of paying the Deferred Installment Payments, the Blandins and Leoni caused SFI to be liquidated, by forcing SFI to file an Assignment for the Benefit of Creditors Proceeding (an "ABC Proceeding") on April 30, 2018 in Florida.  An ABC Proceeding is a "bankruptcy-light" procedure that is widely known for minimizing the principals' exposure to unwanted scrutiny.  Through the filings related to the ABC Proceeding, Zausner has learned that

---

[2]  Zausner is filing this lawsuit in this court because the District of Delaware has concluded that it lacks personal jurisdiction over these individual defendants. *ECB USA, Inc. v. Savencia SA*, No. 19-cv-00731-RGA-CJB, ECF No. 222 (Mar. 25, 2022).

the Blandins own dozens of other companies and shell companies, which appear to all have been members of the entity G.I.E. C2B, which the Blandins refer to as the "Treasury Entity."  The Blandins use G.I.E. C2B to facilitate the transfer of money from one Blandin-controlled company to another in order to divert profits to themselves and shield assets from creditors (like Zausner).

Accordingly, Zausner asserts the following claims against the Defendants for their participation in this elaborate scheme.

*First*, Zausner seeks an equitable accounting from the Blandins and Leoni, to trace the deal proceeds from the asset sale to Atalanta, so that Zausner can identify any potential fraudulent transferees (*i.e.*, the Blandins, Leoni, and/or other John Doe Defendants) from whom Zausner can recoup the Deferred Installment Payments it is owed.

*Second*, Zausner seeks damages in tort by way of conspiracy claims and tortious interference with contract claims against the Blandins and Leoni, the owners of ECB USA, Atlantic Ventures, and G.I.E. C2B, who were the co-conspirators that, along with the John Doe Defendants, contrived this elaborate plan to deprive Zausner of the Deferred Installment Payments.

## ZAUSNER FOODS CORP.'S COMPLAINT

Plaintiff Zausner Foods Corp. ("Zausner") alleges as follows:

### PARTIES

1.     ZNHC, Inc. ("ZNHC") was a Delaware corporation that merged into Zausner and, as such, no longer exists as a separate entity.  ZNHC was a party to both the SPA and the Stock Pledge Agreement.

2.     Plaintiff Zausner, as successor in interest to ZNHC, is a Delaware corporation with its principal place of business in the Commonwealth of Pennsylvania.

3.     Non-party ECB USA is a Florida corporation with its principal place of business in the State of Florida.  *See* Exhibit A.

4.     Non-party Atlantic Ventures is a Florida corporation with its principal place of business in the State of Florida.  *See* Exhibit B.

5.     Through the December 6, 2014 SPA, ECB USA and Voss Enterprises, Inc. ("VEI") acquired SFI from ZNHC pursuant to the SPA.  A true and accurate copy of the SPA is attached hereto as Exhibit C.

6.     Non-party SFI is a Delaware corporation, which was headquartered in Fairfield, New Jersey prior to the closing of the SPA.

7.     Post-Closing, Defendants caused SFI's headquarters to be moved to Florida, with its principal place of business at 1141 NW 107th Street, Suite 1, Miami, FL 33178 (with previous listed business addresses of 501 NE 183rd St Miami, FL 33179, and 3001 SW 3rd Avenue, Miami, FL 33129).

8.     On December 10, 2014, ECB USA and VEI assigned their interests in SFI to Atlantic Ventures through an Assignment and Assumption Agreement.  ECB USA and Atlantic

4

Ventures are the counterparties to the SPA, and pursuant to Amendment No. 1 to the SPA, are the entities that owe Zausner $6.1 million in Deferred Installment Payments.

9.      Defendants Claude Blandin, Bruno Blandin, and Patrick Blandin are the owners and operators of the French family-owned group Établissements Claude Blandin et Fils (the "Blandin Entities"), through which they own and operate ECB USA, Atlantic Ventures, and G.I.E. C2B, and 33 other companies and shell companies.

10.     Following the closing of the SPA, Defendant Claude Blandin became the President of SFI, which was headquartered in Florida.  Claude Blandin is a French citizen who resides in the French territory of Guadeloupe where he owns significant business interests. *Zausner Foods Corp. v. ECB USA, Inc., et al.*, No. 1:20-cv-01769-RGA, ECF No. 43-1, ¶ 3 of Declaration of Claude Blandin (D. Del. May 6, 2021).  Upon information and belief, Claude Blandin may have a residence in Florida, as well.

11.     Claude Blandin frequently did business with Florida corporations.

12.     Claude Blandin was the Vice Chairman and Executive Vice President of SFI  (a Florida corporation).  He was also an officer and director of Florida companies ECB USA and Atlantic Ventures.

13.     Claude Blandin signed the SPA and the Stock Pledge Agreement on behalf of ECB USA and Atlantic Ventures.

14.     Claude Blandin frequently worked in Miami in his capacity as Vice President and Executive Vice President of SFI and as a director of ECB USA and Atlantic Ventures, and he attended numerous business meetings in Miami and, upon information and belief, elsewhere throughout Florida.

15.     Following the closing of the SPA, Defendant Bruno Blandin was a Director and Officer of SFI, which was headquartered in Florida.  Bruno Blandin is a French citizen who resides in the French territory of Guadeloupe where he owns significant business interests.  *Zausner Foods Corp. v. ECB USA, Inc., et al.*, No. 1:20-cv-01769-RGA, ECF No. 43-1, ¶ 3 of Declaration of Bruno Blandin (D. Del. May 6, 2021).

16.     Bruno Blandin frequently did business with Florida corporations.

17.     Bruno Blandin was also an officer and director of Florida companies ECB USA and Atlantic Ventures.

18.     Bruno Blandin attended numerous business meetings in Miami and, upon information and belief, elsewhere throughout Florida.

19.     Following the Closing of the SPA, Defendant Patrick Blandin was a Director and Officer of SFI, which was headquartered in Florida.  Patrick Blandin is a French citizen who resides in the French territory of Guadeloupe where he owns significant business interests.  *Zausner Foods Corp. v. ECB USA, Inc., et al.*, No. 1:20-cv-01769-RGA, ECF No. 43-1, ¶ 3 of Declaration of Patrick Blandin (D. Del. May 6, 2021).

20.     Patrick Blandin frequently did business with Florida corporations.

21.     Patrick Blandin was also an officer and director of Florida companies ECB USA and Atlantic Ventures.

22.     Patrick Blandin also attended numerous business meetings throughout Florida.

23.     Defendant Arno Leoni ("Leoni") is an associate of the Blandins and was appointed the CFO of SFI in the third quarter of 2015.  He also became co-CEO of SFI in February 2017 and sole CEO of SFI in May 2017.  Upon information and belief, he is the sole owner of Ilafy Development, LLC, which became a 2% owner of Atlantic Ventures after the Blandins purchased

SFI.  Leoni is a French citizen who resides in Guadeloupe.  *Zausner Foods Corp. v. ECB USA, Inc., et al.*, No. 1:20-cv-01769-RGA, ECF No. 43-1, ¶ 2 of Declaration of Arno Leoni (D. Del. May 6, 2021).

24.     Leoni frequently did business with Florida corporations.

25.     Leoni is the Treasurer and a director of Florida companies ECB USA and Atlantic Ventures.

26.     Much like his co-conspirators the Blandins, Leoni also attended numerous business meetings in Miami and, upon information and belief, elsewhere throughout Florida.

27.     The Blandins and Leoni, in their capacities of officers and directors of SFI, were present for and held regular and special Board meetings in Miami, Florida.

28.     The Blandins and Leoni, in their capacities as officers and directors of Florida business entities, have signed and certified records submitted to the Florida Department of State.

29.     The Blandins and Leoni previously submitted affidavits that stated that "since their respective formations, ECB USA and Atlantic Ventures have each held required annual shareholder meetings pursuant to their respective bylaws" and "conducted their affairs in accordance with their bylaws."   The company bylaws stated that Board meetings should be held in Miami, Florida (or other locations).   *See* Exhibits A, B.

30.     Non-party G.I.E. C2B ("C2B") is a French "cash-pooling" entity based in the French territory of Guadeloupe that is tasked with managing and funding the Blandin Entities' activities. C2B is the entity that financially controls all of its affiliates, and through which the Defendants transfer funds back and forth across entities at their discretion.

31.     C2B, ECB USA, and Atlantic Ventures are all alter egos of Claude Blandin, Bruno Blandin, and Patrick Blandin, and each other, as evidenced by the significant organizational overlap between their executives, owners, and business addresses:

a.      Bruno Blandin and Claude Blandin are the French equivalents of officers/directors of the Blandin Entities, including C2B.

b.      Patrick Blandin, Bruno Blandin, Claude Blandin, and Arno Leoni are officers of Florida companies ECB USA and Atlantic Ventures.

c.      ECB USA and Atlantic Ventures share the exact same registered address: 3001 SW 3rd Avenue, Miami, FL 33129.

d.      C2B shares a Florida business address with ECB USA.

32.     Claude Blandin, Bruno Blandin, and Arno Leoni are also directors of non-party Tridom International Corp., which is a Florida corporation with its principal place of business at 3001 SW 3rd Avenue, Miami, FL 33129.

33.     To the extent there are additional individuals who were involved with the transfer of proceeds from ECB USA or Atlantic Ventures or who were the recipient(s) of such proceeds, the identities of whom are currently unknown to Zausner, Zausner reserves the right to seek leave to join them to the present action once their identities are ascertained.  Thus, until such time as Zausner learns their identities, currently unknown Defendants shall be known as John Doe Defendants 1-10 ("John Doe Defendants").

34.     Non-party Constantin Associates LLP ("Constantin") is part of a network of entities that comprises the accounting and consulting firm "Constantin – Serval & Associates." Prior to the Closing of the SPA, Constantin was engaged by SFI to audit its financial statements, including preparing audit opinions of SFI's financial statements from 2010 through 2017.

35.     Non-party Deloitte Transactions and Business Analytics LLP ("Deloitte")worked with Claude Blandin, Bruno Blandin, and Patrick Blandin as a consultant, including working with SFI on obtaining a line of credit with Wells Fargo.

36.     Non-party Wells Fargo Capital Finance ("Wells Fargo") was SFI's post-Closing lender.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction over the claims alleged herein pursuant to Section 26.012, as this is a civil dispute with Zausner seeking damages in excess of $750,000.

38.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni are subject to personal jurisdiction in this Court because: (i) the causes of action set forth herein relate to their activities conducted on behalf of themselves, and as directors and/or officers of SFI, ECB USA, and Atlantic Ventures, all of which are corporations headquartered in Florida; (ii) they engaged in substantial business directed toward Florida related to the causes of action set forth herein, including participation in negotiations and business relationships that were necessary to SFI; and (iii) they purposefully and repeatedly directed their activities to Florida and availed themselves of the protection of Florida laws.

39.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni individually transacted business or work in the State of Florida related to SFI in connection with the actionable conduct set forth herein, including by signing the SPA and by performing certain obligations thereunder post-Closing.

40.     Claude Blandin, Bruno Blandin, Patrick Blandin, Arno Leoni, and certain representatives of ECB USA and Atlantic Ventures negotiated the terms of the SPA in Florida.

41.     Claude Blandin, Bruno Blandin, and Patrick Blandin caused ECB USA and Atlantic Ventures to sign the SPA, with Claude Blandin signing on behalf of ECB USA and Atlantic Ventures.  The SPA contains a Florida choice of law provision.

42.     Claude Blandin, Bruno Blandin, and Patrick Blandin caused ECB USA and Atlantic Ventures to sign Amendment No. 1 to the SPA, which has a Florida choice of law provision.

43.     Claude Blandin, Bruno Blandin, and Patrick Blandin caused ECB USA to sign the Security Agreement, dated January 1, 2015, and attached as Exhibit B to the SPA.

44.     Claude Blandin, Bruno Blandin, and Patrick Blandin caused ECB USA to sign the Stock Pledge Agreement, dated January 1, 2015, and attached as Exhibit C to the SPA.  Bruno Blandin was the designated signatory for ECB USA for the Stock Pledge Agreement.

45.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni engaged in conduct related to the business and operation of SFI, which is headquartered in Florida, and, upon information and belief, conspired to destroy any value remaining in SFI.

46.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni caused SFI to enter into ABC proceedings in the State of Florida, hired a trustee in the State of Florida, and caused their affiliate C2B to assert a creditor claim in the ABC in the State of Florida.

47.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni conspired to and committed the torts alleged in detail in this Complaint, which torts harmed Zausner (and its predecessor ZNHC) in the State of Florida.  In committing the torts that harmed Zausner and ZNHC, Defendants Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni specifically directed actions toward the State of Florida.

48.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni engaged in discussions and negotiations with ZNHC and Zausner with respect to Amendment No. 1 of the SPA ("Amendment No. 1") in the State of Florida.

49.     As discussed herein, Amendment No. 1 provided a downward adjustment of the total Deferred Installment Payments from $10 million to $6.1 million.  By conducting negotiations relating to the SPA and Amendment No. 1 in the State of Florida, Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni specifically directed actions toward the State of Florida.

50.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni each conducted significant business and had an extensive business relationship with Deloitte in the State of Florida, in connection with post-Closing activities of SFI, including but not limited to accounting, financial, or consulting work, all of which are directly relevant to their tortious conduct directed towards Zausner.

51.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni each directed communications while working in the State of Florida to Deloitte regarding SFI's finances, which, upon information and belief, included communications expressly relating to the Deferred Installment Payments owed under the SPA, as well as relating to the debts and obligations owed by SFI to other individuals and entities, all of which inform the tort claims asserted against them in this Complaint.

52.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni each conducted significant business and had an extensive business relationship with Wells Fargo in the State of Florida, in connection with various SFI loan agreements directly relevant to the post-Closing activities of SFI and Defendants' tortious conduct directed towards Zausner.

53.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni each directed communications to Wells Fargo regarding SFI's finances, which, upon information and belief, included communications expressly relating to the Deferred Installment Payments owed under the SPA, as well as relating to the debts and obligations owed by SFI to other individuals and entities, all of which inform the tort claims asserted against them in this Complaint.

54.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni have each operated, conducted, engaged in, or carried on a business or business venture in this state and/or have had an office or agency in Florida.

55.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni have each committed a tortious act within this state.

56.     For all of these reasons, this Court has personal jurisdiction over Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni.

57.     Venue is proper in the Eleventh Judicial Circuit in and for Miami Dade County pursuant to Fla. Stat. § 47.011 and because certain defendants are nonresidents over whom personal jurisdiction can be obtained.

## FACTUAL ALLEGATIONS

58.     SFI was a specialty food supply company that both imported and distributed various food products, such as cheeses and other dairy products.

59.     SFI was a subsidiary of ZNHC, which was a subsidiary of Zausner.

60.     SFI had two divisions: All Nations Cheese Organization ("ANCO"), which focused on cheese importation and distribution; and Corman Ship Supplies, LLC, ("Corman"), which focused on supplying cruise ships with SFI's specialized products.

61.     As of 2014, Alain Voss ("Voss") had been the President and CEO of SFI for more than 20 years and owned a 25% stake in SFI.

62.     In early 2014, Voss decided that he no longer wanted to work for SFI and wanted to exit the business, as well as his investment in SFI, to focus on other entrepreneurial pursuits.

63.     In 2014, ZNHC began to explore the sale of SFI and hired an investment bank in connection with that effort.

64.     Subsequently, Voss changed his mind about leaving SFI and approached ZNHC about acquiring 100% of SFI, along with Claude Blandin, Bruno Blandin, and Patrick Blandin, whom Voss introduced to ZNHC.

65.     On December 5, 2014, Claude Blandin, Bruno Blandin, and Patrick Blandin formed ECB USA for the sole purpose of entering into the SPA and acquiring SFI.

66.     The parties negotiated the sale of SFI, and on December 6, 2014, Zausner (as Guarantor), ZNHC (as Seller), ECB USA and VEI (as Buyers), Voss, and SFI entered into the SPA through which ECB USA and VEI purchased all of the outstanding shares of SFI from ZNHC.

67.     On December 10, 2014, ECB USA and VEI assigned their interests in SFI to Atlantic Ventures and owned 55% and 45% of Atlantic Ventures, respectively.

### The Structure of the Deal: The SPA and The Stock Pledge Agreement

68.     Pursuant to Section II.1 of the SPA, ECB USA and Atlantic Ventures purchased SFI from ZNHC and Zausner for $27 million, to be paid as follows:

     a.     $2 million of cash at closing on December 31, 2014 ("Closing");

     b.     $15 million of cash on June 30, 2015; and

     c.     $10 million of deferred payments, payable in four equal annual installments of $2.5 million (collectively, the "Deferred Installment Payments").

69.     Along with the SPA, ZNHC entered into the Stock Pledge Agreement with ECB USA and VEI, which was incorporated into the SPA at Section II.3(b).

70.     Pursuant to the Stock Pledge Agreement, ECB USA and Atlantic Ventures pledged **90% of the stock in SFI to ZNHC** (the "Pledged Shares") specifically to secure the Deferred Installment Payments due to ZNHC in the event of ECB USA's and Atlantic Ventures' default. *See* Stock Pledge Agreement ¶¶ 1(d), 2, 3, attached as Exhibit C to SPA.

71.     The Stock Pledge Agreement was critically important to ZNHC, as a significant portion of the purchase price was being paid after Closing, and ZNHC negotiated for this meaningful collateral.

72.     ECB USA and Atlantic Ventures represented and warranted that "the pledge of the Collateral pursuant to this Agreement creates a valid and perfected first priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations [*i.e.*, the Deferred Installment Payments]." *Id*. ¶ 5(b).

73.     The Stock Pledge Agreement created a continuing first priority lien and security interest in the Collateral that inured to the benefit of ZNHC and its successors (*i.e.*, Zausner), was binding on SFI and its successors and assigns (i.e., ECB USA and Atlantic Ventures), and remained in effect until the Deferred Installment Payments were paid to ZNHC (which never happened). *Id*. ¶ 17.

74.     All of ZNHC's right, liens, and security interests in the Stock Pledge Agreement were "absolute and unconditional irrespective of" (i) "any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any waiver, amendment or other modification of the Stock Purchase Agreement, . . ." (ii) "any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;" or (iii) "any default, failure or delay, wilful or otherwise, in the performance of the Secured Obligations." *Id.* ¶ 14(b), (d), (e).

75.     ECB USA and Atlantic Ventures also agreed they would:

*[N]ot* sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, *any of the Collateral or any interest therein except as expressly provided for herein or with the prior written consent of Secured Party*.

*Id*. at ¶ 8.

76.     In the event that ECB USA and Atlantic Ventures defaulted on their obligation to pay the Deferred Installment Payments, Zausner was entitled to an ownership interest in 90% of the outstanding shares of SFI, which represented millions of dollars of value.

**Amendment No. 1 to SPA: Changes to the Deferred Installment Payments**

77.     Section II.2 of the SPA also provided ECB USA and Atlantic Ventures with a mechanism to negotiate downward the $27 million purchase price of SFI post-Closing, once ECB USA and Atlantic Ventures and their independent auditor, Crowe Horwath, LLC ("Crowe"), had an opportunity to review and audit SFI's 2014 audited financial statements.

78.     SFI's 2014 audited financial statements were prepared by Constantin, who was SFI's third-party accountant and auditor and who had worked with SFI since 2010. The 2014 audited financial statements were transmitted on February 23, 2015, roughly seven weeks post-Closing.

79.     After ECB USA, Atlantic Ventures, and Crowe, the auditor of ECB USA's and Atlantic Ventures' choosing, reviewed SFI's 2014 audited financial statements and had full access and control of SFI's books and records, on April 8, 2015, under Section II.2 of the SPA, ECB USA and Atlantic Ventures sent ZNHC a Closing Net Equity Statement ("CNES"), containing an externally audited balance sheet of SFI to begin negotiations for a downward adjustment to SFI's purchase price.

80.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni engaged in extensive discussions and negotiations with ZNHC for a downward adjustment to SFI's purchase price.  The negotiations were regarding the purchase price of SFI, which has its headquarters in Florida.  Upon information and belief, Claude Blandin and Leoni negotiated certain terms of the purchase price in the State of Florida.

81.     Following receipt of the CNES and extensive discussions and negotiations, the parties to the SPA entered Amendment No. 1 to the SPA, dated June 16, 2015, with Claude Blandin signing Amendment No. 1 on behalf of ECB.  A true and accurate copy of Amendment No. 1 is attached hereto as Exhibit D.

82.     In Amendment No. 1, the parties agreed to a downward adjustment of the total Deferred Installment Payments from $10 million to $6.1 million.  Thus, each Deferred Installment Payment became $1.525 million (instead of $2.5 million), due beginning on December 31, 2016, and continuing on the third, fourth and fifth anniversaries of the Closing (*i.e.*, December 31, 2017, December 31, 2018, and December 31, 2019).  *See* Amendment No. 1, ¶ 3.  As a result, the final purchase price for SFI was reduced by agreement by $3.9 million, from $27 million to $23.1 million.

83.     Subsequently, after ZNHC had already agreed to significantly reduce the Deferred Installment Payments, the Defendants caused ECB USA and Atlantic Ventures to seek extensions of the deadlines to pay the Deferred Installment Payments.

84.     Specifically, Claude Blandin was the lead negotiator on behalf of the Defendants, and in an effort to continue the scheme of refusing to pay the required payments, requested extensions of the payment deadlines under false pretenses that Defendants were actually going to pay (when it is now clear that they had no intention of doing so).

85.     Again, Zausner acquiesced to the extensions in good faith.

86.     All of those extensions have expired, and to date, ECB USA and Atlantic Ventures have failed to pay any of the $6.1 million of remaining Deferred Installment Payments they owe.

**Post-Closing: The Ownership and Operation of SFI by**
**Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni**

87.     Post-Closing, ECB USA and Atlantic Ventures appointed Voss as CEO of SFI, and SFI was thereafter led by both Voss and Claude Blandin: (i) Voss remained President and CEO of SFI, and (ii) Claude Blandin, as co-owner and President of the Blandin Entities (and an officer at ECB), joined as Vice Chairman and Executive Vice President of SFI.

88.     On January 12, 2015, ECB USA and Atlantic Ventures brought SFI into the Blandin family of companies.  Specifically, on January 12, 2015, SFI entered into an agreement with C2B, entitled the Agreement to Centralize Intra-Group Treasury Operations (the "Treasury Agreement"), which was signed by Bruno Blandin on behalf of C2B. A true and accurate copy of the Treasury Agreement is attached hereto as Exhibit E.

89.     Upon information and belief, Claude Blandin, Bruno Blandin, Patrick Blandin, and Arno Leoni caused SFI to enter into the Treasury Agreement for their ulterior motives, and against the interest of SFI.  It was also against the interests of Zausner, as Zausner had a right to 90% of the shares of SFI in the event a default with respect to the Deferred Installment payments.

90.     The Treasury Agreement provided that:

    a.     "[C2B] is the entity that has agreed with its members to coordinate all financial and business activities on a centralized basis in order to avoid redundant and unnecessary administrative expenses with a view to obtaining optimal operational financial results and credit availability and access for its members";

b.    It was being entered into to "view to optimizing the management thereof through diminution of unnecessary expenses and maximizing the utilization of financial products to improve cash flows and treasury functions . . ."; and

c.    "WHEREAS, SCHRATTER FOODS INC; a corporation organized pursuant to the laws of the State of Delaware, having become a member of GIE C2B, also desires to centralize its treasury operations through the aegis of GIE C2B." Exhibit E at 1.

91.    The Treasury Agreement also expressly provided that ***SFI's cash management would "be effectuated by [C2B] through its own systems and methods"*** (emphasis added). In other words, while the Treasury Agreement purported to maintain an aura of legitimacy, its terms plainly contemplated that ***all of SFI's funds would flow to and be controlled by C2B***. *Id.* at § 1.2.

92.    This agreement bestowed upon C2B the purported authority to control SFI's books and records.

93.    Each member of C2B (*i.e.*, all of the Blandin affiliate entities), including SFI, was given at least one share of C2B. Indeed, there were 34 companies (many of which, upon information and belief, are shell companies) that were owned and operated by Claude Blandin, Bruno Blandin, and Patrick Blandin, and listed as single-share shareholders of C2B.

94.    While the Agreement purported to require the documentation of such transfers, upon information and belief, no proper documentation existed, and money was merely transferred subject to the whims of Claude Blandin, Bruno Blandin, and Patrick Blandin around the dozens of Blandin Family-controlled shell companies, leaving it virtually impossible to tell to which entity's assets rightfully belonged where.

95.     Notably, pursuant to the Amended Articles of Association of C2B, the members of C2B, including ECB USA, are jointly and severally liable for each others' respective debts. *See* Exhibit F, Certified English Copy of C2B Amended Articles of Association, ("ARTICLE 10. LIABILITY OF THE GROUP MEMBERS, In accordance with the law, the group members are liable for their debts on their own assets. They are also joint and several, unless otherwise agreed with the third party contractors.").

96.     After bringing SFI into the Intra-Group Treasury, Claude Blandin, Bruno Blandin, and Patrick Blandin began to terminate the employees of SFI from the pre-Closing time period and replace them with new employees who had personal relationships with the Blandin family.  Upon information and belief, the actions of Claude Blandin, Bruno Blandin, and Patrick Blandin had ulterior motives and were against the interests of SFI.  It was also against the interests of Zausner, as Zausner had a right to 90% of the shares of SFI in the event a default with respect to the Deferred Installment payments.

97.     In the third quarter of 2015, Claude Blandin, Bruno Blandin, and Patrick Blandin appointed long-time family loyalist Arno Leoni as CFO of SFI.

98.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni then demoted Bertrand Proust, who had served as SFI's CFO for several years, to Treasurer.

99.     Claude Blandin, Bruno Blandin, and Patrick Blandin claimed they could make SFI profitable.  However, without the requisite experience in the perishable food business, let alone the idiosyncratic cheese business, they were unsuccessful in operating SFI as a profitable enterprise.

100.    SFI's performance and cash flow deteriorated. As a result, SFI began to breach its performance obligations as a cheese distributor for Zausner's affiliates.

101.    Other customers of SFI reached out to Zausner post-Closing to complain about delays, damaged products, and the overall mismanagement of SFI under the control of the Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni.

102.    SFI also began failing to pay suppliers, failing to deliver products, and failing to meet its obligations to pay off its debt.

103.    In or around July 2015, SFI had obtained an asset-based line of credit from Wells Fargo, contingent upon SFI maintaining certain minimum profitability benchmarks to be reported on a regular basis.

104.    In early 2016, SFI was in arrears on its loan commitments with Wells Fargo, and Claude Blandin, Bruno Blandin, and Patrick Blandin were under significant financial pressure.

105.    Pleadings filed in other lawsuits against ECB USA and Atlantic Ventures reveal that SFI was engaged in a variety of alleged unethical conduct. Bertrand Proust, then-Treasurer of SFI, alleged that Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni repeatedly directed him to "cook the books" of SFI to make it appear the company was performing better than it actually was.[3]

106.    Specifically, Leoni directed Proust (i) to recognize as revenue unclaimed or unused customer credits and cash overpayments that represented amounts owed to customers or, if they remained unclaimed, to the relevant state pursuant to escheat law, and (ii) to ignore liabilities resulting from excessive trade discounts or billbacks from SFI's payments made for inventory purchases.

---

[3]    *Proust v. Schratter Foods Incorporated*, C.A. No. 2018-004370-CA-01 (February 12, 2018), Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade, Florida; ECF No. 2 (the "Proust Complaint").

107.    Proust refused to make these false accounting adjustments and identified many other fraudulent financial accounting endeavors engaged in by SFI, at the express direction of Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni, including, among other things:

a.    Steve Blandin (financial analyst) determined that Alouette had been charged excessive trade discounts or bill backs in the aggregate amount of $600,000, which were improperly deducted from payments made for inventory purchases and needed to be paid back to Alouette and reflected as a liability on SFI's books. Leoni, acting at the direction of Claude Blandin, Bruno Blandin, and Patrick Blandin, refused to recognize these liabilities (Proust Complaint ¶¶ 28-30).

b.    Proust identified other examples of vendors who were entitled to refunds because a discount was never authorized or promotion conditions had not been met (*e.g.*, Toscana Cheese Company for $211,000). Leoni told Proust to continue to recognize the unauthorized trade discounts to bolster financial results and include those in reports to Wells Fargo. (*Id.*, ¶¶ 30-33, 39);

c.    SFI's balance sheet contained unclaimed customer credits, which were then concealed from customers to prevent them from claim the credits, after which SFI could absorb those credits into revenue for purposes of artificially inflating revenues (by as much as $2 million of more) (*Id.* ¶¶ 38, 56(a), 64);

d.    Intentionally understating insurance expense by overstating prepaid insurance (*Id.* ¶ 56(e));

e.    Falsely adjusting downward the necessary write-off amounts for unsalable inventory (*Id.* ¶ 56(f));

f.    Reclassifying income items as sales instead of other operating income (in an effort to falsely inflate net revenue, one of the important financial performance indicators for Wells Fargo) (*Id.* ¶ 56(g)); and

g.    In April and May 2017, Leoni, at the direction of Claude Blandin, Bruno Blandin, and Patrick Blandin, refused to correct these fraudulent accounting practices in order to make SFI appear more profitable to Wells Fargo, so SFI would not default on its loan (*Id.* ¶¶ 55-60).

108.    Similarly, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni ordered Voss to fire mission-critical employees and cut costs that were essential to the running of the business in a proper and ethical way.

109.    As a reward for his loyalty, Claude Blandin, Bruno Blandin, and Patrick Blandin gave Leoni's company, Ilafy Development, LLC, a 2% stake in Atlantic Ventures.

110.    Because of SFI's financial difficulties, SFI—led by each of Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni—renegotiated its financial covenants with Wells Fargo, which would commence in May 2016.

111.    More specifically, Claude Blandin and Arno Leoni each had extensive discussions with Wells Fargo relating to SFI's business relationship with Wells Fargo, including submitting information relating to SFI's finances and debts owed to other parties.  These discussions also included the Deferred Installment Payments owed under the SPA.

112.    SFI was unable to meet the minimum profitability benchmarks required to continue accessing its line of credit with Wells Fargo.

113.    On December 31, 2016, the Initial Deferred Payment of $1.525 million became due. Prior to its due date, ECB USA and Atlantic Ventures requested an extension. Pursuant to Section II.2 of the SPA and by an agreement of the parties dated December 26, 2016, Zausner agreed to defer this payment.  To date, it remains unpaid.

114.    Leoni, at the direction of Claude Blandin, Bruno Blandin, and Patrick Blandin, instructed Proust to change the financial results as of March 31, 2017, to be submitted to Wells Fargo, such that they would falsely reflect the forecasts that SFI had previously provided to Wells Fargo.  Proust refused to do so.

115.    In May 2017, Proust was terminated from his employment because of his refusal (i) to falsify financial information intended for distribution to Wells Fargo and other creditors, (ii) to falsely adjust amounts owed to creditors, and (iii) to misappropriate unused credits and cash overpayments owed to customers.

116.    As a result of the above, as well as more detailed allegations contained therein, Proust filed the Proust Complaint, a Florida Whistleblower action against SFI, which details the self-serving dishonesty with which Claude Blandin, Bruno Blandin, Patrick Blandin and Arno Leoni conducted the business of SFI.

117.    ECB USA and Atlantic Ventures also fired Voss because, like Proust, he would not participate in financial fraud at the direction of Claude Blandin, Bruno Blandin, and Patrick Blandin.

118.    Before firing Voss, Claude Blandin, Bruno Blandin, and Patrick Blandin caused SFI to name Leoni as Co-CEO from mid-February 2017 through April 30, 2017, and then sole CEO from May 1, 2017 forward.

119.    Meanwhile, ECB USA and Atlantic Ventures and each of Claude Blandin, Bruno Blandin, and Patrick Blandin continued to run SFI into the ground due to a dangerous combination of mismanagement and financial fraud.

**The Sale of Substantially All of SFI's Assets**

120.    As early as Fall of 2017 and by no later than February 2018, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni put the most valuable assets of SFI up for sale.  Despite the substantial operational and financial performance issues, exacerbated by the conduct described above, SFI still had valuable assets.  Accordingly, Claude Blandin, Bruno Blandin, Patrick Blandin, supported by Leoni, decided to sell the ANCO division of SFI to Atalanta, and the Corman division of SFI to Swiss Chalet, a division of Atalanta, while retaining the accounts receivable and accounts payable of SFI.

121.    Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni intentionally structured the sale to Atalanta and Swiss Chalet as an asset sale to avoid triggering the notice and consent provisions of the Stock Pledge Agreement.

122.    Tom Gellert, Atalanta's President, noted that "ANCO has been one of the most established importers of specialty cheese to the U.S.[,]" and that through this acquisition, Atalanta had "the unique opportunity to solidify [Atalanta's] position as leaders in the specialty cheese and deli categories." *See* Kayla Webb, *Atalanta Corp Acquires ANCO Fine Cheese & Corman Ship Supplies*, Deli Market News (Feb. 7, 2018).

123.    Similarly, Swiss Chalet President Steven D'Onofrio touted the benefits of acquiring Corman, explaining that Corman's "history of tailored service to the Cruise Lines will allow us to expand our reach to this growing market segment." *Id*.

124.    The sale of these assets was in excess of $12 million, more than double what would have been required to pay the outstanding $6.1 in Deferred Installment Payments.

125.    Despite this influx of deal proceeds, at the direction of Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni, SFI failed to pay off any of the Deferred Installment Payments or the payables owed to Zausner's affiliates.  As a result of the wrongdoing of Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni, as alleged herein, it is unclear how the deal proceeds were ultimately distributed and who ultimately received any of those proceeds.

126.    Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni schemed and conspired about how to keep these funds for themselves and divert them away from SFI to entities in which Zausner had no relationship.

127.    Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni conspired to use and did use the purported cash pooling Treasury Agreement to ensure that no portion of the Atalanta deal proceeds would leave the Blandin family and its wholly owned affiliates.

128.    Upon information and belief, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni caused at least some of the deal proceeds to be distributed to C2B for their own ulterior motives and against the interest of SFI and Zausner.

129.    Upon information and belief, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni personally profited from the distribution of at least some of the deal proceeds to C2B, either by pocketing the proceeds directly or by transferring those proceeds to other Blandin owned entities and member companies of C2B.

130.    As set forth above, the C2B allowed **SFI's cash management to "be effectuated by [C2B] through its own systems and methods"** and plainly contemplated that **all of SFI's funds would flow to and be controlled by C2B**. *See* Exhibit E at § 1.2 (emphasis added).

131.    While the Treasury Agreement provided that accurate books and records would be kept of all transfers, upon information and belief, no such records were kept, and funds were transferred across the Blandin Entities and individuals without formal documentation, and transfers back and forth were abundant, making it nearly impossible to trace the flow of funds.

132.    After Claude Blandin, Bruno Blandin, Patrick Blandin, Leoni directed the disbursement of the SFI deal proceeds, SFI was left without adequate funding and became insolvent, and there was no money left to pay the $6.1 million in Deferred Installment Payments.

<u>**Immediately After the Sale,**</u>
<u>**Defendants Retrocede SFI's Share in C2B and Place SFI into Insolvency**</u>

133.    On April 30, 2018, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni caused an ABC Petition to be filed in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, alleging that SFI is indebted to creditors and is unable to pay its debts. *In Re: Assignment for the Benefit of Creditors of Schratter Foods Incorporated*, Case No. 2018-013998-CA-01 ("ABC Proceedings").

134.    By forcing SFI into liquidation, Claude Blandin, Bruno Blandin, Patrick Blandin, Leoni, through their control of ECB USA, Atlantic Ventures, and C2B, destroyed, dissipated and disposed of the value of Zausner's security interest in 90% of the shares of SFI, which was intended to secure ECB USA's and Atlantic Ventures' obligations to pay the Deferred Installment Payments.

135.    Likewise, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni improperly disposed of the Pledged Shares without the requisite prior written notice to and consent from Zausner, as mandated by the Stock Pledge Agreement.

136.    On the very same day the ABC Petition was filed, Claude Blandin, Bruno Blandin, and Patrick Blandin held an "extraordinary general meeting" to amend C2B's Articles of Association and to effect a share assignment of SFI's share in C2B.  *See* Exhibit F.

137.    Indeed, the control over SFI by Claude Blandin, Bruno Blandin, and Patrick Blandin was so absolute and complete that SFI assigned to C2B its likely sole remaining valuable asset, its share in C2B, for no remuneration (other than an inconsequential €10) and against its own interests.

138.    At the "extraordinary general meeting," Bruno Blandin presided as Chairman, while Claude Blandin and Patrick Blandin were identified as "scrutineers."  Bruno Blandin attended as the representative of the Blandin Entities, and Patrick Blandin attended as the representative of three additional entities controlled by the Blandins.  Claude Blandin attended as the representative of SFI, ECB USA, and Atlantic Ventures.

139.    The meeting minutes state that "the company SCHRATTER FOODS is in the process of the assignment of its assets and liabilities [i.e., ABC Proceedings], and that it has been

decided that the share of the GIE C.2.B that it currently holds would be retroceded to the company ETABLISSEMENTS CLAUDE BLANDIN ET FILS." *See* Exhibit F.

140.    The Assignment of Share document was signed by Claude Blandin on behalf of SFI, and by Bruno Blandin on behalf of the Blandin Entities.

141.    By these acts, Claude Blandin, Bruno Blandin, and Patrick Blandin destroyed one of the only remaining assets of value possessed by SFI (its equity in C2B), as well as Zausner's collateral interest in SFI's stock.  This was even more egregious, as by retroceding the share, the Blandins were attempting to terminate any joint and several liability that any other members of C2B would owe as a result of SFI's ownership in C2B.

142.    Incredibly, after forcing SFI to retrocede its share, C2B then alleged that it was the largest creditor of the SFI Assignor Estate, claiming that SFI owed it $12 million. *See* Exhibit G.

143.    Zausner's affiliates are also creditors of SFI's Assignor Estate for an amount in excess of $4 million as a result of all of SFI's post-Closing unpaid payables.

144.    But for the ABC Proceedings, SFI would be named a Defendant in this instant action.

### Claude Blandin, Bruno Blandin, and Patrick Blandin Contrive Multiple Lawsuits as a Pretext to Justify Their Failure to Make Any Deferred Installment Payments

145.    After stripping SFI of its assets without paying Zausner the Deferred Installment Payments, Claude Blandin, Bruno Blandin, and Patrick Blandin (as well as ECB USA and Atlantic Ventures, which the Blandins controlled) began "part two" of their scheme:  initiate a broad litigation campaign to paint themselves as the victims.  To that end, ECB USA and Atlantic Ventures sued Voss and Constantin in separate lawsuits, settling with both.

146.    On August 10, 2018, ECB USA and Atlantic Ventures sued Voss and VEI for contract and fraud claims in *ECB USA. Inc. and Atlantic Ventures, Corp. v. Alain Voss and VEI,*

Circuit Court, in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Complex Business Litigation Division, Case No. 2018-cv-027234-CA-01.  On January 6, 2020, Voss and VEI settled this lawsuit.

147.    On August 22, 2018, ECB USA sued Constantin and Proust for tort and contract claims in *ECB USA, Inc. v. Constantin Associates, LLP*, Circuit Court, in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Complex Business Litigation Division, 2018-028627-CA-01 (44).  On October 24, 2019, the Constantin lawsuit settled pursuant to a settlement agreement, which terms are confidential.  ECB USA's and Atlantic Ventures' claims against Proust were dismissed.

148.    On October 23, 2018, ECB USA and Atlantic Ventures commenced an action in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Complex Business Litigation Division against Zausner, ZNHC (as successor in interest), and Savencia S.A., a French corporation.  The case was removed to federal court, and then transferred to the District Court of Delaware. *See ECB USA, Inc. v. Savencia SA*, No. 19-cv-00731-RGA-CJB.

149.    To date, ECB USA and Atlantic Ventures have failed to pay any Deferred Installment Payment.

150.    On January 31, 2019, pursuant to Section IX.3(c) of the SPA, Zausner provided written notice of its indemnity claim (the "Claim Notice"), the sole and exclusive remedy between the parties for a breach of the SPA, to ECB USA and Atlantic Ventures for breach of their contractual obligation to pay the Deferred Installment Payments.

151.    Specifically, pursuant to Section IX.1(b) of the SPA, Zausner provided written notice of breach and demanded that ECB USA and Atlantic Ventures "defend, indemnify and hold harmless the Seller, . . . from and against any Loss incurred by the Seller arising from, out of or in

connection with or related to the . . . willful breach of any of the . . . covenants or agreements of the Buyer[s] contained in this Agreement," including without limitation interest and attorneys' fees.

152.   On November 30, 2020, Zausner provided an updated written notice of its indemnity claim for all four unpaid Deferred Installment Payments.

## FIRST CAUSE OF ACTION

### (Equitable Accounting of Claude Blandin, Bruno Blandin, Patrick Blandin, Arno Leoni)

153.   Zausner repeats and realleges the allegations set forth in paragraphs 1 through 152, as though fully set forth herein.

154.   Zausner entered into a complex transaction with ECB USA and Atlantic Ventures, through the SPA, as modified by Amendment No. 1.  Zausner is the successor to ZNHC in this transaction by law.  The transaction's multi-tiered structure for securing payment from ECB USA and Atlantic Ventures due under the SPA, which set up a series of Deferred Installment Payments over multiple years with security in the stock of SFI pursuant to the Stock Pledge Agreement, is sufficiently complex and indicative of complex negotiations the parties to the SPA, each of whom was represented by counsel.

155.   ECB USA's and Atlantic Ventures' multiple attempts to avoid their obligations under the deferred payment schedule, including initiating the ABC Proceedings, demonstrate that the breach of contract remedy at law is inadequate to make Zausner whole.  It is unlikely that any judgment on the basis of Zausner's breach of contract claim would be obtainable.

156.   Defendants' actions have created a scenario where they have fraudulently transferred the funds from the sale of SFI assets that could be used to pay off ECB USA and Atlantic Ventures' existing debts to Zausner.

157.    The control of SFI by Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni stems from the same complex transaction, and although Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni are not individual Parties to the SPA, they played essential roles in negotiating the SPA and the subsequent Amendment No. 1.

158.    Following the acquisition, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni directed SFI and C2B to enter into the Treasury Agreement, through which Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni could control all of SFI's assets and cash and distributed them as needed to other Blandin Entities.  The terms of the Treasury Agreement are vague and provide little detail on the cash-pooling arrangement contained therein, thus necessitating the need for an accounting of the assets of Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni to determine the details of these potentially fraudulent transfers to the Blandin Entities or elsewhere, including to Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni, individually, and to one or more of the John Doe Defendants.

159.    Conversations with the Trustee in the ABC Proceeding revealed that SFI's post-sale record-keeping was poor and its financial accounting system was antiquated.

160.    Further, Zausner has no insight into where the proceeds from the Atalanta transaction went after SFI received the funds, in particular, whether the proceeds were directed to the personal accounts of Claude Blandin, Bruno Blandin, Patrick Blandin, and/or Leoni, and/or other entities controlled by the Blandins and/or Leoni.

161.    Because Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni are not parties to the SPA, Zausner cannot assert a breach of contract claim directly against them, despite the significant control and oversight Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni had

over these schemes. As a result, Zausner has no breach of contract claim through which it can obtain an adequate remedy at law.

162.     Under such exceptional circumstances, an equitable accounting is appropriate.

## SECOND CAUSE OF ACTION

**(Tortious Interference with Contract— Claude Blandin, Bruno Blandin,
Patrick Blandin, Arno Leoni)**

163.     Zausner repeats and realleges the allegations set forth in paragraphs 1 through 162, as though fully set forth herein.

164.     A valid contract existed between ZNHC, Zausner's predecessor in interest, and ECB USA and Atlantic Ventures, namely the SPA, Amendment No. 1 thereto, and the Stock Pledge Agreement.

165.     Zausner, as ZNHC's successor in interest, is a party to the contract.

166.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni had knowledge of the SPA, Amendment No. 1, and the Stock Pledge Agreement, having been intimately involved in the negotiations over both contracts.

167.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni took affirmative steps with ulterior motives to prevent ECB USA and Atlantic Ventures from paying the $6.1 million in Deferred Installment Payments owed to Zausner, including, but not limited to, causing ECB USA and Atlantic Ventures (i) to sell SFI's most valuable assets to Atalanta and Swiss Chalet and divert the proceeds of those sales elsewhere instead of having ECB USA and Atlantic Ventures use those funds to pay the Deferred Installment Payments, (ii) to breach the Stock Pledge Agreement by initiating ABC Proceedings for SFI, which destroyed Zausner's collateral interest in 90% of SFI's stock, and retroceding SFI's share in C2B (its last remaining valuable asset), and (iii) to otherwise not pay the Deferred Installment Payments from existing funds within ECB USA's and Atlantic

Ventures' possession, separate and apart from the proceeds from the SFI asset sale to Atalanta and Swiss Chalet.

168.     There was no legal justification for wrongful actions of Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni, nor was it in ECB USA's and Atlantic Ventures' best interest.

169.     As a result of this tortious interference, Zausner has been damaged by an amount to be determined, but no less than $6.1 million.

## THIRD CAUSE OF ACTION

### (Conspiracy to Commit Tortious Interference with Contract— Claude Blandin, Bruno Blandin, Patrick Blandin, Arno Leoni)

170.     Zausner repeats and realleges the allegations set forth in paragraphs 1 through 169, as though fully set forth herein.

171.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni conspired and agreed amongst themselves that ECB USA and Atlantic Ventures would not pay any portion of the $6.1 million due to Zausner under the SPA, as amended by Amendment No. 1.

172.     To accomplish this agreed-upon goal, Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni conspired to cause the sale of the primary assets of SFI to Atalanta and Swiss Chalet, and further structured the deal as an asset sale to avoid triggering the notice and consent provisions of the Stock Pledge Agreement in an effort to prevent Zausner from discovering and seeking judicial intervention to stop their plan.

173.     Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni then caused SFI to enter ABC Proceedings, thus wrongfully disposing of the Pledged Shares of SFI, in which Zausner retained a 90% interest and retroceding SFI's equity interest in C2B, paving the way for SFI to initiate ABC Proceedings and for C2B to claim it was SFI's largest creditor who was owed over $12 million.

174.    Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni also conspired and agreed amongst themselves not to pay the Deferred Installment Payments from existing funds within ECB USA's and Atlantic Ventures' possession and caused such non-payment, separate and apart from the proceeds from the SFI asset sale to Atalanta and Swiss Chalet.

175.    Each of Claude Blandin, Bruno Blandin, Patrick Blandin, and Leoni had a personal stake in this conspiracy because they were all motivated solely to enrich themselves financially by diverting the funds of SFI, ECB USA, and Atlantic Ventures to themselves.

176.    As a result of this conspiracy, Zausner has been damaged by an amount to be determined, but no less than $6.1 million.

## PRAYER FOR RELIEF

WHEREFORE, Zausner prays for relief as follows:

1.    An award to Zausner of damages according to proof in an amount to be determined, but in no event less than $6.1 million;

2.    For pre-and post-judgment interest at the maximum rate allowable by law;

3.    An equitable accounting;

4.    For Zausner's costs of suit and attorneys' fees under Section XII.5 of the SPA; and

5.    For such other and further relief as the Court may deem just and appropriate.

## JURY TRIAL DEMAND

Zausner demands a jury trial in this action on all issues so triable.

Dated this 28th day of April 2022.

/s/ David W. Marston Jr.
David W. Marston Jr.
Florida Bar No. 111636
Email: david.marston@morganlewis.com
Morgan, Lewis & Bockius LLP
600 Brickell Avenue, Suite 1600
Miami, FL  33131-3075
Telephone:  305.415.3443

*Counsel for Plaintiff Zausner Foods Corp.*

# Exhibit A

# SECRETARY'S CERTIFICATE

## OF

## ECB USA INC

July 7, 2015

I, Bruno Blandin, hereby certify to Wells Fargo Bank, National Association (the "Lender"), the lender under the Credit Agreement, dated as of July 7, 2015 (the "Credit Agreement"), by and between the Lender and Schratter Foods Incorporated, a Delaware corporation ("Schratter"); and a party to the Security Agreement, dated as of July 7, 2015 (the "Security Agreement") by and among the Lender, Schratter, Atlantic Ventures Corp, a Florida corporation; Voss Enterprises, Inc., a New York corporation; and ECB USA Inc, a Florida corporation (the "Company"), (the Credit Agreement and the Security Agreement, collectively referred to as the "Loan Documents"), as follows:

(a)     I am the duly elected, qualified and acting Secretary of the Company.

(b)     Attached hereto as Exhibit A is a true, correct and complete filed copy of the Articles of Incorporation of the Company, together with all amendments thereto, as in full force and effect on the date hereof.  No amendment, alteration, revision, or modification to the Articles of Incorporation has been authorized or is being contemplated by the Company.

(c)     Attached hereto as Exhibit B is a true, correct and complete copy of the Bylaws of the Company, together with all amendments thereto, as in full force and effect on the date hereof.  No amendment, alteration, revision, or modification to the Bylaws has been authorized or is being contemplated by the Company.

(d)     Attached hereto as Exhibit C is a true, correct and complete list of certain officers of the Company, each of whom has been duly elected and appointed to, and holds as of the date hereof, the office set forth opposite their respective names as indicated on Exhibit C. The signature set forth opposite the name of each officer is his or her authentic and official signature.

(e)     Attached hereto as Exhibit D is a true, correct and complete copy of all resolutions duly adopted by the Board of Directors of the Company in accordance with the Company's Bylaws and the laws of the State of Florida with respect to the Loan Documents, and all transactions and documents contemplated thereby.  Such resolutions have not been modified, amended, repealed or rescinded and remain in full force and effect as of the date hereof; and such resolutions are the only resolutions adopted by the Company's Board of Directors relating to the matters described therein.

(f)     Attached hereto as Exhibit E is a true and correct copy of the Certificate of Good Standing of the Company, as certified by the Department of State of the State of Florida.

[SIGNATURE PAGE FOLLOWS]

CONFIDENTIAL

IN WITNESS WHEREOF, I have hereunto set my hand as of the date first set forth above.

Name: **Bruno BLANDIN**

Title: Secretary

37094953.1

CONFIDENTIAL

ECBUSA2489280

<u>EXHIBIT A</u>

<u>Articles of Incorporation</u>

See Attached

3709493 1

CONFIDENTIAL

ECBUSA2489281

# Electronic Articles of Incorporation
## For

P14000097833
FILED
**December 05, 2014**
Sec. Of State
nhaney

ECB USA INC

The undersigned incorporator, for the purpose of forming a Florida profit corporation, hereby adopts the following Articles of Incorporation:

## Article I
The name of the corporation is:

ECB USA INC

## Article II
The principal place of business address:

100 N BISCAYNE BOULEVARD
SUITE 500
MIAMI, FL. 33132

The mailing address of the corporation is:

100 N BISCAYNE BOULEVARD
SUITE 500
MIAMI, FL. 33132

## Article III
The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV
The number of shares the corporation is authorized to issue is:

100

## Article V
The name and Florida street address of the registered agent is:

JADE ASSOCIATES MIAMI INC
100 N BISCAYNE BOULEVARD
SUITE 500
MIAMI, FL. 33132

I certify that I am familiar with and accept the responsibilities of registered agent.

Registered Agent Signature:  OLIVIER SUREAU

CONFIDENTIAL

P14000097833
FILED
December 05, 2014
Sec. Of State
nhaney

## Article VI

The name and address of the incorporator is:

JADE ASSOCIATES MIAMI INC
100 N BISCAYNE BOULEVARD
SUITE 500
MIAMI, FL 33132

Electronic Signature of Incorporator:  OLIVIER SUREAU

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:  P
CLAUDE  BLANDIN
2 MERS, ZAC DE MOUDONG SUD
BAIE MAHAULT, ..  97122  FR

Title:  S
BRUNO  BLANDIN
2 MERS, ZAC DE MOUDONG SUD
BAIE MAHAULT, ..  97122  FR

Title:  T
ARNAUD  LEONI
2 MERS, ZAC DE MOUDONG SUD
BAIE MAHAULT, ..  97122  FR

ECBUSA2489283

EXHIBIT B

Bylaws

See Attached

3709493 1

CONFIDENTIAL

ECBUSA2489284

**BY-LAWS**

**OF**

**ECB USA INC**

ARTICLE I—OFFICES

SECTION 1. PRINCIPAL PLACE OF BUSINESS

The initial location of the principal place of business of the corporation shall be as specified in the Articles of Incorporation, and may be changed from time to time by Resolution of the Board of Directors. It may be located at any place within or outside the State of Florida.

SECTION 2. OTHER OFFICES

The corporation may also have offices at such other places as the Board of Directors may from time to time designate, or as the business of the corporation may require.

ARTICLE II—SHAREHOLDERS

SECTION 1. PLACE OF MEETINGS

All meetings of the shareholders shall be held either in Miami, Florida; Paris, France; Fairfield, New Jersey, or at such other places, within or outside the State of Florida, as the Board of Directors may determine from time to time.

SECTION 2. ANNUAL MEETINGS

The annual meeting of the shareholders shall be held in the month of January of each year, at the time and place designated by the Board of Directors of the corporation, at which time the shareholders shall elect a Board of Directors and transact any other proper business that may come before the annual meeting of shareholders, the exact date to be established by the Board of Directors from time to time.

SECTION 3. SPECIAL MEETINGS

Special meetings of the shareholders may be called by the Board of Directors or by the shareholders. In order for a special meeting to be called by the shareholders, ten (10%) per cent or more of all the votes entitled to be cast on any issue proposed to be considered at the

CONFIDENTIAL

ECBUSA2489285

proposed special meeting shall sign, date and deliver to the Secretary one or more written demands for the meeting, describing the purpose or purposes for which it is to be held. Business transacted at any special meeting of shareholders shall be limited to the purposes stated in the notice. The Secretary shall issue the call for special meetings unless the President, the Board of Directors, or the shareholders designate another person to make the call. The Board of Directors may designate any place, either within or without the state of Florida, as the place of meeting for any annual or special meeting of the shareholders.

SECTION 4. NOTICE OF MEETINGS

Notice of all shareholders' meetings, whether annual or special, shall be given to each shareholder of record entitled to vote at such meeting no fewer than 10 or more than 60 days before the meeting date. The notice shall include the date, time and place of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Only the business within the purpose or purposes included in the notice of special meeting may be conducted at a special shareholders' meeting.

Notice of shareholders' meetings may be given orally or in writing, by or at the direction of the President, the Secretary or the officer or persons calling the meeting. Notice of meetings may be communicated in person, by telephone, facsimile machine, or other form of electronic communication; or by mail. If mailed, notice of the meeting shall be deemed to be delivered when deposited in the United States mail, addressed to the shareholder at the shareholder's address as it appears on the stock transfer books of the corporation, with postage prepaid.

When a meeting is adjourned to a different date, time or place, it shall not be necessary to give any notice of the meeting at which the adjournment is taken, and any business may be transacted at the adjourned meeting that might have been transacted on the original date of the meeting. If, however, after the adjournment, the Board fixes a new record date for the adjourned meeting, notice of the adjourned meeting in accordance with the preceding paragraphs of this Bylaw shall be given to each person who is a shareholder as of the new record date and is entitled to vote at such meeting.

SECTION 5. WAIVER OF NOTICE AND CALL

A shareholder may waive any notice or call required by the Florida Statutes, the Articles of Incorporation or these Bylaws before or after the date and time stated in the notice. The waiver must be in writing, be signed by the shareholder entitled to the notice, and be delivered to the

CONFIDENTIAL

ECBUSA2489286

corporation for inclusion in the minutes or filing with the corporate records. Neither the business to be transacted at nor the purpose of any meeting shall be required as to any shareholder who shall attend the meeting in person or by proxy, except that when the shareholder attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

SECTION 6.  QUORUM

Except as otherwise provided in these bylaws or in the Articles of Incorporation, a majority of the outstanding shares of the corporation entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of the shareholders and, except as otherwise provided in the Articles of Incorporation, the vote, in person or by proxy, of the holders of a majority of the shares constituting this quorum shall be the act of the stockholders of the corporation.  If less than a majority of the outstanding shares are represented at a meeting, a majority of the shares so represented may adjourn the meeting from time to time without further notice. At the adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.  The shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.

SECTION 7.  VOTING LISTS

Each shareholder entitled to vote shall be entitled at every meeting of the shareholders to one vote in person or by proxy for each share of voting stock held by the shareholder.  The right to vote shall be subject to the right of the Board of Directors to close the transfer books or to fix a record date for voting stockholders as hereinafter provided.

SECTION 8. PROXIES

At all meetings of shareholders, a shareholder may vote by proxy, executed in writing by the shareholder or by the shareholder's duly authorized attorney-in-fact, but no proxy shall be valid after 11 months from its date unless the proxy provides for a longer period.  Each proxy shall be filed with the Secretary of the corporation before or at the time of the meeting.  In the event that a proxy shall designate two or more persons to act as proxies, a majority of those persons present at the meeting shall have all of the powers conferred by the proxy on all the persons so designated, unless the instrument provides otherwise.

CONFIDENTIAL

SECTION 9. INFORMAL ACTION BY SHAREHOLDERS

Unless otherwise provided in the Articles of Incorporation, any action required to be taken at a meeting of the shareholders, or any other action that may be taken at a meeting of the stockholders, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the shareholders holding not less than the minimum number of shares that would be necessary to authorize or take the action at a meeting at which all shares entitled to vote were present and voted. If less than all stockholders consent, then within 10 days after this action is authorized by written consent, the shareholders who did not consent must be given written notice of the action taken.

SECTION 10. INSPECTORS

For each meeting of the shareholders, the Board of Directors or the President may appoint two inspectors to supervise the voting. If inspectors are appointed, all questions concerning the qualification of any vote, the validity of any proxy, and the acceptance or rejection of any vote shall be decided by the inspectors. Before acting at any meeting, the inspectors shall take an oath to execute their duties with strict impartiality and according to the best of their ability. If any inspector shall fail to be present or shall decline to act, the President shall appoint another inspector to act. In case of a tied vote by the inspectors on any question, the presiding officer shall decide the issue.

ARTICLE III—BOARD OF DIRECTORS

SECTION 1. GENERAL POWERS

The business and affairs of the corporation shall be managed by the Board of Directors. The Board of Directors may exercise all the powers of the corporation and take all lawful acts, except for those acts that are required or directed to be exercised only by the shareholders.

SECTION 2. NUMBER, TENURE AND QUALIFICATIONS

The number of directors of the corporation shall be not less than three nor more than seven, and shall be fixed by the shareholders at any annual or special meeting. Each director shall hold office until the next annual meeting of the shareholders and until each director's successor shall have been duly elected and shall have qualified, unless the director sooner dies, resigns or is removed by the shareholders any annual or special meeting. It shall not be necessary for directors to be stockholders of the corporation in order to serve as a director. No minor shall serve as a director.

ECBUSA2489288

SECTION 3. ANNUAL MEETING OF DIRECTORS

After each annual meeting of shareholders, the Board of Directors shall hold its annual meeting at the same place and immediately following the annual meeting of shareholders for the purpose of the election of officers and the transaction of other business as may come before the meeting; and, if a majority of the Directors are present at the place and time, no previous notice of the meeting shall be required to be given to the Directors. The place and time of the meeting may be varied by written consent of all the Directors.

SECTION 4. REGULAR MEETINGS

Regular meetings of the Board of Directors may be held without notice at the time and at the place as shall be determined from time to time by the Board of Directors. Until the Board decides otherwise, regular meetings of the Board of Directors shall be held on a monthly or bi-monthly basis, in person or by telephone communication, in Miami, Florida; Paris, France; Guadeloupe; or in Fairfield, New Jersey, as determined by the Board of Directors at the Annual Meeting of the Board of Directors.

SECTION 5. SPECIAL MEETINGS

Special meetings of the Board of Directors may be called by the Chairman, the President, or any two directors. The person or persons authorized to call special meetings may fix the place for holding any special meetings of the Board of Directors. If no designation is made, the place of meeting shall be the principal office of the corporation in the state of Florida.

SECTION 6. NOTICE

Written notice stating the place, day and hour of the meeting shall be delivered at least 3 days before the meeting to each director, either personally or by mail or e-mail to the director's business address.

If notice is given by mail, the notice shall be deemed to be delivered when deposited in the United States mail addressed with prepaid postage. If notice is given by e-mail, the notice shall be deemed to be delivered when return receipt is received by the sender. Any director may waive notice of any meeting, either before, at, or after the meeting. The attendance of a director at a meeting shall constitute a waiver of notice of the meeting, except when a director attends a meeting for the express purpose of objecting to the transaction of any business because the meting is not lawfully called or convened.

ECBUSA2489289

SECTION 7.  QUORUM

A majority of the total number of directors as determined from time to time shall constitute a quorum, but a smaller number may adjourn from time to time, without further notice, until a quorum is secured.

SECTION 8.  MANNER OF ACTING

The act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

SECTION 9.  REMOVAL

Any director may be removed by the shareholders at any meeting of the shareholders called expressly for that purpose whenever in the judgment of the shareholders the best interests of the corporation will be served by that director's removal, but this removal shall be without prejudice to the contract rights, if any, of the person removed.  This bylaw shall not be subject to change by the Board of Directors.

SECTION 10.  VACANCIES

Any vacancy occurring in the Board of Directors, including any vacancy created by reason of an increase in the number of directors, may be filled by the affirmative vote of a majority of the remaining directors, although less than a quorum of the Board of Directors, unless otherwise provided in the Articles of Incorporation.  A director elected to fill a vacancy shall be elected for the unexpired term of the director's predecessor in office.

SECTION 11.  COMPENSATION

By resolution of the Board of Directors, the directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors, and may be paid a fixed sum for attendance at each meeting of the Board of Directors, or a stated salary as directors.  No payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor.

SECTION 12.  PRESUMPTION OF ASSENT

A director of the corporation who is present at a meeting of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless the director votes against the action or abstains from voting in respect to the matter because of an asserted conflict of interest.

CONFIDENTIAL

SECTION 13.  INFORMAL ACTION BY BOARD

Any action required or permitted to be taken by any provisions of law, the Articles of Incorporation, or these bylaws, at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if a written consent is signed by all members of the Board or of any committee, as the case may be.

SECTION 14.  MEETING BY TELEPHONE

Directors or the members of any committee thereof shall be deemed present at a meeting of the Board of Directors or of any committee, as the case may be, if the meeting is conducted using a conference telephone or similar communications equipment or computer program by means of which all persons participating in the meeting can hear each other at the same time.

ARTICLE IV—OFFICERS

SECTION 1.  NUMBER

The officers of the corporation shall consist of a President, a Secretary, and a Treasurer, each of whom shall be elected by the Board of Directors.  The Board of Directors may also elect a Chairman of the Board, one or more Vice Presidents, one or more Assistant Secretaries and Assistant Treasurers, and other officers as the Board of Directors shall deem appropriate.  Two or more offices may be held by the same person.

SECTION 2.  ELECTION AND TERM OF OFFICE

The officers of the corporation shall be elected annually by the Board of Directors at the annual meeting of the board.  If the election of officers shall not be held at the meeting, the election shall be held as soon thereafter as is convenient.  Each officer shall hold office until that officer's successor has been duly elected and qualified, unless the officer sooner dies, resigns or is removed by the Board of Directors.

SECTION 3.  REMOVAL

Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors whenever, in its judgment, the best interests of the corporation will be served, but the removal shall be without prejudice to the contract rights, if any, of the person removed.

ECBUSA2489291

SECTION 4. VACANCIES

A vacancy in any office because of death, resignation, removal, disqualification or otherwise may be filled by the Board of Directors for the unexpired portion of the term.

SECTION 5. DUTIES OF OFFICERS

The Chairman of the Board of the corporation, or the President if there shall not be a Chairman, shall preside at all meetings of the Board of Directors and of the shareholders. The President shall be the chief executive officer of the corporation. Subject to the foregoing, the officers of the corporation shall have powers and duties as ordinarily pertain to their respective offices, and any additional powers and duties specifically conferred by law, the Articles of Incorporation, and these bylaws, or as may be assigned to them from time to time by the Board of Directors.

SECTION 6. SALARIES

The salaries of the officers shall be fixed from time to time by the Board of Directors, and no officer shall be prevented from receiving a salary by reason of the fact that the officer is also a director of the corporation.

SECTION 7. DELEGATION OF DUTIES

In the absence or disability of any officer of the corporation, or for any other reason deemed sufficient by the Board of Directors, the board may delegate the powers or duties of the officer to any other officer or any other director, either temporarily or permanently.

SECTION 8. POWERS OF ACTING OFFICERS.

If any officer is unable to perform the duties of his or her office, the powers and duties of that officer shall be held and performed by that officer of the corporation highest on the list of successors who shall be available and capable of holding and performing these powers and duties. That acting officer selected shall hold and perform the powers and duties and shall serve in that capacity until the officer again becomes capable of holding and performing the powers and duties of that office, or until the Board of Directors shall have elected a new officer or designated another individual as acting officer. Each acting officer so appointed shall be entitled to exercise all powers invested by law, the Articles of Incorporation, these bylaws, and the Board of Directors in the office in which the person is serving. Anyone transacting business with the corporation may rely on a certificate signed by any two officers of the

CONFIDENTIAL

corporation that a specified individual has succeeded to the powers and duties of the President or any other specified office.

## ARTICLE V—INDEMNIFICATION OF DIRECTORS AND OFFICERS

### SECTION 1. GENERAL

To the fullest extent permitted by law, the corporation shall indemnify any person who was or is a party, or threatened to be made a party, to any threatened, pending or completed action, lawsuit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that the person is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director of officer of another corporation, partnership, joint venture, trust, or other enterprise affiliated with this corporation, against expenses (including attorneys' fees), judgments, fines, and the amounts paid in settlement actually and reasonably incurred by the person in connection with the action, lawsuit, or proceeding, including any appeal thereof, if the person acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful.  The termination of any action, lawsuit or proceeding by judgment, order, settlement or conviction, or on a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner that the person reasonably believed to be in, or not opposed to, the best interests of the corporation or, with respect to any criminal action or proceeding, create a presumption that the person had reasonable cause to believe that the person's conduct was unlawful.

### SECTION 2. ACTIONS BY, OR DERIVATIVELY ON BEHALF OF, THE CORPORATION

In any action, lawsuit, or proceeding, threatened, pending or completed, by or in the right of the corporation, indemnification shall be made as provided in Section 1 of this Article, except that no indemnification shall be made in respect of any claim, issue, or matter of which the person shall have been adjudged to be liable for negligence or misconduct in the performance of the person's duty to the corporation, unless and only to the extent that the court in which the action or lawsuit was brought shall determine on application that, despite the adjudication of liability but in view of all the circumstances of the case, the person is fairly and reasonably entitled to indemnity for the expenses which the court shall deem proper.

ECBUSA2489293

SECTION 3. HOW EFFECTED

Indemnification under Section 1 or Section 2 of this Article, unless under a determination by a court, shall be made by the corporation only as authorized in the specific case by a determination that the indemnification is proper in the circumstances because the indemnified person has met the applicable standard of conduct set forth in Section 1 or Section 2 hereof. This determination shall be made by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to the action, lawsuit or proceeding to which the indemnification relates or by the shareholders by a majority vote of a quorum consisting of shareholders who were not parties to the action, lawsuit, or proceeding to which the indemnification relates. If a director, officer, employee, agent for, or attorney acting on behalf of the corporation has been successful on the merits or otherwise in defense of any action, lawsuit or proceeding referred to in Section 1 or Section 2 of this Article, or in the defense of any claim, issue or matter therein, the corporation shall be obligated on proper application to indemnify the person in respect of expenses (including attorneys' fees) actually and reasonably incurred by the person in connection therewith.

SECTION 4. PREPAYMENT OF EXPENSES

Expenses (including attorneys' fees) incurred in defending a civil or criminal action, lawsuit, or proceeding may be paid by the corporation in advance of the final disposition of the action, lawsuit or proceeding on a preliminary determination following one of the procedures set forth in Section 3 of this Article that the indemnified person meets the applicable standard of conduct referred to therein and after receipt of an undertaking satisfactory in form and substance to the corporation that the person will promptly repay the amount unless it shall ultimately be determined that the person is entitled to be indemnified by the corporation as authorized in this Article.

SECTION 5. NONEXCLUSIVITY

The indemnification provided by this Article shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any bylaw, agreement, vote of shareholders or disinterested directors, or otherwise, both as to action in any official capacity and as to action in any other capacity while holding office with the corporation. The Board of Directors may, at any time, approve indemnification of any other person that the corporation has the power by law to indemnify, including without limitation, employees, agents and attorneys of the corporation. The indemnification provided for in this Article shall continue for any person who has ceased to be a director,

ECBUSA2489294

officer, employee or agent or attorney and shall inure to the benefit of the person's heirs and personal representatives.

## ARTICLE VI—INTERESTED PARTIES

### SECTION 1. GENERAL

No contract or other transaction between the corporation and any one or more of its directors or any other corporation, firm, association, or entity in which one or more of its directors are directors or officers or are financially interested shall be either void or voidable because of the relationship or interest, because the director or directors were present at the meeting of the Board of Directors of a committee thereof that authorizes, approves, or ratifies the contract or transaction, or because the director's or directors' votes are counted for this purpose if: (a) the fact of the relationship or interest is disclosed or known to the Board of Directors or committee that authorizes, approves, or ratifies the contact or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of the interested directors; (b) the fact of the relationship or interest is disclosed or known to the shareholders entitled to vote on the matter, and they authorize, approve, or ratify the contract or transaction by vote or written consent; or (c) the contract or transaction is fair and reasonable as to the corporation at the time it is authorized by the Board of Directors, a committee thereof, or the shareholders.

### SECTION 2. DETERMINATION OF QUORUM

Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or a committee thereof that authorizes, approves, or ratifies a contract or transaction referred to in Section 1 of this Article.

## ARTICLE VII—CERTIFICATES OF STOCK

Shares of stock shall be issued from the corporation's Stock Certificate Book; and all issuances and transfers thereof shall be recorded in the corporation's Stock Record Book.

## ARTICLE VIII—RECORD DATE

The Board of Directors is authorized from time to time to fix in advance a date, nor more than 60 days nor less than 10 days before the date of any meeting of shareholders, or nor more than 60 days before the date for the payment of any dividend or the date for the allotment of rights, or the date when any change or conversion or exchange of stock

ECBUSA2489295

shall go into effect, or a date in connection with the obtaining of the consent of shareholders for any purpose, as a record date for the determination of the shareholders entitled to notice of and to vote at the meeting and any adjournment thereof, or entitled to received payment of a dividend, or to an allotment, or to exercise the rights in respect of any change, conversion or exchange of stock or to give consent as the case may be; and those shareholders as shall be shareholders of record as of the close of business on the date so fixed shall be entitled to notice of and to vote at the meeting and any adjournment thereof, or to receive payment of a dividend, or to receive an allotment of rights, or to exercise the rights or to given consent, as the case may be, notwithstanding any transfer of any stock on the books of the corporation after the record date is fixed.

### ARTICLE IX—DIVIDENDS

The Board of Directors may from time to time declare, and the corporation may pay, dividends on its outstanding shares of common stock in the manner and on the terms and conditions provided by law. Subject to the provisions of law, dividends may be paid in cash or property, including shares of stock or other securities of the corporation.

### ARTICLE X—FISCAL YEAR

The fiscal year of the corporation shall be the period selected by the Board of Directors as the taxable year of the corporation for federal tax purposes.

### ARTICLE XI—SEAL

The corporate seal shall have the name of the corporation and the year of the incorporation inscribed thereon, and may be a facsimile, engraved, printed or impression seal. An impression of the seal appears on the margin of this Article.

### ARTICLE XII—STOCK IN OTHER CORPORATIONS

Shares of stock in other corporations held by the corporation shall be voted by the officer or officers of the corporation as the Board of Directors shall from time to time designate for the purpose or by a proxy that is duly authorized by the Board of Directors.

### ARTICLE XIII—AMENDMENTS

These bylaws may be altered, amended or repealed, and new bylaws may be adopted by the Board of Directors, provided that any

ECBUSA2489296

bylaws or amendment as adopted by the Board of Directors may be altered, amended or repealed by vote of the shareholders entitled to vote, or a new bylaw in lieu thereof may be adopted by the shareholders. No bylaw that has been altered, amended, or adopted by the vote of the shareholders may be altered, amended or repealed by a vote of the directors until two years have passed since the vote of the shareholders.

**WITNESSETH**, these bylaws were duly adopted by the Board of Directors of **ECB USA INC** on the __6ᵗʰ__ day of December 2014.

Bruno BLANDIN, Director

Claude BLANDIN, Director

Arno LEONI, Director

EXHIBIT C

Officers

Name and Title                          Signature

Claude BLANDIN, President

Bruno BLANDIN, Secretary

Arno LEONI, TREASURER

3709493.1

CONFIDENTIAL                                     ECBUSA2489298

EXHIBIT D

Resolutions of the Board of Directors

**ECB USA INC**

See attached

3709493 1

CONFIDENTIAL

ECBUSA2489299

## ECB USA INC

### WRITTEN CONSENT BY ALL

### DIRECTORS AND SOLE SHAREHOLDER

#### IN LIEU OF A SPECIAL MEETING

On the 26th day of June 2015, in accordance with Sections 607.0821(1) and 607.0704(1) of the Florida Statutes, all the Directors and the sole Shareholder of **ECB USA INC** (the "Company") hereby consent to and approve the following resolutions:

**WHEREAS**, pursuant to a proposed Credit Agreement (as may be amended, restated or otherwise modified from time to time, the "Credit Agreement") by and between Schratter Foods Incorporated, a Delaware corporation ("Schratter Foods") and Wells Fargo Bank, National Association (the "Lender"), the Lender has agreed to make certain advances and other extensions of credit to Schratter Foods as provided in the Credit Agreement; and

**WHEREAS**, as a condition to making advances and other extensions of credit to Schratter Foods pursuant to the Credit Agreement, the Lender requires the execution and delivery by Schratter Foods and by each Grantor (as defined below) of the Security Agreement described below; and by each Grantor of the Guaranty described below;

**WHEREAS**, the Company desires to enter into the Security Agreement, substantially in the form presented to the Board and the Shareholders, by and among Schratter Foods; Atlantic Ventures Corp, a Florida corporation; Voss Enterprises, Inc., a New York corporation; and the Company (collectively, the "Grantors"); and the Lender (the "Security Agreement"), pursuant to which, among other things, the Grantors grant to the Lender a security interest in the Collateral, as defined in the Security Agreement; and

**WHEREAS**, the Company desires to execute the Guaranty, substantially in the form presented to the Board and the Shareholders, in favor of the Lender, pursuant to which the Company guarantees certain obligations of Schratter Foods to the Lender; and

**WHEREAS**, the Board and the sole Shareholder of the Company

ECBUSA2489300

have been presented with, and have reviewed, the Security Agreement and the Guaranty; and

**WHEREAS,** the Board and the sole Shareholder believe it is in the best interests of the Company and its Shareholder to enter into the Security Agreement and to execute the Guaranty for the purposes stated therein;

**NOW, THEREFORE, IT IS**

**RESOLVED** that the Board and the sole Shareholder of the Company hereby declare the Security Agreement, the Guaranty, and the related agreements (the "Security Documents") advisable and in the best interests of the Company and its Shareholders; and it is

**FURTHER RESOLVED,** that the Board and the sole Shareholder hereby authorize and approve the form, terms and provisions of the Security Documents, including all exhibits and schedules attached thereto, and all such agreements, instruments, certificates and other documents in connection with the transactions contemplated by the Security Documents; and be it

**FURTHER RESOLVED,** that the President, Vice President, Treasurer, Secretary and any other officer of the Company (each such person, an "Authorized Officer") are, and each of them hereby is, authorized, directed and empowered, in the name and on behalf of the Company, to negotiate the terms and conditions of the Security Documents, and such Authorized Officer or Authorized Officers are, and each of them hereby is, authorized, directed and empowered to execute and deliver such agreements, including all exhibits and schedules attached thereto, in the name and on behalf of the Company with such additions, deletions or changes therein (including, without limitation, any additions, deletions or changes to any schedules or exhibits thereto) as the Authorized Officer executing the same shall deem necessary or appropriate (the execution and delivery thereof by any such Authorized Officer to be conclusive evidence of approval).

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

ECBUSA2489301

**IN WITNESS WHEREOF** all the Directors and the sole Shareholder of the Company have executed this Written Consent of Directors and Sole Shareholder of the Company on the day and year first written above.

DIRECTORS:

Claude BLANDIN

Arno LEONI

Bruno BLANDIN

SOLE SHAREHOLDER:

ECB et FILS

BY:
Claude BLANDIN, President

CONFIDENTIAL

ECBUSA2489302

<u>EXHIBIT E</u>

GOOD STANDING CERTIFICATE

D-

1705480 1

CONFIDENTIAL

ECBUSA2489303

# *State of Florida*
# *Department of State*

I certify from the records of this office that ECB USA INC is a corporation organized under the laws of the State of Florida, filed on December 5, 2014.

The document number of this corporation is P14000097833.

I further certify that said corporation has paid all fees due this office through December 31, 2015, that its most recent annual report/uniform business report was filed on April 23, 2015, and that its status is active.

I further certify that said corporation has not filed Articles of Dissolution.

*Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-sixth day of June, 2015*



*Ken Detzner*

**Secretary of State**

Tracking Number: CU3930391411

To authenticate this certificate,visit the following site,enter this number, and then follow the instructions displayed.

https://services.sunbiz.org/Filings/CertificateOfStatus/CertificateAuthentication

CONFIDENTIAL

ECBUSA2489304

# Exhibit B

# SECRETARY'S CERTIFICATE

## OF

## ATLANTIC VENTURES CORP

July 7, 2015

I, Bruno Blandin, hereby certify to Wells Fargo Bank, National Association (the "Lender"), the lender under the Credit Agreement, dated as of July 7, 2015 (the "Credit Agreement"), by and between the Lender and Schratter Foods Incorporated, a Delaware corporation ("Schratter"); and a party to the Security Agreement, dated as of July 7, 2015 (the "Security Agreement") by and among the Lender, Schratter, Atlantic Ventures Corp, a Florida corporation (the "Company"); Voss Enterprises, Inc., a New York corporation; and ECB USA Inc, a Florida corporation, (the Credit Agreement and the Security Agreement, collectively referred to as the "Loan Documents"), as follows:

(a)     I am the duly elected, qualified and acting Secretary of the Company.

(b)     Attached hereto as Exhibit A is a true, correct and complete filed copy of the Articles of Incorporation of the Company, together with all amendments thereto, as in full force and effect on the date hereof. No amendment, alteration, revision, or modification to the Articles of Incorporation has been authorized or is being contemplated by the Company.

(c)     Attached hereto as Exhibit B is a true, correct and complete copy of the Bylaws of the Company, together with all amendments thereto, as in full force and effect on the date hereof.  No amendment, alteration, revision, or modification to the Bylaws has been authorized or is being contemplated by the Company.

(d)     Attached hereto as Exhibit C is a true, correct and complete list of certain officers of the Company, each of whom has been duly elected and appointed to, and holds as of the date hereof, the office set forth opposite their respective names as indicated on Exhibit C. The signature set forth opposite the name of each officer is his or her authentic and official signature.

(e)     Attached hereto as Exhibit D is a true, correct and complete copy of all resolutions duly adopted by the Board of Directors of the Company in accordance with the Company's Bylaws and the laws of the State of Florida with respect to the Loan Documents, and all transactions and documents contemplated thereby.  Such resolutions have not been modified, amended, repealed or rescinded and remain in full force and effect as of the date hereof; and such resolutions are the only resolutions adopted by the Company's Board of Directors relating to the matters described therein.

(f)     Attached hereto as Exhibit E is a true and correct copy of the Certificate of Good Standing of the Company, as certified by the Department of State of the State of Florida.

[SIGNATURE PAGE FOLLOWS]

CONFIDENTIAL

IN WITNESS WHEREOF, I have hereunto set my hand as of the date first set forth above.

Name: **Bruno BLANDIN**

Title: Secretary

3769493.1

CONFIDENTIAL

ECBUSA2489160

EXHIBIT A

Articles of Incorporation

See Attached

3709493.1

CONFIDENTIAL

ECBUSA2489161

# Electronic Articles of Incorporation
## For

ATLANTIC VENTURES CORP

P14000097868
**FILED**
**December 08, 2014**
**Sec, Of State**
jahickman

The undersigned incorporator, for the purpose of forming a Florida
profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

ATLANTIC VENTURES CORP

## Article II

The principal place of business address:

100 N BISCAYNE BOULEVARD
SUITE 500
MIAMI, FL.  33132

The mailing address of the corporation is:

100 N BISCAYNE BOULEVARD
SUITE 500
MIAMI, FL.  33132

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The number of shares the corporation is authorized to issue is:

100

## Article V

The name and Florida street address of the registered agent is:

JADE ASSOCIATES MIAMI INC
100 N BISCAYNE BOULEVARD
SUITE 500
MIAMI, FL.  33132

I certify that I am familiar with and accept the responsibilities of
registered agent.

Registered Agent Signature:  OLIVIER SUREAU

CONFIDENTIAL

ECBUSA2489162

P14000097868
FILED
December 08, 2014
Sec. Of State
jahickman

## Article VI

The name and address of the incorporator is:

JADE ASSOCIATES MIAMI INC
100 N BISCAYNE BOULEVARD
SUITE 500
MIAMI, FL 33132

Electronic Signature of Incorporator:  OLIVIER SUREAU

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:  P
CLAUDE  BLANDIN
2 MERS, ZAC DE MOUDONG SUD
BAIE MAHAULT, ..  97122  FR

Title:  S
BRUNO  BLANDIN
2 MERS, ZAC DE MOUDONG SUD
BAIE MAHAULT, ..  97122  FR

Title:  T
ARNAUD  LEONI
2 MERS, ZAC DE MOUDONG SUD
BAIE MAHAULT, ..  97122  FR

CONFIDENTIAL

ECBUSA2489163

# COVER LETTER

**TO:**   Amendment Section
Division of Corporations

**SUBJECT:**   **ATLANTIC VENTURES CORP**

<span style="font-size:small">Name of Corporation</span>

**DOCUMENT NUMBER:**  P14000097868

The enclosed Articles of Correction and fee are submitted for filing.

Please return all correspondence concerning this matter to the following:

**ALAIN VOSS**

<span style="font-size:small">Name of Contact Person</span>

**ATLANTIC VENTURES CORP**

<span style="font-size:small">Firm/Company</span>

**100 N BISCAYNE BLVD SUITE 500**

<span style="font-size:small">Address</span>

**MIAMI, FL 33132**

<span style="font-size:small">City/State and Zip Code</span>

**OSUREAU@JADE-ASSOCIATES.COM**

<span style="font-size:small">E-mail address: (to be used for future annual report notification)</span>

For further information concerning this matter, please call:

**ALAIN VOSS**        at ( **305** )  **579-0220**

<span style="font-size:small">Name of Contact Person</span>          <span style="font-size:small">Area Code & Daytime Telephone Number</span>

Enclosed is a check for the following amount:

■ $35.00 Filing Fee        ☐ $43.75 Filing Fee & Certificate of Status

☐ $43.75 Filing Fee & Certified Copy     ☐ $52.50 Filing Fee, Certificate of Status &
                            Certified Copy

**Mailing Address:**              **Street Address:**
Amendment Section               Amendment Section
Division of Corporations          Division of Corporations
P.O. Box 6327                Clifton Building
Tallahassee, FL 32314            2661 Executive Center Circle
                         Tallahassee, FL 32301

FILED
14 DEC 23 PM 10: 34
SECRETARY OF STATE
TALLAHASSEE. FLORIDA

CONFIDENTIAL

ECBUSA2489164

# ARTICLES OF CORRECTION

For

## ATLANTIC VENTURES CORP
Name of Corporation as currently filed with the Florida Dept. of State

### P14000097868
Document Number (if known)

Pursuant to the provisions of Section 607.0124 or 617.0124, Florida Statutes, this corporation files these Articles of Correction within 30 days of the file date of the document being corrected.

These articles of correction correct ARTICLES OF INCORPORATION - OFFICER DETAIL
(Document Type Being Corrected)

filed with the Department of State on 12/08/2014
(File Date of Document)

Specify the inaccuracy, incorrect statement, or defect:

THE PRESIDENT OF "ATLANTIC VENTURES CORP" IS NOT M CLAUDE BLANDIN

Correct the inaccuracy, incorrect statement, or defect:

M CLAUDE BLANDIN IS THE VICE PRESIDENT

M Alain VOSS IS THE PRESIDENT

HIS ADDRESS :

235 UPPER SHAD ROAD

POUND RIDGE, NY 10576

(Signature of a director, president or other officer - if directors or officers have not been selected, by an incorporator - if in the hands of the receiver, trustee, or other court appointed fiduciary, by that fiduciary.)

CLAUDE BLANDIN
(Typed or printed name of person signing)

VICE PRESIDENT
(Title of person signing)

**Filing Fee: $35.00**

CONFIDENTIAL

ECBUSA2489165

EXHIBIT B

Bylaws

See Attached

CONFIDENTIAL

ECBUSA2489166

# BY-LAWS

## OF

## ATLANTIC VENTURES CORP

### ARTICLE I—OFFICES

### SECTION 1. PRINCIPAL PLACE OF BUSINESS

The initial location of the principal place of business of the corporation shall be as specified in the Articles of Incorporation, and may be changed from time to time by Resolution of the Board of Directors. It may be located at any place within or outside the State of Florida.

### SECTION 2. OTHER OFFICES

The corporation may also have offices at such other places as the Board of Directors may from time to time designate, or as the business of the corporation may require.

### ARTICLE II—SHAREHOLDERS

### SECTION 1. PLACE OF MEETINGS

All meetings of the shareholders shall be held either in Miami, Florida; Paris, France; Fairfield, New Jersey, or at such other places, within or outside the State of Florida, as the Board of Directors may determine from time to time.

### SECTION 2. ANNUAL MEETINGS

The annual meeting of the shareholders shall be held in the month of January of each year, at the time and place designated by the Board of Directors of the corporation, at which time the shareholders shall elect a Board of Directors and transact any other proper business that may come before the annual meeting of shareholders, the exact date to be established by the Board of Directors from time to time.

### SECTION 3. SPECIAL MEETINGS

Special meetings of the shareholders may be called by the Board of Directors or by the shareholders. In order for a special meeting to be called by the shareholders, ten (10%) per cent or more of all the votes entitled to be cast on any issue proposed to be considered at the

CONFIDENTIAL

ECBUSA2489167

proposed special meeting shall sign, date and deliver to the Secretary one or more written demands for the meeting, describing the purpose or purposes for which it is to be held. Business transacted at any special meeting of shareholders shall be limited to the purposes stated in the notice. The Secretary shall issue the call for special meetings unless the President, the Board of Directors, or the shareholders designate another person to make the call. The Board of Directors may designate any place, either within or without the state of Florida, as the place of meeting for any annual or special meeting of the shareholders.

SECTION 4. NOTICE OF MEETINGS

Notice of all shareholders' meetings, whether annual or special, shall be given to each shareholder of record entitled to vote at such meeting no fewer than 10 or more than 60 days before the meeting date. The notice shall include the date, time and place of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Only the business within the purpose or purposes included in the notice of special meeting may be conducted at a special shareholders' meeting.

Notice of shareholders' meetings may be given orally or in writing, by or at the direction of the President, the Secretary or the officer or persons calling the meeting. Notice of meetings may be communicated in person, by telephone, facsimile machine, or other form of electronic communication; or by mail. If mailed, notice of the meeting shall be deemed to be delivered when deposited in the United States mail, addressed to the shareholder at the shareholder's address as it appears on the stock transfer books of the corporation, with postage prepaid.

When a meeting is adjourned to a different date, time or place, it shall not be necessary to give any notice of the meeting at which the adjournment is taken, and any business may be transacted at the adjourned meeting that might have been transacted on the original date of the meeting. If, however, after the adjournment, the Board fixes a new record date for the adjourned meeting, notice of the adjourned meeting in accordance with the preceding paragraphs of this Bylaw shall be given to each person who is a shareholder as of the new record date and is entitled to vote at such meeting.

SECTION 5. WAIVER OF NOTICE AND CALL

A shareholder may waive any notice or call required by the Florida Statutes, the Articles of Incorporation or these Bylaws before or after the date and time stated in the notice. The waiver must be in writing, be signed by the shareholder entitled to the notice, and be delivered to the

CONFIDENTIAL

ECBUSA2489168

corporation for inclusion in the minutes or filing with the corporate records. Neither the business to be transacted at nor the purpose of any meeting shall be required as to any shareholder who shall attend the meeting in person or by proxy, except that when the shareholder attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

SECTION 6.  QUORUM

Except as otherwise provided in these bylaws or in the Articles of Incorporation, a majority of the outstanding shares of the corporation entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of the shareholders and, except as otherwise provided in the Articles of Incorporation, the vote, in person or by proxy, of the holders of a majority of the shares constituting this quorum shall be the act of the stockholders of the corporation. If less than a majority of the outstanding shares are represented at a meeting, a majority of the shares so represented may adjourn the meeting from time to time without further notice. At the adjourned meeting at which a quorum shall be present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed. The shareholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.

SECTION 7.  VOTING LISTS

Each shareholder entitled to vote shall be entitled at every meeting of the shareholders to one vote in person or by proxy for each share of voting stock held by the shareholder.  The right to vote shall be subject to the right of the Board of Directors to close the transfer books or to fix a record date for voting stockholders as hereinafter provided.

SECTION 8.  PROXIES

At all meetings of shareholders, a shareholder may vote by proxy, executed in writing by the shareholder or by the shareholder's duly authorized attorney-in-fact, but no proxy shall be valid after 11 months from its date unless the proxy provides for a longer period. Each proxy shall be filed with the Secretary of the corporation before or at the time of the meeting.  In the event that a proxy shall designate two or more persons to act as proxies, a majority of those persons present at the meeting shall have all of the powers conferred by the proxy on all the persons so designated, unless the instrument provides otherwise.

ECBUSA2489169

## SECTION 9.  INFORMAL ACTION BY SHAREHOLDERS

Unless otherwise provided in the Articles of Incorporation, any action required to be taken at a meeting of the shareholders, or any other action that may be taken at a meeting of the stockholders, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the shareholders holding not less than the minimum number of shares that would be necessary to authorize or take the action at a meeting at which all shares entitled to vote were present and voted.  If less than all stockholders consent, then within 10 days after this action is authorized by written consent, the shareholders who did not consent must be given written notice of the action taken.

## SECTION 10.  INSPECTORS

For each meeting of the shareholders, the Board of Directors or the President may appoint two inspectors to supervise the voting.   If inspectors are appointed, all questions concerning the qualification of any vote, the validity of any proxy, and the acceptance or rejection of any vote shall be decided by the inspectors.  Before acting at any meeting, the inspectors shall take an oath to execute their duties with strict impartiality and according to the best of their ability.  If any inspector shall fail to be present or shall decline to act, the President shall appoint another inspector to act.  In case of a tied vote by the inspectors on any question, the presiding officer shall decide the issue.

### ARTICLE III—BOARD OF DIRECTORS

## SECTION 1.  GENERAL POWERS

The business and affairs of the corporation shall be managed by the Board of Directors.  The Board of Directors may exercise all the powers of the corporation and take all lawful acts, except for those acts that are required or directed to be exercised only by the shareholders.

## SECTION 2.  NUMBER, TENURE AND QUALIFICATIONS

The number of directors of the corporation shall be not less than three nor more than seven, and shall be fixed by the shareholders at any annual or special meeting.  Each director shall hold office until the next annual meeting of the shareholders and until each director's successor shall have been duly elected and shall have qualified, unless the director sooner dies, resigns or is removed by the shareholders any annual or special meeting.  It shall not be necessary for directors to be stockholders of the corporation in order to serve as a director.  No minor shall serve as a director.

ECBUSA2489170

SECTION 3.  ANNUAL MEETING OF DIRECTORS

After each annual meeting of shareholders, the Board of Directors shall hold its annual meeting at the same place and immediately following the annual meeting of shareholders for the purpose of the election of officers and the transaction of other business as may come before the meeting; and, if a majority of the Directors are present at the place and time, no previous notice of the meeting shall be required to be given to the Directors.  The place and time of the meeting may be varied by written consent of all the Directors.

SECTION 4.  REGULAR MEETINGS

Regular meetings of the Board of Directors may be held without notice at the time and at the place as shall be determined from time to time by the Board of Directors.  Until the Board decides otherwise, regular meetings of the Board of Directors shall be held on a monthly or bi-monthly basis, in person or by telephone communication, in Miami, Florida; Paris, France; Guadeloupe; or in Fairfield, New Jersey, as determined by the Board of Directors at the Annual Meeting of the Board of Directors.

SECTION 5. SPECIAL MEETINGS

Special meetings of the Board of Directors may be called by the Chairman, the President, or any two directors.  The person or persons authorized to call special meetings may fix the place for holding any special meetings of the Board of Directors.  If no designation is made, the place of meeting shall be the principal office of the corporation in the state of Florida.

SECTION 6.  NOTICE

Written notice stating the place, day and hour of the meeting shall be delivered at least 3 days before the meeting to each director, either personally or by mail or e-mail to the director's business address.

If notice is given by mail, the notice shall be deemed to be delivered when deposited in the United States mail addressed with prepaid postage.  If notice is given by e-mail, the notice shall be deemed to be delivered when return receipt is received by the sender.  Any director may waive notice of any meeting either before, at, or after the meeting. The attendance of a director at a meeting shall constitute a waiver of notice of the meeting, except when a director attends a meeting for the express purpose of objecting to the transaction of any business because the meting is not lawfully called or convened.

CONFIDENTIAL

ECBUSA2489171

SECTION 7. QUORUM

A majority of the total number of directors as determined from time to time shall constitute a quorum, but a smaller number may adjourn from time to time, without further notice, until a quorum is secured.

SECTION 8. MANNER OF ACTING

The act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

SECTION 9. REMOVAL

Any director may be removed by the shareholders at any meeting of the shareholders called expressly for that purpose whenever in the judgment of the shareholders the best interests of the corporation will be served by that director's removal, but this removal shall be without prejudice to the contract rights, if any, of the person removed. This bylaw shall not be subject to change by the Board of Directors.

SECTION 10. VACANCIES

Any vacancy occurring in the Board of Directors, including any vacancy created by reason of an increase in the number of directors, may be filled by the affirmative vote of a majority of the remaining directors, although less than a quorum of the Board of Directors, unless otherwise provided in the Articles of Incorporation. A director elected to fill a vacancy shall be elected for the unexpired term of the director's predecessor in office.

SECTION 11. COMPENSATION

By resolution of the Board of Directors, the directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors, and may be paid a fixed sum for attendance at each meeting of the Board of Directors, or a stated salary as directors. No payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor.

SECTION 12. PRESUMPTION OF ASSENT

A director of the corporation who is present at a meeting of the Board of Directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless the director votes against the action or abstains from voting in respect to the matter because of an asserted conflict of interest.

CONFIDENTIAL

## SECTION 13.  INFORMAL ACTION BY BOARD

Any action required or permitted to be taken by any provisions of law, the Articles of Incorporation, or these bylaws, at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if a written consent is signed by all members of the Board or of any committee, as the case may be.

## SECTION 14.  MEETING BY TELEPHONE

Directors or the members of any committee thereof shall be deemed present at a meeting of the Board of Directors or of any committee, as the case may be, if the meeting is conducted using a conference telephone or similar communications equipment or computer program by means of which all persons participating in the meeting can hear each other at the same time.

### ARTICLE IV—OFFICERS

## SECTION 1.  NUMBER

The officers of the corporation shall consist of a President, a Secretary, and a Treasurer, each of whom shall be elected by the Board of Directors.  The Board of Directors may also elect a Chairman of the Board, one or more Vice Presidents, one or more Assistant Secretaries and Assistant Treasurers, and other officers as the Board of Directors shall deem appropriate.  Two or more offices may be held by the same person.

## SECTION 2.  ELECTION AND TERM OF OFFICE

The officers of the corporation shall be elected annually by the Board of Directors at the annual meeting of the board.  If the election of officers shall not be held at the meeting, the election shall be held as soon thereafter as is convenient.  Each officer shall hold office until that officer's successor has been duly elected and qualified, unless the officer sooner dies, resigns or is removed by the Board of Directors.

## SECTION 3.  REMOVAL

Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors whenever, in its judgment, the best interests of the corporation will be served, but the removal shall be without prejudice to the contract rights, if any, of the person removed.

CONFIDENTIAL

ECBUSA2489173

SECTION 4.  VACANCIES

A vacancy in any office because of death, resignation, removal, disqualification or otherwise may be filled by the Board of Directors for the unexpired portion of the term.

SECTION 5.  DUTIES OF OFFICERS

The Chairman of the Board of the corporation, or the President if there shall not be a Chairman, shall preside at all meetings of the Board of Directors and of the shareholders.  The President shall be the chief executive officer of the corporation.  Subject to the foregoing, the officers of the corporation shall have powers and duties as ordinarily pertain to their respective offices, and any additional powers and duties specifically conferred by law, the Articles of Incorporation, and these bylaws, or as may be assigned to them from time to time by the Board of Directors.

SECTION 6.  SALARIES

The salaries of the officers shall be fixed from time to time by the Board of Directors, and no officer shall be prevented from receiving a salary by reason of the fact that the officer is also a director of the corporation.

SECTION 7.  DELEGATION OF DUTIES

In the absence or disability of any officer of the corporation, or for any other reason deemed sufficient by the Board of Directors, the board may delegate the powers or duties of the officer to any other officer or any other director, either temporarily or permanently.

SECTION 8.  POWERS OF ACTING OFFICERS.

If any officer is unable to perform the duties of his or her office, the powers and duties of that officer shall be held and performed by that officer of the corporation highest on the list of successors who shall be available and capable of holding and performing these powers and duties.  That acting officer selected shall hold and perform the powers and duties and shall serve in that capacity until the officer again becomes capable of holding and performing the powers and duties of that office, or until the Board of Directors shall have elected a new officer or designated another individual as acting officer.  Each acting officer so appointed shall be entitled to exercise all powers invested by law, the Articles of Incorporation, these bylaws, and the Board of Directors in the office in which the person is serving.  Anyone transacting business with the corporation may rely on a certificate signed by any two officers of the

CONFIDENTIAL

ECBUSA2489174

corporation that a specified individual has succeeded to the powers and duties of the President or any other specified office.

## ARTICLE V—INDEMNIFICATION OF DIRECTORS AND OFFICERS

### SECTION 1. GENERAL

To the fullest extent permitted by law, the corporation shall indemnify any person who was or is a party, or threatened to be made a party, to any threatened, pending or completed action, lawsuit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that the person is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director of officer of another corporation, partnership, joint venture, trust, or other enterprise affiliated with this corporation, against expenses (including attorneys' fees), judgments, fines, and the amounts paid in settlement actually and reasonably incurred by the person in connection with the action, lawsuit, or proceeding, including any appeal thereof, if the person acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, lawsuit or proceeding by judgment, order, settlement or conviction, or on a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner that the person reasonably believed to be in, or not opposed to, the best interests of the corporation or, with respect to any criminal action or proceeding, create a presumption that the person had reasonable cause to believe that the person's conduct was unlawful.

### SECTION 2. ACTIONS BY, OR DERIVATIVELY ON BEHALF OF, THE CORPORATION

In any action, lawsuit, or proceeding, threatened, pending or completed, by or in the right of the corporation, indemnification shall be made as provided in Section 1 of this Article, except that no indemnification shall be made in respect of any claim, issue, or matter of which the person shall have been adjudged to be liable for negligence or misconduct in the performance of the person's duty to the corporation, unless and only to the extent that the court in which the action or lawsuit was brought shall determine on application that, despite the adjudication of liability but in view of all the circumstances of the case, the person is fairly and reasonably entitled to indemnity for the expenses which the court shall deem proper.

## SECTION 3.  HOW EFFECTED

Indemnification under Section 1 or Section 2 of this Article, unless under a determination by a court, shall be made by the corporation only as authorized in the specific case by a determination that the indemnification is proper in the circumstances because the indemnified person has met the applicable standard of conduct set forth in Section 1 or Section 2 hereof.  This determination shall be made by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to the action, lawsuit or proceeding to which the indemnification relates or by the shareholders by a majority vote of a quorum consisting of shareholders who were not parties to the action, lawsuit, or proceeding to which the indemnification relates.  If a director, officer, employee, agent for, or attorney acting on behalf of the corporation has been successful on the merits or otherwise in defense of any action, lawsuit or proceeding referred to in Section 1 or Section 2 of this Article, or in the defense of any claim, issue or matter therein, the corporation shall be obligated on proper application to indemnify the person in respect of expenses (including attorneys' fees) actually and reasonably incurred by the person in connection therewith.

## SECTION 4.  PREPAYMENT OF EXPENSES

Expenses (including attorneys' fees) incurred in defending a civil or criminal action, lawsuit, or proceeding may be paid by the corporation in advance of the final disposition of the action, lawsuit or proceeding on a preliminary determination following one of the procedures set forth in Section 3 of this Article that the indemnified person meets the applicable standard of conduct referred to therein and after receipt of an undertaking satisfactory in form and substance to the corporation that the person will promptly repay the amount unless it shall ultimately be determined that the person is entitled to be indemnified by the corporation as authorized in this Article.

## SECTION 5.  NONEXCLUSIVITY

The indemnification provided by this Article shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any bylaw, agreement, vote of shareholders or disinterested directors, or otherwise, both as to action in any official capacity and as to action in any other capacity while holding office with the corporation.  The Board of Directors may, at any time, approve indemnification of any other person that the corporation has the power by law to indemnify, including without limitation, employees, agents and attorneys of the corporation. The indemnification provided for in this Article shall continue for any person who has ceased to be a director,

CONFIDENTIAL

ECBUSA2489176

officer, employee or agent or attorney and shall inure to the benefit of the person's heirs and personal representatives.

## ARTICLE VI—INTERESTED PARTIES

### SECTION 1. GENERAL

No contract or other transaction between the corporation and any one or more of its directors or any other corporation, firm, association, or entity in which one or more of its directors are directors or officers or are financially interested shall be either void or voidable because of the relationship or interest, because the director or directors were present at the meeting of the Board of Directors of a committee thereof that authorizes, approves, or ratifies the contract or transaction, or because the director's or directors' votes are counted for this purpose if: (a) the fact of the relationship or interest is disclosed or known to the Board of Directors or committee that authorizes, approves, or ratifies the contact or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of the interested directors; (b) the fact of the relationship or interest is disclosed or known to the shareholders entitled to vote on the matter, and they authorize, approve, or ratify the contract or transaction by vote or written consent; or (c) the contract or transaction is fair and reasonable as to the corporation at the time it is authorized by the Board of Directors, a committee thereof, or the shareholders.

### SECTION 2. DETERMINATION OF QUORUM

Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or a committee thereof that authorizes, approves, or ratifies a contract or transaction referred to in Section 1 of this Article.

## ARTICLE VII—CERTIFICATES OF STOCK

Shares of stock shall be issued from the corporation's Stock Certificate Book; and all issuances and transfers thereof shall be recorded in the corporation's Stock Record Book.

## ARTICLE VIII—RECORD DATE

The Board of Directors is authorized from time to time to fix in advance a date, nor more than 60 days nor less than 10 days before the date of any meeting of shareholders, or nor more than 60 days before the date for the payment of any dividend or the date for the allotment of rights, or the date when any change or conversion or exchange of stock

CONFIDENTIAL

shall go into effect, or a date in connection with the obtaining of the consent of shareholders for any purpose, as a record date for the determination of the shareholders entitled to notice of and to vote at the meeting and any adjournment thereof, or entitled to received payment of a dividend, or to an allotment, or to exercise the rights in respect of any change, conversion or exchange of stock or to give consent as the case may be; and those shareholders as shall be shareholders of record as of the close of business on the date so fixed shall be entitled to notice of and to vote at the meeting and any adjournment thereof, or to receive payment of a dividend, or to receive an allotment of rights, or to exercise the rights or to given consent, as the case may be, notwithstanding any transfer of any stock on the books of the corporation after the record date is fixed.

## ARTICLE IX—DIVIDENDS

The Board of Directors may from time to time declare, and the corporation may pay, dividends on its outstanding shares of common stock in the manner and on the terms and conditions provided by law. Subject to the provisions of law, dividends may be paid in cash or property, including shares of stock or other securities of the corporation.

## ARTICLE X—FISCAL YEAR

The fiscal year of the corporation shall be the period selected by the Board of Directors as the taxable year of the corporation for federal tax purposes.

## ARTICLE XI—SEAL

The corporate seal shall have the name of the corporation and the year of the incorporation inscribed thereon, and may be a facsimile, engraved, printed or impression seal. An impression of the seal appears on the margin of this Article.

## ARTICLE XII—STOCK IN OTHER CORPORATIONS

Shares of stock in other corporations held by the corporation shall be voted by the officer or officers of the corporation as the Board of Directors shall from time to time designate for the purpose or by a proxy that is duly authorized by the Board of Directors.

## ARTICLE XIII—AMENDMENTS

These bylaws may be altered, amended or repealed, and new bylaws may be adopted by the Board of Directors, provided that any

bylaws or amendment as adopted by the Board of Directors may be altered, amended or repealed by vote of the shareholders entitled to vote, or a new bylaw in lieu thereof may be adopted by the shareholders. No bylaw that has been altered, amended, or adopted by the vote of the shareholders may be altered, amended or repealed by a vote of the directors until two years have passed since the vote of the shareholders.

**WITNESSETH**, these bylaws were duly adopted by the Board of Directors of **ATLANTIC VENTURES CORP** on the _____ day of December 2014.

_____
Alain VOSS, Director

_____
Bruno BLANDIN, Director

_____
Claude BLANDIN, Director

_____
Patrick BLANDIN, Director

_____
Arno LEONI, Director

ECBUSA2489179

EXHIBIT C

Officers

**Name and Title**                    **Signature**

Alain VOSS, President

Claude BLANDIN, Vice President

Bruno BLANDIN, Secretary

Arno LEONI, TREASURER

Patrick BLANDIN



3709493 1

CONFIDENTIAL

ECBUSA2489180

EXHIBIT D

Resolutions of the Board of Directors

**Atlantic Ventures Corp**

See attached

3709493 1

CONFIDENTIAL

ECBUSA2489181

## ATLANTIC VENTURES CORP

### WRITTEN CONSENT BY ALL

### DIRECTORS AND SHAREHOLDERS

### IN LIEU OF A SPECIAL MEETING

On the 26th day of June 2015, in accordance with Sections 607.0821(1) and 607.0704(1) of the Florida Statutes, all the Directors and Shareholders of **ATLANTIC VENTURES CORP** (the "Company") hereby consent to and approve the following resolutions:

**WHEREAS**, pursuant to a proposed Credit Agreement (as may be amended, restated or otherwise modified from time to time, the "Credit Agreement") by and between Schratter Foods Incorporated, a Delaware corporation ("Schratter Foods") and Wells Fargo Bank, National Association (the "Lender"), the Lender has agreed to make certain advances and other extensions of credit to Schratter Foods as provided in the Credit Agreement; and

**WHEREAS,** as a condition to making advances and other extensions of credit to Schratter Foods pursuant to the Credit Agreement, the Lender requires the execution and delivery by Schratter Foods and by each Grantor (as defined below) of the Security Agreement described below; and by each Grantor of the Guaranty described below;

**WHEREAS,** the Company desires to enter into the Security Agreement, substantially in the form presented to the Board and the Shareholders, by and among Schratter Foods; the Company; ECB USA Inc, a Florida corporation; and Voss Enterprises, Inc., a New York corporation (collectively, the "Grantors"); and the Lender (the "Security Agreement"), pursuant to which, among other things, the Grantors grant to the Lender a security interest in the Collateral, as defined in the Security Agreement; and

**WHEREAS,** the Company desires to execute the Guaranty, substantially in the form presented to the Board and the Shareholders, in favor of the Lender, pursuant to which the Company guarantees certain obligations of Schratter Foods to the Lender; and

**WHEREAS,** the Board and the Shareholders of the Company have

CONFIDENTIAL

ECBUSA2489182

been presented with, and have reviewed, the Security Agreement and the Guaranty; and

**WHEREAS**, the Board and the Shareholders believe it is in the best interests of the Company and its Shareholders to enter into the Security Agreement and to execute the Guaranty for the purposes stated therein;

**NOW, THEREFORE, IT IS**

**RESOLVED** that the Board and the Shareholders of the Company hereby declare the Security Agreement, the Guaranty, and the related agreements (the "Security Documents") advisable and in the best interests of the Company and its Shareholders; and it is

**FURTHER RESOLVED**, that the Board and the Shareholders hereby authorize and approve the form, terms and provisions of the Security Documents, including all exhibits and schedules attached thereto, and all such agreements, instruments, certificates and other documents in connection with the transactions contemplated by the Security Documents; and be it

**FURTHER RESOLVED**, that the President, Vice President, Treasurer, Secretary and any other officer of the Company (each such person, an "Authorized Officer") are, and each of them hereby is, authorized, directed and empowered, in the name and on behalf of the Company, to negotiate the terms and conditions of the Security Documents, and such Authorized Officer or Authorized Officers are, and each of them hereby is, authorized, directed and empowered to execute and deliver such agreements, including all exhibits and schedules attached thereto, in the name and on behalf of the Company with such additions, deletions or changes therein (including, without limitation, any additions, deletions or changes to any schedules or exhibits thereto) as the Authorized Officer executing the same shall deem necessary or appropriate (the execution and delivery thereof by any such Authorized Officer to be conclusive evidence of approval).

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

ECBUSA2489183

IN WITNESS WHEREOF all the Directors and the Shareholders of the Company have executed this Written Consent of Directors and Shareholders of the Company on the day and year first written above.

DIRECTORS:

Claude BLANDIN

Arno LEONI

Bruno BLANDIN

Alain VOSS

Patrick BLANDIN

SHAREHOLDERS:

EOB USA INC

BY:
Claude BLANDIN, President

VOSS ENTERPRISES, INC.

BY:
Alain VOSS, President

ILAFY DEVELOPMENT LLC

BY:
Arno LEONI, Manager

CONFIDENTIAL

ECBUSA2489184

EXHIBIT E

GOOD STANDING CERTIFICATE

D-

ECBUSA2489185

# *State of Florida*
# *Department of State*

I certify from the records of this office that ATLANTIC VENTURES CORP is a corporation organized under the laws of the State of Florida, filed on December 8, 2014.

The document number of this corporation is P14000097868.

I further certify that said corporation has paid all fees due this office through December 31, 2015, that its most recent annual report/uniform business report was filed on April 23, 2015, and that its status is active.

I further certify that said corporation has not filed Articles of Dissolution.

*Given under my hand and the Great Seal of the State of Florida at Tallahassee, the Capital, this the Twenty-sixth day of June, 2015*



*Ken Detzner*

## *Secretary of State*

Tracking Number: CU7307830524

To authenticate this certificate,visit the following site,enter this number, and then follow the instructions displayed.

https://services.sunbiz.org/Filings/CertificateOfStatus/CertificateAuthentication

CONFIDENTIAL

ECBUSA2489186

# Exhibit C

# STOCK PURCHASE AGREEMENT

## BY AND AMONG

### VOSS ENTERPRISES, INC.

and

### ECB USA, INC.,

AS BUYERS,

### ZNHC, INC.,

AS SELLER,

### ALAIN VOSS,
### SCHRATTER FOODS INCORPORATED

### and

### ZAUSNER FOODS CORP.,

AS GUARANTOR

December 6, 2014

## STOCK PURCHASE AGREEMENT

This **STOCK PURCHASE AGREEMENT** (this "Agreement"), is made and entered into on December 6, 2014, by and among **VOSS ENTERPRISES, INC.**, a New York corporation, or assigns ("VE"); **ECB USA, INC.**, a Florida corporation, or assigns ("ECB" and together with VE, jointly and severally, the "Buyer"); **ZNHC, INC.**, a Delaware corporation (the "Seller"); **ALAIN VOSS**, an individual ("Voss"); **SCHRATTER FOODS INCORPORATED**, a Delaware corporation ("Schratter Foods" or the "Company") and **ZAUSNER FOODS CORP.,** a Delaware corporation ("ZAUSNER" or "Guarantor"), as guarantor. Certain capitalized terms used in this Agreement have the meanings ascribed to them in Article XIII.

### RECITALS

A.      The Seller is the sole owner of all of the authorized, issued and outstanding shares of common stock, par value $0.01 per share, of Schratter Foods (the "Shares").

B.      Schratter Foods is engaged in the business of importing, selling and distributing various specialty foods, including but not limited to imported and domestic cheeses and dairy products, throughout the United States, and to the cruise industry calling at ports in the United States and abroad (the "Business"). Schratter Foods does business in its corporate legal name, as well as through the fictitious names, ANCO Fine Cheese, Cognati and Corman Ship Supplies.

C.      Prior to the consummation of the transactions contemplated by this Agreement, Schratter Foods will transfer, and Seller or an Affiliate of Seller will assume, all of the assets and liabilities of the Foreign Affiliate Dairy Business and all rights and interest of Schratter Foods in the ILE DE FRANCE brand, in consideration for the payment to the Company by the Seller (or its Affiliate) of $955,000.00 and $810,000.00, respectively, in cash.

D.    The Buyer desires to acquire from the Seller, and the Seller desires to sell, convey, transfer, assign and deliver to the Buyer, the Shares.

E.    The Seller desires to sell, transfer or license to the Company all permits and licenses now owned or used by the Company relating to the Business, and the Buyer desires to have the Company obtain such licenses and permits, all on the terms and subject to the conditions set forth herein.

F.    Guarantor desires to join in this Agreement for the purpose of guaranteeing the indemnification obligations of its subsidiary, ZNHC, Inc.

**NOW, THEREFORE**, in consideration of the representations, warranties, covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## Article I

## PURCHASE AND SALE OF ALL OF THE SHARES OF SCHRATTER FOODS

I.1.    **Purchase and Sale of the Shares**.

(a)    On the terms and subject to the conditions herein set forth, at the Closing, the Seller shall sell, transfer, convey, assign and deliver (a) 450 Shares to VE, representing 45% of the Shares owned by the Seller, and (b) 550 Shares to ECB, representing 55% of the Shares owned by the Seller, in each case, free and clear of all Encumbrances, and the Buyer shall purchase, acquire and accept the Shares from the Seller for the consideration specified in Section II.1 of this Agreement.  The Shares represent all of the Equity Interests in the Company.  If, prior to the Closing Date, VE or ECB transfer their rights and duties under this Agreement in accordance with Section XI.4 to an entity controlled by them, then the Seller shall sell, transfer, convey, assign and deliver to such entity original certificates for all the Shares.  The above Recitals are true and correct in all respects and are incorporated herein by reference.

(b)    As a result of the purchase and sale of the Shares pursuant to Section I.1(a), the Buyer will acquire all of the assets owned by the Company (other than the Excluded Assets transferred by the Company prior to

the Closing) by operation of law, including, without limitation, the following assets of the Business:

(i)     All of the Company's right, title and interest in and to the tangible assets of the Business, including but not limited to all machinery, trucks, forklifts, fixtures, leasehold improvements, industrial vehicles, office furniture, buildings, signage, lighting, supplies, equipment, and all other tangible assets and properties of the Company used in the operation of the Business; and

(ii)     All of the Company's right, title and interest in and to all intangible assets of the Business, including but not limited to all proprietary knowledge, trademarks, trade names, fictitious names, service marks, trade secrets, patents, technical information, quality control data, processes and methods owned by the Company, or held for use in the operation of the Business.

(iii)     All of the Company's right, title and interest in and to the Business as a going concern, including but not limited to its permits, licenses, telephone numbers, customer lists, vendor lists, supplier lists, referral lists and Contracts, advertising materials and data, restrictive covenants, choses in action and similar assets and obligations owing to, used by, or owned by the Company, together with all books, paper files, papers, records and other data of the Company used by the Company in the operation of the Business; and

(iv)     All of the Company's right, title and interest in and to all inventory of the Company and to all other property (real and personal) and rights of every kind or nature used by the Company in the operation of the Business.

I.2.     **Method of Conveyance**.   The sale, transfer, conveyance, assignment and delivery by the Seller of the Shares to the Buyer in accordance with Section I.1 shall be effected on the Effective Date by the Seller's delivery of executed original stock certificates evidencing the Shares, free and clear of all

Encumbrances, duly endorsed in blank or accompanied by duly executed stock powers, with all required stock transfer tax stamps affixed thereto, substantially in the form attached hereto as Exhibit "A" (the "Stock Powers").

## Article II

## PURCHASE PRICE; DEFERRED PAYMENTS

II.1.    **Purchase Price**.  In consideration for the sale of the Shares to the Buyer, the Buyer shall pay to the Seller the sum of **$27,000,000.00** (the "Purchase Price") in the manner set forth below:

(a)    **$2,000,000.00** in cash, payable at Closing (the "Closing Date Purchase Price");

(b)    **$15,000,000.00** in cash, payable on the date that is six months after the Closing Date (the "Initial Deferred Payment"); and

(c)    **$10,000,000.00** in cash, payable in four equal annual installments of **$2,500,000.00**, beginning on the second anniversary of the Closing Date, and continuing on the third, fourth and fifth anniversaries of the Closing Date (the "Deferred Installment Payments").  VE shall pay 45% of the Closing Date Purchase Price, the Initial Deferred Payment and each Deferred Installment Payment and ECB shall pay 55% of the Closing Date Purchase Price, the Initial Deferred Payment and each Deferred Installment Payment.

II.2.    **Deferred Purchase Price**.    If the Buyer, in good faith, reasonably determines that it is unable to make one of the Deferred Installment Payments (or any portion thereof) on any of the due dates specified in Section II.1(c), the Buyer may pay any such Deferred Installment Payments on or before the fifth anniversary of the Closing Date, provided that any such Deferred Installment Payments shall accrue interest from such due date until the date of payment at the Prime Rate plus 2%.  The Buyer shall be entitled to deduct from the Deferred Installment Payments any Loss in accordance with Article VIII (Indemnification).

II.3.    **Collateral Matters**.

(a)     On and after the Closing, the Buyer shall cause the Company to grant a security interest to the Seller in the Company's inventory and customers accounts receivable as collateral security for the Buyer's obligation to pay the Initial Deferred Payment, pursuant to a Security Agreement in the form attached hereto as Exhibit "B" (the "Security Agreement"). The security interest in the inventory and customers accounts receivable of the Company shall be released by the Seller upon full payment to the Seller of the Initial Deferred Payment, which is required to occur on June 30, 2015. Upon the Seller's receipt of such full payment, the Seller shall terminate its security interest in the Company's inventory and customers accounts receivable by filing any and all necessary termination statements and other documents necessary to effectuate the termination, and shall deliver to the Buyer and its attorney proof of filing of such termination statements. The Seller shall procure, deliver and/or execute and deliver to the Buyer, from time to time, all further releases, termination statements, certificates, instruments and documents, each in form and substance satisfactory to the Buyer and its counsel, and take any other actions, as may be reasonably requested by the Buyer or its counsel, or which are required to evidence the consummation of the release of such security interest, or the Pledge (q.v. II.3(b)).

(b)     On and after the Closing, the Buyer shall pledge, or cause to be pledged, to the Seller 90% of the Shares as collateral security for the Buyer's obligation to pay the Deferred Installment Payments (the "Pledge"), pursuant to a Stock Pledge Agreement in the form attached hereto as Exhibit "C" (the "Stock Pledge Agreement"). The Pledge shall be released by the Seller upon full payment to the Seller of the Deferred Installment Payments. It is understood by the Seller and the Buyer that, notwithstanding any provision to the contrary in the Stock Pledge Agreement, so long as the Buyer has made and is making all required payments of the Deferred Installment Payments, the Buyer shall be entitled to vote all the Shares, and to declare any and all dividends thereon, without restrictions.

II.4.     **Purchase Price Adjustment**.

(a)     **Post-Closing Adjustment**.

(i)     Seller shall use its commercially reasonable efforts to provide to the Buyer on or before January 31, 2015 the audited Financial Statements of the Company for the year ended December 31, 2014, duly certified, without qualifications or limitations, by the current auditors of the Company, Constantin, Chartered Accountants and Registered Auditors, consistent with auditing methods and practices utilized by Constantin on behalf of the Company for prior periods, including but not limited to practices for loss reserves and valuation methods (the "Constantin 2014 Audited Financials") with any and all schedules attached for the Buyer's inspection, and as a basis for the determination of any Post-Closing Adjustment of the Purchase Price, provided, however that these methods and practices shall be changed to the extent required by US GAAP.  The Buyer shall have the right to be present and review the process of any physical inventory made in connection with the preparation of the Constantin 2014 Audited Financials. The limits set forth in this subparagraph (a)(i) shall not apply to adjustments made by the Company in relation to settling accounts with Alouette Cheese USA LLC.

(ii)     Within 45 days after receiving the Constantin 2014 Audited Financial Statements, Buyer shall prepare and deliver to Seller a statement setting forth its calculation of Closing Net Equity, which statement shall contain an externally audited balance sheet of the Company as of the Closing Date, and a calculation of the Closing Net Equity (the "Closing Net Equity Statement"), consistent with the calculations of the Illustrative Determination of Closing Net Equity, attached hereto as Exhibit "D", and prepared in accordance with US GAAP applied using the same accounting methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies that were used in the preparation of the Financial Statements for the most recent fiscal year end as if such Closing Net Equity Statement was being prepared and audited as of a fiscal year end.

Page 6 of 74

LDG

(iii)     After receipt of the Closing Net Equity Statement, Seller shall have 30 days (the "Review Period") to review the Closing Net Equity Statement. During the Review Period, Seller and Seller's Representatives shall have reasonable access to and the right to inspect all of the books and records of the Company, the personnel of, and work papers prepared by, Buyer and/or Buyer's accountants to the extent that they relate to the Closing Net Equity Statement and to such historical financial information (to the extent in Buyer's possession) relating to the Closing Net Equity Statement as Seller may reasonably request for the purpose of reviewing the Closing Net Equity Statement and to prepare a Statement of Objections (defined below), provided, that such access shall be conducted during normal business hours upon reasonable advance notice to Buyer or the Company and in such a manner that does not interfere with the normal business operations of Buyer or the Company.  All requests by Seller for access pursuant to this Section II.4(a)(iii) shall be submitted or directed exclusively to Arno Leoni, Chief Financial Officer of ECB USA, Inc., at ALeoni@ECB.gp or such other individuals as Buyer may designate in writing from time to time.

(iv)     On or prior to the last day of the Review Period, Seller may object to the Closing Net Equity Statement by delivering to Buyer a written statement setting forth Seller's objections in reasonable detail, indicating each disputed item or amount and the basis for Seller's disagreement therewith (the "Statement of Objections"). If Seller fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing Net Equity Statement and the Post-Closing Adjustment, as the case may be, reflected in the Closing Net Equity Statement shall be deemed to have been accepted by Seller. If Seller delivers the Statement of Objections before the expiration of the Review Period, Buyer and Seller shall negotiate in good faith to resolve such objections within 30 days after the delivery of the Statement of Objections (the "Resolution Period"), and, if the same are so resolved within the Resolution Period, the Post-Closing Adjustment and the Closing Net Equity

Statement with such changes as may have been previously agreed in writing by Buyer and Seller, shall be final and binding (the "Binding Closing Net Equity").

(v)     If Seller and Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("Disputed Amounts") shall be submitted for resolution to the office of an impartial nationally recognized firm of independent certified public accountants other than Seller's Accountants or Buyer's Accountants appointed by mutual agreement of Seller and Buyer (the "Independent Accountants") who, acting as experts and not arbitrators, shall resolve the Disputed Amounts only and make any adjustments to the Post-Closing Adjustment, as the case may be, and the Closing Net Equity Statement. The Independent Accountants shall only decide the specific items under dispute by the parties and their decision for each Disputed Amount must be within the range of values assigned to each such item in the Closing Net Equity Statement and the Statement of Objections, respectively.

(vi)    The fees and expenses of the Independent Accountant shall be paid by Seller, on the one hand, and by Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded to Seller or Buyer, respectively, bears to the aggregate amount actually contested by Seller and Buyer.

(vii)   The Independent Accountants shall make a determination as soon as practicable within 30 days (or such other time as the parties hereto shall agree in writing) after their engagement, and their resolution of the Disputed Amounts and their adjustments to the Closing Net Equity Statement and/or the Post-Closing Adjustment shall be the Binding Closing Net Equity. The Purchase Price adjustment shall be made pursuant to this determination of Binding Closing Net Equity.

(viii)  The "Post-Closing Adjustment" shall be an amount equal to the Binding Closing Net Equity minus $23,000,000.00 (the "Target Net Equity").

(ix)    If the Post-Closing Adjustment is a positive number, but less than $1,476,860.00 (consisting of goodwill according to US GAAP/IFRS plus $500,000.00), then the Buyer will not be liable to pay any increase in Purchase Price.  If the Post-Closing Adjustment is a positive number, and in excess of $1,476,860.00, then the Buyer will pay an additional amount to the Seller by which such number exceeds $1,476,860.00, but in no event shall the Buyer pay greater than $1,000,000.00 above the Purchase Price. By way of illustration only, if the Binding Closing Net Equity is $25,000,000.00, then the difference between the Binding Closing Net Equity and the Target Net Equity is more than $1,476,860.00.  As a result, there will be a Purchase Price increase equal to $523,140.00 [$25,000,000.00 (Binding Closing Net Equity) minus $23,000,000.00 (Target Net Equity) minus $1,476,860].

(x)    If the Binding Closing Net Equity is less than the Target Net Equity by less than $500,000, then Seller will not be liable to make any adjustment to the Purchase Price.  If the Binding Closing Net Equity is less than the Target Net Equity by more than $500,000,  then there shall be a reduction in the Purchase Price equal to Target Net Equity minus Binding Closing Net Equity minus $500,000 (the "Collar"), but in no event shall the Buyer be entitled to a diminution of the Purchase Price greater than $10,000,000.00. By way of illustration only, if the Binding Closing Net Equity is $22,000,000.00, then the difference between the Binding Closing Net Equity and the Target Net Equity is more than $500,000.  As a result, there will be a Purchase Price reduction equal to $500,000 [$23,000,000.00 (Target Net Equity) minus $22,000,000.00 (Closing Net Equity) minus $500,000].

(b)    **Adjustment for Deferred Tax Asset**.  To the extent that the line item for Deferred Tax Asset on Exhibit D is determined by the Constantin 2014 Audited Financials to be less than $5,235,351 (the "Constantin DTA Determination"), then there shall be an adjustment to the Deferred Installment Payments by the absolute value of the difference between the Constantin DTA Determination and 5,235,351, but in no case shall the

Buyer be entitled to a diminution in the Deferred Installment Payments of more than $5,235,351.

(c)     **Goodwill Adjustment**.   To the extent that the Cognati Goodwill (currently, $1,334,690) is no longer recognized in full on the Constantin 2014 Audited Financials (the Constantin GW Determination), there shall be a decrease to the Deferred Installment Payments by an amount equal to 50% of the absolute value of the difference between the Constantin GW Determination and the Cognati Goodwill, but in no case shall the Buyer be entitled to a diminution greater than $667,345.

(d)     **Adjustments for Tax Purposes**. Any payments made pursuant to Section II.4 shall be treated by the parties for Tax purposes as an adjustment to the Purchase Price, unless otherwise required by Law.

(e)     **Payment of Purchase Price Adjustments.**  The amount of any increase shall be paid by the Buyer at the time of the final payment due to the Seller pursuant to the Deferred Installment Payments.  If the Post-Closing Adjustment is a negative number, the amount of the Deferred Installment Payments shall be reduced, in inverse order of their respective due dates, by the amount of the Post-Closing Adjustment.

(f)     **Limit on Adjustment to Purchase Price**.  In no event shall the aggregate of the Post-Closing Adjustment, the Adjustment for Deferred Tax and the Goodwill Adjustment combined entitle the Buyer to an aggregate decrease in Purchase Price greater than $10,000,000.00.

(g)     **Withholding Rights**. Buyer shall be entitled to deduct and withhold from any amount otherwise payable pursuant to this Agreement, such amounts as are required to deduct and withhold with respect to such payment under applicable Law. To the extent that amounts are so withheld and paid to the appropriate Taxing Authority, such withheld amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made, provided that Buyer shall not withhold so long as Seller had provided an IRS Form W-9 and a statement to the effect that it is not a "U.S. real property holding corporation"

as required by applicable Treasury regulations or a foreign real property holding company as provided under the Foreign Investor Real Property Tax Act.

## Article III
### SELLER'S REPRESENTATIONS AND WARRANTIES

Seller hereby represents and warrants to the Buyer, as of the date hereof, and as of the Closing, as follows:

III.1.    **Corporate Organization, Licenses, etc.**  Each of the Seller and Schratter Foods is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Schratter Foods has full corporate power and authority to carry on the Business as it is now being conducted, and to own, operate and lease its properties for the purposes of carrying on the Business.  To the Knowledge of the Seller, Schratter Foods has all necessary governmental licenses and permits to operate the Business as it is presently being operated, and has passed all inspections ancillary to the operation of the Business in the various jurisdictions where Schratter Foods has been and is conducting its Business.  The Seller has provided the Buyer with full, correct and complete copies of Schratter Food's certificate of incorporation and bylaws as in full force and effect on the date hereof, and, as of five business days prior to the Closing Date, shall have provided to the Buyer any notices received by Schratter Foods or Seller of alleged violations of applicable requirements as a result of any inspections ancillary to the operation of the Business.

III.2.    **Authorization by the Seller, Etc.**  The Seller has full power and authority to enter into this Agreement and the agreements contemplated hereby, to perform its obligations hereunder and to consummate the transactions contemplated hereby.  The execution, delivery and performance of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by all requisite corporate action on the part of the Seller.  Assuming due authorization, execution and delivery by the

Buyer, this Agreement constitutes a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

III.3.     **Governmental Filings; No Violation or Conflicts**.  No notices, reports or other filings are required by any law, rule, regulation, order or injunction to be made or effected by the Seller or by Schratter Foods with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by the Seller or Schratter Foods from, any domestic or foreign governmental or regulatory authority, agency, commission, body or other governmental entity ("Governmental Entity") in connection with the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby by the Seller or the Company, or the performance of the Seller's or Schratter Foods' obligations hereunder. The execution, delivery and performance by the Seller and the Company of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not, result in a violation or breach of (a) the certificate of incorporation or by-laws of the Seller or Schratter Foods, as applicable, or (b) any law, rule, regulation, or Order to which the Seller or Schratter Foods is subject.

III.4.     **Title and Related Matters**.   The Seller is the record and beneficial owner of, and will own at Closing, all of the Shares, and has good and marketable title to all of the Shares, free and clear of any Encumbrances, and upon consummation of the transactions contemplated hereby, the Buyer shall own all of the Shares, free and clear of any Encumbrances, except for the Buyer's pledge of a portion of the Shares to the Seller pursuant to the Stock Pledge Agreement.

III.5.     **Capitalization**.     (a) The authorized capital stock of the Company consists of 1,000 shares of common stock, par value $0.01 per share, of which 1,000 shares of common stock are issued and outstanding, and constitute all the Shares.  All of the Shares (A) have been duly authorized and validly issued; (B) are fully paid and non-assessable; and (C) were issued in compliance with all applicable laws concerning the issuance of securities. Other than the Shares, there are no Equity Interests in Schratter Foods that

are issued, authorized or outstanding on the date hereof, nor shall any be issued between the date hereof and the Closing.  There are no pre-emptive rights or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements, or commitments of any character under which the Seller or Schratter Foods may be obligated to sell, or giving any Person, a right to acquire, or in any way dispose of, any of the Shares or any securities or obligations exercisable or exchangeable for, or convertible into, any of the Shares, and no securities or obligations evidencing such rights are authorized, issued or outstanding.  The Shares are not subject to any voting trust agreement or other contract, agreement or arrangement restricting or otherwise relating to the voting, dividend rights or disposition of the Shares.

III.6.  **Subsidiaries and Divisions**.  As of the date hereof, the only subsidiary of Schratter Foods is Corman Ship Supplies LLC, a Delaware limited liability company, formed in 2014, and the only divisions of Schratter Foods are Anco Fine Cheese (cheese importation and distribution), Cognati (cheese cut and wrap) and Corman Ship Supplies (cruise ship supply). Corman Ship Supplies LLC was formed in Delaware on June 5, 2014 and has no operations and assets or liabilities.  Except as disclosed on Schedule III.6 of the Seller's Disclosure Letter, all fictitious name certificates with respect to any subsidiaries or divisions of Schratter Foods have been filed in all jurisdictions where Schratter Foods does business and are still valid and enforceable in accordance with all local laws.  Neither Schratter Foods nor any Subsidiary nor any Division thereof (i) is a party to or bound by any Contract to acquire, any Equity Interest or other security of any Person or any direct or indirect equity or ownership interest in any other business, or (ii) is obligated to provide funds to or make any investment (whether in the form of a loan, capital contribution, or otherwise) in any other Person.  For purposes hereof, "Subsidiary" means, with respect to any Person, any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having

the power to direct the business and policies of that corporation or other Person are held by the first specified Person or one or more of its Subsidiaries, and "Division" means, with respect to any Person, any line of business or segment of assets of that Person.

III.7.   **Financial Statements, Etc.**

(a)   The Seller has provided to the Buyer and its representatives complete and correct copies of the audited consolidated (as applicable) financial statements of the Company, consisting of the balance sheet of the Company as at December 31 in each of the years 2011, 2012 and 2013 and the related consolidated (as applicable) statements of income and retained earnings, stockholders' equity and cash flow for the years then ended (the "Audited Financial Statements"), and unaudited financial statements consisting of the balance sheet of the Company as at August 31, 2014 and the related statements of income for the eight-month period then ended (the "Interim Financial Statements" and together with the Audited Financial Statements, the "Financial Statements"). The Financial Statements have been prepared in accordance with US GAAP applied on a basis consistent with prior periods, and are true, correct, and fairly present in all material respects the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated. The books and records of Schratter Foods have been maintained accurately in all material respects and in accordance with all applicable Laws in all material respects; the transactions entered therein represent good faith transactions; and the revenues, expenses, assets and liabilities of Schratter Foods have been properly recorded therein in all material respects. The internal controls and procedures of Schratter Foods are designed to ensure that the Financial Statements are accurate in all material respects. Schedule III.7 of the Sellers' Disclosure Letter sets forth a true and complete list of the individual items to be paid in full or contributed to capital as set forth in Article VI.1(c).

(b)     Schratter Foods records the liabilities on its year-end balance sheet in accordance with US GAAP applied on a consistent basis throughout the period involved.

(c)     Since August 31, 2014, the Business of Schratter Foods has been operated in the Ordinary Course of Business.

III.8.     **Recognition of Liabilities in Audited Financial Statements.** To the Knowledge of Seller, Schratter Foods has no liabilities or obligations, fixed or contingent, matured or unmetered, which are not shown on the Financial Statements; and all reserves established by the Seller and the Company, and set forth on the Financial Statements, are adequate and in conformity with past practices.   The Audited Financials are prepared in accordance with US GAAP.  To the Knowledge of Seller, Schratter Foods does not have any loss contingencies other than as reflected or reserved against on the Financial Statements included in, or otherwise disclosed in, the Financial Statements and not heretofore paid or discharged.  Moreover, to the Knowledge of Seller, Schratter Foods does not have any Liabilities that are not reflected in the Financial Statements as a liability, or as a loss reserve.  Neither the Seller nor its stockholders have taken or withdrawn any funds, or taken any property from Schratter Foods that have not been disclosed, in writing, to the Buyer, or that were not rightfully withdrawn for reimbursement for officer expenses against presentation of justifiable receipts; it being understood that the neither the Seller nor its officers or directors, its stockholders or their affiliates are entitled to any salary, compensation, commission, or rent from Schratter Foods that is not already reflected in the Financial Statements.

**III.9 Absence of Changes.**  To the Knowledge of Seller and except as set forth in Schedule III.9 of the Seller's Disclosure Letter, since July 1, 2014 the Business of Schratter Foods has been operated in the Ordinary Course of Business, and there has not been (a) any adverse change in the condition (financial or otherwise), assets, liabilities, earnings, net worth, business or prospects of Schratter Foods, for such period or at any time during such

period; (b) any damage, destruction or loss (whether or not covered by insurance) adversely affecting the Business or Assets of Schratter Foods; (c) any obligation or liability (whether absolute, accrued, contingent or otherwise, and whether due or to become due) incurred by the Seller or Schratter Foods with respect to Schratter Foods, other than obligations or liabilities incurred in the Ordinary Course of Business; (d) any distribution or setting aside of monies in anticipation of a distribution or payment to any officers, directors or stockholders of the Seller or Schratter Foods, or any direct or indirect redemption or anticipated redemption, purchase or acquisition of any Equity Interests of Schratter Foods, the Seller or any stockholder thereof; (e) any issuance or sale by Schratter Foods, or any contract entered into by Schratter Foods for the issuance or sale of, any interest in Schratter Foods; (f) any sale, transfer or other disposition of any tangible asset of Schratter Foods, except in the Ordinary Course of Business; (g) any write-down of the value of any inventory of Schratter Foods, or any write-off as uncollectible of any notes or accounts receivable, except for write-downs and write-offs in Ordinary Course of Business; (h) any cancellation of any debts or claims of any rights of value due to Schratter Foods; (i) any material increase in the compensation of any officers or employees of Schratter Foods; any change in the accounting methods or practices of Schratter Foods; (j) issuance of or change in the authorized or issued Equity Interests of Schratter Foods; purchase, redemption, retirement, or other acquisition by Schratter Foods of any Equity Interest; or declaration or payment of any dividend or other distribution or payment in respect of the Equity Interests of Schratter Foods; (k) amendment to the Organizational Documents of Schratter Foods; (l) entry into, modification, termination, or expiration of, or receipt of notice of termination of, any Material Agreement (or Contract which would be a Material Agreement if in effect as of the date hereof) other than in the Ordinary Course of Business consistent with past practice in nature and amount; (m) release or waiver of any claim or right of Schratter Foods other than in the Ordinary Course of Business consistent with past practice in nature and amount; (n) capital

expenditure (or series of related capital expenditures) by Schratter Foods in excess of $100,000.00; (o) capital investment in, loan to, or acquisition of the securities or assets of, any Person (or series of related capital investments, loans, and acquisitions) by Schratter Foods; (p) note, bond, debenture, or other indebtedness for borrowed money issued, created, incurred, assumed, or guaranteed by Schratter Foods; or (q) agreement or commitment by Schratter Foods (or Seller on behalf of Schratter Foods) to do any of the foregoing.

**III.10  Tax Matters**.  To the Knowledge of Seller and except as set forth in Schedule III.10 of the Seller's Disclosure Letter:  (i) all Federal, state and local tax returns and tax reports required to be filed by the Company or the Consolidated Income Tax Group  on behalf of the Company have been timely filed with the appropriate governmental agencies, and all of the foregoing are true, correct and complete; (ii) all Federal, state and local income, profits, sales, use, occupation, property and other taxes (including interest and penalties) due from Schratter Foods have been fully paid or adequately provided for on the Financial Statements or shall be timely paid by Schratter Foods; (iii) no issues have been raised (or are currently pending) by the IRS or any other taxing authority in connection with any of the returns and reports referred to in the foregoing clause; (iv) all deficiencies or assessments made in writing as a result of any audit, examination or investigation by any Taxing Authority of Tax Returns of Schratter Foods that are due and payable have been fully paid, and no audits, examinations or investigations by any Taxing Authority relating to any Tax Returns of Schratter Foods are in progress, except for the pending 2011 Tax audit for which an extension has been granted to March 31, 2016; (v) neither the Seller nor Schratter Foods has received written notice from any Taxing Authority of the commencement of any audit, examination or investigation not yet in progress; (vi) there is no action, claim, hearing or, to the Knowledge of Schratter Foods or the Seller, proceeding, relating to Taxes pending or threatened against Schratter Foods; (vii) there is no action, claim, hearing proceeding, relating to Taxes pending or threatened against the

Company and its Subsidiaries; (viii) no power of attorney granted by or with respect to the Company or any of its Subsidiaries relating to Taxes is currently in force; (ix) no closing agreement pursuant to Section 7121 of the Code (or any similar provision of any state, local or foreign law) has been entered into by or with respect to the Company or any of its Subsidiaries; (x) neither the Company nor any of its Subsidiaries (A) is or has ever been a member of an affiliated group of corporations filing a consolidated federal income Tax Return (other than the group to which they are currently members and the common parent of the Seller, or for the period prior to June 2013 when the Company filed on behalf of its Subsidiary/Division, Cognati Cheese Company), or (B) has any liability for the Taxes of any Person (other than the Company or any of its Subsidiaries) under Treasury Regulations Section 1.1502-6 (or any similar provision of any state, local, or foreign law), as a transferee or successor, by contract, or otherwise; (xi) the Company and its Subsidiaries have duly and timely withheld from employee salaries, wages and other compensation and paid over to the appropriate Taxing Authorities all amounts required to be so withheld and paid over for all periods under all applicable laws and regulations. (xii) the Company and its Subsidiaries have collected all material sales and use Taxes required to be collected, and have remitted, or will remit on a timely basis, such amounts to the appropriate Governmental Authorities, or have been furnished properly completed exemption certificates and have maintained all such records and supporting documents in the manner required by all applicable sales and use Tax statutes and regulations; (xiii) neither the Company nor any of its Subsidiaries is a party to, or bound by, or has any obligation under, any tax allocation or sharing agreement or similar contract or arrangement or any agreement that obligates it to make any payment computed by reference to the Taxes, taxable income or taxable losses of any other Person; (xiv) neither the Company nor any of its U.S. Subsidiaries will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (A) change in method of accounting for a taxable

period ending on or prior to the Closing Date, (B) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state or local income Tax law) executed on or prior to the Closing Date, (C) intercompany transactions or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state or local income Tax law), (D) installment sale or open transaction disposition made on or prior to the Closing Date, or (E) prepaid amount received on or prior to the Closing Date; and  (xv) none of the Company or any of its Subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution in which the parties to such distribution treated the distribution as one to which Section 355 of the Code is applicable; and (xvi) Neither the Company nor any U.S. Subsidiary has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period.

**III.11  Compliance with Laws**.  To the Knowledge of the Seller and except for violations that would not, individually or in the aggregate, reasonably be likely to have a Company Material Adverse Effect, the Business of Schratter Foods has not been, and is not being, conducted in violation of any federal, state, local or foreign law, statute or ordinance, common law or any rule, regulation, guideline, standard, judgment, order, writ, injunction, decree, arbitration award, agency requirement, license or permit of any Governmental Entity (collectively, "Laws"), including, but not limited to Anti-Trust Compliance.  No investigation or review of any Governmental Entity with respect to Schratter Foods is, to the Knowledge of the Seller, pending or threatened, nor has any Governmental Entity indicated an intention to conduct such, except for such investigations or reviews that would not, individually or in the aggregate, reasonably be likely to have a Company Material Adverse Effect.  To the Knowledge of the Seller, Schratter Foods has obtained and is in compliance with all permits, licenses, certifications, approvals, registrations, consents, authorizations, franchises, variances, exemptions and orders issued or granted by a Governmental Entity ("Licenses") necessary to conduct its

Business as presently conducted, except those the absence of which, or the failure to comply with which, would not, individually or in the aggregate, reasonably be likely to have a Company Material Adverse Effect.  None of the representations and warranties contained in this Section shall be deemed to be related to any Commercial Matter or Employee Matter.

**III.12   Trademarks**.   Schedule III.12 of the Seller Disclosure Letter contains a true and complete list of all registered trademarks that are owned and used or held for use by Schratter Foods and that, to the Knowledge of Seller, will be owned by Schratter Foods as of Closing.   The registered trademarks listed on Schedule III.12 are valid and subsisting and all trademarks listed thereon are owned by Schratter Foods free and clear of all Encumbrances.  To the Knowledge of the Seller, the Company is not, nor has it during the past two years, infringed, misappropriated or otherwise violated the Intellectual Property rights of others, nor has it committed any act or omission that would constitute unfair competition or trade practices in any jurisdiction. The Intellectual Property used by the Company enables the Company to conduct its Business as presently conducted.

**III.13   Environmental Matters**.   To the Knowledge of the Seller, Schratter Foods is in material compliance with all applicable Environmental Laws.   To the Knowledge of the Seller, there has not been any release, contamination or disposal of Hazardous Substances by Schratter Foods at any property currently owned or operated in connection with the Business of Schratter Foods (including in soils, groundwater, surface water, buildings or other structures), or from any waste generated by Schratter Foods that has given rise, or would reasonably be likely to give rise, individually or in the aggregate, to any Liability under any Environmental Laws for which Schratter Foods would incur or share Liability.

**III.14   Prohibited Payments**.   Except as set forth on Schedule III.14 of the Seller Disclosure Letter and to the Knowledge of the Seller, the Company is in compliance in all material respects with laws, rules, and regulations of any jurisdiction applicable to the Company from time to time concerning or relating

to (a) bribery or corruption, including without limitation the Foreign Corrupt Practices Act of 1977, and (b) money laundering,

**III.15   Litigation**.   Schedule III.15 of the Seller Disclosure Letter contains a complete list, and a brief description, of all litigation as to which Schratter Foods is a party.  To the Knowledge of the Seller, there are no civil, criminal or administrative actions, suits, demands, claims, investigations or hearings, or legal or administrative or arbitration proceedings pending or threatened against the Seller or Schratter Foods, or any of their officers, directors or employees, other than as set forth in Schedule III.15.  Neither the Seller nor Schratter Foods is a party to, or subject to the provisions of, any judgment or Order of any Governmental Entity that would, individually or in the aggregate, reasonably be likely to have a Company Material Adverse Effect.

**III.16   Employee Benefits**. To the Knowledge of the Seller, all benefit and compensation plans, contracts, or arrangements sponsored or contributed to by Schratter Foods (or for which Schratter Foods could have any liability), including "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and employment agreements, deferred compensation, change of control, retention, stock option, stock purchase, stock appreciation, stock based, incentive, severance and bonus plans (the "Benefit Plans") in effect as of the date hereof are listed on Schedule III.16 of the Seller Disclosure Letter. Except as otherwise set forth on Schedule III.16 to the Seller Disclosure Letter, to the Knowledge of the Seller, each Benefit Plan has been maintained and administered in material compliance in all respects with the terms thereof and the applicable requirements of ERISA, the Internal Revenue Code of 1986, as amended (the "Code"), and any applicable law.  Except as otherwise set forth on Schedule III.14 to the Seller Disclosure Letter, to the Knowledge of the Seller, each Benefit Plan that is intended to be qualified under the Code has received a favorable determination or opinion letter from the Internal Revenue Service with respect to its qualified status under the Code, or has until January 31, 2015 to file an application for such determination from the IRS.  Except as

otherwise set forth on Schedule III.16 to the Seller Disclosure Letter, to the Knowledge of the Seller, all contributions that are required to be made under the terms of any Benefit Plans have been timely made or are reflected in the Financial Statements as at the dates thereof. Except as otherwise set forth on Schedule III.15 to the Seller Disclosure Letter, to the Knowledge of the Seller, no event has occurred, and no condition exists that would, individually or in the aggregate, reasonably be likely to subject Schratter Foods to any material Tax, fine, lien, penalty or other liability imposed by ERISA or the Code in respect of any Benefit Plan. Schratter Foods does not maintain or contribute to, or has within the last six months maintained or contributed to, or been required to contribute to, an "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA that is subject to Title IV of ERISA. Except as required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or similar state or local law or is reflected on the Financial Statements, Schratter Foods is not obligated to provide any retiree health or life insurance benefits to any employee or former employees of Schratter Foods. Except as otherwise described in this Agreement, to the Knowledge of the Seller, neither the execution of this Agreement, nor consummation of the Transaction will (whether alone or in connection with any other event): (A) entitle any employee of Schratter Foods (other than may be made available to the Transferred Employees) to severance pay or any increase in severance pay (or other compensation or benefits) upon any termination of employment; (B) accelerate the time of payment or vesting or result in any payment or funding of any compensation of benefits under, or increase the amount payable pursuant to, any of the Benefit Plans; (C) limit or restrict the right of Schratter Foods or the Buyer to merge, amend or terminate any of the Benefit Plans; or (D) result in payments under any of the Benefit Plans that would not be deductible under Section 280G of the Code.

**III.17  Bank Accounts.** Schedule III.17 of the Seller Disclosure Letter will set forth an accurate list and summary description of the name and address of every bank and other financial institution in which Schratter Foods

maintains an account (whether checking, savings or otherwise), lock box or safe deposit box, and the account numbers and names of the persons having signing authority or wire or other access thereto, as provided by the respective Company banks, to be delivered to Buyer no later than five days prior to Closing.

**III.18   Solvency.**   The Company has not voluntarily commenced any, and to Seller's Knowledge, there is, no bankruptcy or insolvency proceeding of any character pending, including, without limitation, bankruptcy, receivership, reorganization, dissolution or arrangement with creditors, voluntary or involuntary, by Schratter Foods or the Seller or known by Seller to be threatened.

**III.19   Absence of Encumbrance.**   The assets owned by Schratter Foods as set forth in the Financial Statements as being owned by the Company are free and clear of all Encumbrances and constitute all the assets, properties and rights.

**III.20   Full Disclosure.** To the Knowledge of the Seller, the Seller has provided to the Buyer full, fair and accurate disclosure of all material information relative to the financial position and operating results of Schratter Foods for the three years ended December 31, 2011, 2012 and 2013 for the eight-month interim period ended August 31, 2014. To the Knowledge of the Seller, no representation or warranty by the Seller contained in this Agreement, and no statement contained in any certificate, schedule or list attached hereto contains or will contain any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading.

**III.21   Other Representations and Warranties.** Except for the express representations and warranties contained in this Article III (including the related attachments), none of Seller, the Company or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or the Company, including any representation or warranty regarding the Company furnished or made available

to Buyer and its directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents (including any information, documents or material made available to Buyer in management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Company, or any representation or warranty arising from statute or otherwise in law.

**Article IV**

**BUYER'S REPRESENTATIONS AND WARRANTIES**

The Buyer represents and warrants to the Seller as follows, it being understood that each of VE and ECB severally and not jointly represent and warrant as to itself only:

IV.1.     **Organization, etc.**   VE is a New York corporation that is duly organized, validly existing and in good standing under the laws of the State of New York.  ECB is a Florida corporation that is duly organized, validly existing and in good standing under the laws of the State of Florida.

IV.2.     **Authorization, Etc.**   The Buyer has full power and authority to enter into this Agreement and to carry out the transactions contemplated hereby. The President of VE, and the President of ECB, have duly authorized the execution, delivery and performance of this Agreement and the transactions contemplated hereby, and no other proceedings on their part are necessary to authorize this Agreement and the transactions contemplated hereby. Assuming due authorization, execution and delivery by Seller, this Agreement constitutes the legal, valid and binding obligation of the Buyer, enforceable against it in accordance with its terms.

IV.3.     **No Conflicts; Consents**.   The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) result in a violation or breach of any provision of the articles of incorporation or the by-laws of the Buyer; or (b) result in a violation or breach of any provision of any Law or Order applicable to the Buyer. No consent, approval, permit, Order, declaration

or filing with, or notice to, any Governmental Entity is required by or with respect to the Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

IV.4.     **Investment Purpose**.  The Buyer is acquiring the Shares solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. The Buyer acknowledges that the Shares are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Shares may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended, or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Buyer is able to bear the economic risk of holding the Shares for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

IV.5.     **Decision to Purchase**.  Buyer acknowledges and agrees that in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer is relying upon the limited information to which it has had access on the date hereof and upon representations and warranties of the Seller set forth in Article III of this Agreement (including the related portions of the Seller Disclosure Letter).

## Article V

## REPRESENTATION AND WARRANTY

Alain Voss represents and warrants to the Seller and Buyer that the Company has been operated in compliance with Law, including, but not limited to Anti-Trust Compliance

## Article VI

## COVENANTS

VI.1.    **Interim Operations**. Except with the Buyer's prior written consent (not to be unreasonably withheld, conditioned or delayed), the Seller during fiscal 2014 has been, and shall continue to cause the Company: (i) to conduct its business in the ordinary course and, to the extent consistent therewith, use its commercially reasonable efforts to (A) preserve its business organizations intact, (B) maintain existing relations and goodwill with Governmental Entities, customers, suppliers, distributors, creditors, lessors, employees and business associates, and (C) keep available the services of its present employees and agents; and (ii) not to:

(a)    amend its certificate of incorporation or bylaws;

(b)    merge or consolidate with any other Person;

(c)    acquire assets outside of the ordinary course of business consistent with past practice from any other Person with a value or purchase price in the aggregate in excess of $100,000.00 or that would have any possibility of preventing or delaying the Closing;

(d)    issue, sell, pledge, dispose of, grant, transfer, Encumber, or authorize the issuance, sale, pledge, disposition, grant, transfer, lease, license, guarantee or other Encumbrance of, any Equity Interests of the Company, except for the Excluded Assets;

(e)    create or incur any Encumbrance on the assets of the Company that, individually or in the aggregate, is material to the Company, except with respect to the Excluded Assets;

(f)    make any loans, advances, guarantees or capital contributions to or investments in any Person, other than in the ordinary course of business consistent with past practice and which do not have any possibility of preventing or delaying the Closing;

(g)    declare, set aside, make or pay any (i) cash distributions or dividends, or (ii) non-cash distributions or dividends, payable in stock, property or otherwise, with respect to any of its Equity Interests or enter into any agreement with respect to the voting of its Equity Interests;

(h)   (i) incur any Indebtedness for borrowed money, or issue or sell any debt securities or warrants or other rights to acquire any debt security of the Company or any of its Subsidiaries, except for Indebtedness incurred in the ordinary course of business consistent with past practice that is satisfied in full at or prior to the Closing, or (ii) amend, modify, supplement or waive the terms of any existing Indebtedness, debt securities or warrants or other rights to acquire debt securities of the Company, except in the Ordinary Course of Business consistent with past practice or in connection with the payoff by the Seller of the Indebtedness owed to Citibank by the Company, and contribution of the Indebtedness owed by the Company to the Seller and/or its Affiliates, in accordance with Section VI.1(c);

(i)   make or authorize any payment of, or accrual or commitment for, capital expenditures in excess of $100,000.00;

(j)   amend, supplement, waive, terminate, assign, convey, encumber or otherwise transfer, in whole or in part, its rights or interests under or in any material contract, or enter into any contract with an Affiliates that would be a material contract if in effect as of the date hereof; provided that the Seller may terminate the Cheese Alliance Agreement;

(k)   enter into any contract with an Affiliate or amend, modify or waive any contract with an Affiliate in any manner that would result in the Company or its subsidiaries paying to the other parties thereto aggregate consideration greater than $100,000.00 except in the Ordinary Course of Business;

(l)   make any changes with respect to material financial accounting policies or procedures, except as required by changes in US GAAP;

(m)   enter into any line of business in any geographic area other than the current lines of business of the Company;

(n)   settle any litigation or other proceedings before a Governmental Entity for an amount in excess of $100,000.00;

(o)   except to the extent otherwise required by Law, make or change any Tax election, change any method of Tax accounting or settle or

finally resolve any controversy with respect to Taxes for an amount that materially exceeds the amount reserved with respect thereto in the most recent Financial Statements, provided, however, that the Company intends prior to Closing to eliminate the tax benefits recorded between July 1 and December 31, 2014 and may apply the pro rata allocation method for utilizing the net operating loss carryforwards available for the fiscal year 2014 as permitted by the current Internal Revenue Code of the United States;

(p)     to the Knowledge of Seller transfer, sell, lease, license, mortgage, pledge, surrender, encumber, divest, cancel, abandon or allow to lapse or expire or otherwise dispose of any licenses (all of which, to the Knowledge of Seller, shall be in full force and effect at the Closing) other than in the Ordinary Course of Business and other than as to the Excluded USDA Import Licenses;

(q)     other than as may be required by applicable Law, pursuant to the existing terms and conditions of any Benefit Plan as in effect on the date hereof or the termination of the Company's Highly Compensated Employee Medical Plan (i) terminate, establish, adopt or amend any Benefit Plan other than the adoption of annual Benefit Plans in the ordinary course of business consistent with past practice and amendments to health and welfare plans (other than severance plans) that do not increase benefits or result in materially increased administrative costs, (ii) grant any salary or wage increase, other than to increase salary and wages for employees by no more than 4% in the aggregate in the ordinary course of business consistent with past practice, (iii) pay aggregate bonus or incentive compensation other than in the ordinary course consistent with past practice, (iv) (x) grant any new compensation award, other than bonus awards and cash-based long term incentive compensation awards, in each case in amounts and on terms that are in the ordinary course of business consistent with past practice; (y) amend the terms of outstanding compensation awards other than in a manner that does not increase the amounts payable or accelerate the timing of any payment under

such awards and in the ordinary course of business consistent with past practice, or (z) change the compensation opportunity under any Benefit Plan;

(r) pay any severance other than in the ordinary course of business consistent with past practice in connection with employees' entering into and not revoking a release of claims against the Company in connection with terminations of employment;

(s) take any action to accelerate the vesting or payment, or fund or secure the payment, of any amounts under any Benefit Plan;

(t) change any assumptions used to calculate funding or contribution obligations under any Benefit Plan, other than as required by US GAAP;

(u) forgive any loans to directors, officers or employees of the Company or any of its subsidiaries;

(v) transfer, sell, lease, license, divest or otherwise dispose of any properties owned or leased by the Company except with respect to the transfer of the Excluded Assets or otherwise in the ordinary course of business; or

(w) authorize or enter into an agreement to do any of the foregoing other than in the Ordinary Course of Business.

VI.2.    **Access to Information**. From the date hereof through the Effective Date Seller shall, and shall cause the Company to: (a) afford Buyer and its Representatives reasonable access to and the right to inspect all of the properties, assets, premises, books and records, contracts, agreements and other documents and data related to the Company (q.v. Article IV.5.); (b) furnish Buyer and its Representatives no later than December 19, 2014 with true and complete copies of all Benefit Plans and such financial, operating and other data and information related to the Company that Buyer or any of its Representatives have requested on or before November 26, 2014; and (c) instruct the Representatives of Seller and the Company to cooperate with Buyer in its investigation of the Company; provided, however, that any such investigation shall be conducted during normal business hours upon

reasonable advance notice to Seller, under the supervision of Seller's personnel and in such a manner as not to interfere with the normal operations of the Company. All requests by Buyer for access pursuant to this Section V.2 shall be submitted or directed exclusively to Lewis D. Gitlin, General Counsel of ZNHC, Inc., at lew.gitlin@sbmsincusa.com or such other individuals as Seller may designate in writing from time to time.

VI.3.  **Seller Disclosure Letter**.  On the date of this Agreement, the Seller shall provide to the Buyer the Seller Disclosure Letter, which shall include all Schedules referred to herein and all information required by the Schedules.

VI.4.  **Liquidation of Indebtedness Owed by the Company.**  Prior to the Closing Date, the Seller and/or its Affiliates shall pay off or contribute to the equity of the Company any and all inter-company Indebtedness owed by the Company to (A) the Seller or its Affiliates; and (B) Citibank or its Affiliates, such that the Company's Financial Statements, as at the Closing Date, will not reflect any Indebtedness, contingent or otherwise, to such entities, and there shall be no such Indebtedness outstanding at the Closing Date.  The Seller and the Company have not, and shall not, refinance any such Indebtedness with any other institution or Person between the date hereof and the Closing Date. Five days before the Closing Date, the Seller and the Company will provide to the Buyer a schedule as to any outstanding Indebtedness of the Company as at that date, together with copies of any and all payoff letters for such Indebtedness.  At Closing, Seller and the Company shall provide to the Buyer a schedule as to any outstanding Indebtedness of the Company as at that date. q.v. VII.1(c)

VI.5.  **Reserved**.

VI.6.  **Net Operating Loss Carrybacks and Carryforwards; Tax Refunds**.  Subsequent to the Closing Date, the Seller relinquishes the right to any net operating losses of the Company for any taxable period ending on or before the date that the Company became a member of any Consolidated Income Tax Group ("Company Net Operating Losses"), except that the Seller

reserves the right to use the pro rata allocation method for 2014. Moreover, in the event that the Company or the Seller is deemed to be entitled to, or does receive, any tax refunds that are attributable to Company Net Operating Losses from federal, state or local taxing entities for any taxing period prior or subsequent to the Closing Date with respect to tax returns or tax liabilities of the Company for any such periods, then, if such refunds or payments are received by the Company, the Company shall be entitled to retain such tax refunds or payments. If the Seller is notified that it is entitled to receive, or if the Seller does receive such refunds or payments, then the Seller shall either remit such refunds or payments to the Buyer, or the Buyer shall be entitled to utilize such refunds or payments as a credit against its deferred obligations to the Seller.

VI.7.     **Publicity**. Prior to the Closing neither party to this Agreement shall issue or permit to be issued any press releases or otherwise make any public announcements with respect to the transactions contemplated hereby other than in accordance with a mutually agreed communications plan, with the prior written consent of the other party.

VI.8.     **Employees; Benefit Plans**.

(a)     During the period commencing at the Closing and ending on the date which is 12 months from the Closing (or if earlier, the date of the employee's termination of employment with the Company), the Buyer shall, or shall cause the Company to, provide each Employee who remains employed immediately after the Closing ("Company Continuing Employee") with: (i) base salary or hourly wages which are no less than the base salary or hourly wages provided to any specific employee by the Company immediately prior to the Closing; (ii) target bonus opportunities (excluding equity-based compensation), if any, which are no less than the target bonus opportunities (excluding equity-based compensation) provided by the Company immediately prior to the Closing; (iii) retirement and welfare benefits that are no less favorable in the aggregate than those provided by the Company immediately prior to the Closing (except for termination of the Highly Compensated Employee medical

plan); (iv) in the case of termination severance benefits that are no less favorable than the practice, plan or policy in effect for such Company Continuing Employee immediately prior to the Closing, and (v) participation in Company Benefit Plans in accordance with Section V.6(b).

(b)     With respect to any employee benefit plan maintained by the Company, Buyer or its Subsidiaries (collectively, "Company Benefit Plans") as of the Closing, Buyer shall, or shall cause the Company to, recognize all service of the Company Continuing Employees with the Company or any of its Subsidiaries, as the case may be, as if such service were with the Buyer, for vesting and eligibility purposes in any Company Benefit Plan in which such Company Continuing Employees may be eligible to participate after the Closing Date; provided, however, such service shall not be recognized to the extent that (x) such recognition would result in a duplication of benefits or (y) such service was not recognized under the corresponding benefit plan.  The costs and fees associated with updating, correcting or filing for a determination as to the ongoing qualified status of the Company's  401(k) Plan shall be undertaken by the Seller, and shall be paid by the Seller unless incurred after the Closing.

(c)     On or before the Closing Date, the Seller shall cause the Company to amend its 401(k) Plan to incorporate all amendments not previously made to incorporate all changes required to the 401(k) Plan by IRS Notice 2013-84 to maintain the qualified status of the 401(k) Plan and to submit a determination letter application to the Internal Revenue Service to obtain a current determination letter for the 401(k) Plan certifying its qualified status under Section 401(a) of the Code.

(d)     If the Company terminates Sunit Patel, an employee of the Company, during the period commencing at the Closing and ending on the date which is three months from the Closing, Seller shall reimburse the Company for one-half of any severance payments paid by the Company to Sunit Patel, provided, however, that any such severance payment will be on terms (including with respect to amounts) which are consistent with the Company's practice, plan or policy as in effect immediately prior to the Closing.

(e)     On June 30, 2015, the Company shall terminate, and the Seller (or its Affiliates) shall be solely responsible for the employment of the Transferred Employees, and the Seller shall either continue to employ the Transferred Employees or pay the amount of any severance payment owed to such Transferred Employees, provided, however, that any such severance payment will be on terms (including with respect to amounts) which are consistent with the Company's practice, plan or policy as in effect immediately prior to the Closing.

(f)     If any of the Retention Pay Employees (i) remains employed by the Company at all times from the Closing Date until December 31, 2015 or (ii) is terminated by the Company without cause (as determined in good faith by the Company after consultation with the Seller) prior to that date, the Company shall pay such Retention Pay Employee a bonus in the amount of $50,000.00 and the Seller shall promptly reimburse the Company for the amount of any such bonus.  In the event of the termination of B. Andersen or B. Proust prior to July 1, 2015, the Company shall pay any amounts due in connection with said termination and the Seller shall promptly reimburse the Company for the amount of said severance payment, provided, however, that any such severance payment will be on terms (including with respect to amounts) which are consistent with the Company's practice, plan or policy as in effect immediately prior to the Closing.

(g)     The Buyer acknowledges that the Company shall not employ any of the following individuals: Claude Bertrand, Jean-Pierre Chesse or Regina Martin-Cocher (each, a "Visa Employee") immediately after the Closing; provided that if Company obtains the proper work authorization for Claude Bertrand, the Seller or its Affiliates hereby agree to reimburse the Company for the cost of Mr. Bertrand's salary and benefits (but not living or travel expenses) for six (6) months.

VI.9.     **USDA Import Licenses**. To the extent that the Company is requested by the Seller, or its Affiliates, to import the Seller's or the Affiliates' products into the United States, the Company shall use its best efforts to

utilize the Company's USDA licenses for such importation, and shall charge for such services at the rate of $0.01/lb, plus expenses that the Company may incur for such "sale in transit" services.

VI.10.   **Confidentiality**. Each party acknowledges and agrees that the Confidentiality Agreements remain in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to each other pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section shall nonetheless continue in full force and effect.

VI.11.   **Governmental Approvals and Other Third-Party Consents**.

(a)   Each party hereto shall, as promptly as possible, use its reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, Orders and approvals from all Governmental Entities and third parties that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the consummation of the transactions contemplated hereby. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, Orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, Orders and approvals.

(b)   All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either party before any Governmental Entity or the staff or regulators of any Governmental Entity, in connection with the transactions contemplated hereunder shall be disclosed to the other party hereunder in advance of any filing, submission or attendance, it being the intent that the parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments,

and proposals. Each party shall give notice to the other party with respect to any meeting, discussion, appearance or contact with any Governmental Entity or the staff or regulators of any Governmental Entity, with such notice being sufficient to provide the other party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

(c)     The Seller and the Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties that are described in the Seller Disclosure Letter or the Schedules.

VI.12.   **Books and Records of the Company**.

(a)     In order to facilitate the resolution of any claims made by or against or incurred by the Seller prior to the Closing, or for any other reasonable purpose, for a period of five (5) years after the Closing, the Buyer shall:

(i)     retain the books and records (including personnel files) of the Company relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of the Company; and

(ii)     upon reasonable notice, afford the representatives of the Seller reasonable access to (including the right to make, at the Seller's expense, photocopies of), during normal business hours, such books and records.

(b)     In order to facilitate the resolution of any claims made by or against or incurred by the Buyer or the Company after the Closing, or for any other reasonable purpose, for a period of five (5) years following the Closing, the Seller shall:

(i)     retain the books and records (including personnel files) of the Seller which relate to the Company and its operations for all periods prior to the Closing; and

(ii)     upon reasonable notice, afford the representatives of the Buyer or the Company reasonable access to (including the right to make, at the Buyer's expense, photocopies of), during normal business hours, such books and records.

VI.13.    **Closing Conditions**. From the date hereof until the Closing, each party hereto shall, and the Seller shall cause the Company to, use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in this Agreement.

VI.14.    **Further Assurances**. Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and to give effect to the transactions contemplated by this Agreement.

VI.15.    **Post-Closing Cooperation**. Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, use commercially reasonably efforts to provide such assistance on commercial matters relating to their respective business as the Buyer and the Seller may reasonably request.

VI.16.    **Exclusive Dealing**.  From the date of this Agreement until the Closing Date or the earlier termination of this Agreement pursuant to Article IX, the Seller will not, and will cause Schratter Foods and their respective Affiliates, stockholders, directors, officers, employees, advisors, representatives and agents not to, directly or indirectly, (i) discuss, negotiate, undertake, authorize, recommend, propose or enter into, either as the proposed surviving, merged, acquiring or acquired corporation, any Acquisition Proposal, (ii) facilitate, knowingly encourage, solicit or initiate any discussions, negotiations or inquiry, or the making of any proposal that constitutes, or that would reasonably be expected to lead to, an Acquisition Proposal, (iii) furnish or cause to be furnished, to any Person, any information concerning the business, operations, properties or assets of Schratter Foods or the Business in connection with an Acquisition Proposal, or (iv) otherwise cooperate in any way with, or assist or participate in, facilitate or knowingly encourage, any effort or attempt by any other Person to do or seek any of the foregoing.  Seller will (and will cause Schratter Foods to) immediately cease and cause to be terminated

any existing activities, discussions or negotiations with any Persons conducted heretofore with respect to any Acquisition Proposal.  The Company will promptly notify Buyer if any Person makes an Acquisition Proposal.  As used herein, "Acquisition Proposal" means a proposal for (a) a merger, reorganization, share exchange, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving the Company, or (b) a sale, exchange or other transaction involving shares of the Company's capital stock (other than transactions contemplated by this Agreement) or assets of Schratter Foods.

VI.17.    **Transfer Taxes**. All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and other government fees (excluding any penalties and interest) specifically required to be paid as a direct result of this Agreement (including any real property transfer tax and any other similar tax, including, without limitation, any tax or fee due in connection with the assignment of any of the leases to which the Company is a party) shall be borne and paid one-half by the Buyer and one-half by the Seller when due. Post-Closing, the Buyer shall, at its own expense, timely file any tax return or other document with respect to such taxes or government fees (and the Seller shall cooperate with respect thereto as necessary).  Any accounting or attorney fees, or other costs and expenses that the Seller may incur in connection with such cooperation shall be borne by the Seller.

VI.18.    **Tax Matters**.

(a)    **Cooperation in Filing Tax Returns**.  The Buyer and the Seller shall, and shall each cause its Affiliates to, provide to the other party such cooperation and information, as and to the extent reasonably requested, in connection with preparing, reviewing and filing of any tax return, amended tax return or claim for refund, determining liabilities for taxes or a right to refund of taxes, or in conducting any audit or other action with respect to taxes.  Such cooperation and information shall include providing copies of all relevant portions of relevant tax returns, together with relevant accompanying schedules and relevant work papers, relevant documents relating to rulings

and other determinations by governmental entities relating to taxes, and relevant records concerning the ownership and tax basis of property, which any such party may possess.  Each party will retain all tax returns, schedules, work papers, and all material records and other documents relating to tax matters of the Company for the tax period first ending after the Closing Date and for all prior tax periods until the later of either (i) the expiration of the applicable statute of limitations (and, to the extent notice is provided with respect thereto, any extensions thereof) for the tax periods to which the tax returns and other documents relate or (ii) six (6) years following the due date (without extension) for such tax returns.  Thereafter, the party holding such tax returns or other documents may dispose of them provided that such party shall give to the other party thirty (30) days written notice of such disposal and provide the other party with the opportunity to copy (at such other party's cost) such tax returns or other documents.  Each party shall make its employees reasonably available on a mutually convenient basis at its cost to provide explanation of any documents or information so provided.

(b)      **Consolidated Income Taxes**.  The Seller shall prepare, or cause to be prepared, and file, or cause to be filed, all Consolidated Income Tax Returns for all periods of the Company or any Subsidiary of the Company ending on or before the Closing Date and which are filed after the Closing Date, and shall pay any Consolidated Income Taxes shown as due or otherwise required to be paid with respect to such Consolidated Income Tax Returns. Any refund of Consolidated Income Taxes with respect to Consolidated Income Tax Returns shall be for the account of the Buyer.

(c)      **Tax Sharing Agreements**.  Seller shall cause all Tax allocation agreements or Tax sharing agreements with respect to each of the Company and its Subsidiaries to be terminated as of the Closing Date, and shall ensure that such agreements are of no further force or effect as to any of the Company and its Subsidiaries on and after the Closing Date and that there shall be no further liabilities or obligations imposed on any of the Company and its Subsidiaries under any such agreements.

(d)    **Straddle Period Allocation.** For purposes of this Agreement (including Article VIII), in the case of any Straddle Period, the amount of Taxes allocable to the portion of the Straddle Period ending on the Closing Date shall be deemed to be: In the case of Taxes imposed on a periodic basis (such as real or personal property Taxes), the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period) multiplied by a fraction, the numerator of which is the number of calendar days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire relevant Straddle Period, and In the case of Taxes not described in the above clause (such as franchise Taxes, Taxes that are based upon or related to income or receipts, based upon occupancy or imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible)), the amount of any such Taxes shall be determined as if such taxable period ended as of the close of business on the Closing Date. Buyer shall prepare, or cause to be prepared, and, subject to the review and comment of Seller, file, or cause to be filed, all tax returns that take into account any Straddle Period. The Buyer and Seller shall use all commercially reasonable efforts to cooperate in the preparation and filing of such returns and the external cost of such preparation shall be apportioned according the allocation of taxes due.

### VI.17 Termination

(a)    **Termination and Release.** Subject to the terms and conditions of this Agreement, the Employment Letters shall each be terminated as of Closing. From and after Closing, the Employment Letters will be of no further force or effect, and the rights and obligations of each of the parties to the Employment Letters thereunder shall terminate, including the eligibility of Alain Voss for any bonuses or payments.

(b)    **Release.** In consideration of the covenants, agreements and undertakings of Buyer and Seller under this Agreement, Voss, on behalf of

himself, and his successors and assigns (collectively, "Releasors") hereby release, waive and forever discharge Seller and its present and former, direct and indirect, parents, subsidiaries, Affiliates, employees, officers, directors, shareholders, members, agents, Representatives, permitted successors and permitted assigns (collectively, "Releasees") of and from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, sums of money, accounts, reckonings, obligations, costs, expenses, liens, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands, of every kind and nature whatsoever, whether now known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, in law, admiralty or equity, including, without limitation, any bonus or earn-out bonus or other payments set forth in the Employment Letters (collectively, "Claims"), which any of such Releasors ever had, now have, or hereafter can, shall, or may have against any of such Releasees for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of time through the Closing arising out of or relating to the Employment Letters. The Releasors understand that they may later discover Claims or facts that may be different than, or in addition to, those that they or any other Releasor now knows or believes to exist regarding the subject matter of the release contained in this Section and which, if known at the time of signing this Agreement, may have materially affected this Agreement and such Releasor's decision to enter into it and grant the release contained in this Section V.17(b). Nevertheless, the Releasors intend to fully, finally and forever settle and release all Claims that now exist, may exist or previously existed, as set forth in the release contained in this Section, whether known or unknown, foreseen or unforeseen, or suspected or unsuspected, and the release given herein is and will remain in effect as a complete release, notwithstanding the discovery or existence of such additional or different facts. The Releasors hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts.

VI.19.   **Post-Closing Rights and Obligations**.

(a)     **Right to Supply**. During the period commencing at the Closing and ending on the tenth anniversary of the Closing and pursuant to the terms of a supply agreement in form and substance reasonably satisfactory to the Seller and the Buyer, (i) Seller or its Affiliates shall have the right to supply the Company and its Affiliates, directly or indirectly through Seller's Affiliates, with any private label products whose private labels were sold or distributed by the Company within the United States during the twelve (12) months prior to the Closing Date, and (ii) Seller or its Affiliates shall have the right of first refusal to supply the Company and its Affiliates, directly or indirectly through Seller's Affiliates, with (A) any products labeled with a brand owned by the Company and its Affiliates where said brand was not so owned or licensed prior to the Closing, and (B) any private label product where said private label was not sold or distributed by the Company prior to the Closing Date.

(b)     **Option to Distribute; License**. During the period commencing at the Closing and ending on the date which is one year from the Closing, Seller or its Affiliates shall have the option to require the Company and its Affiliates to distribute any products manufactured, sold or distributed by Seller or its Affiliates (each a "Groupe Product"), which distribution agreement will be in accordance with a distribution agreement in form and substance reasonably satisfactory to the Seller and the Buyer, which distribution agreement shall provide that the Seller and its Affiliates shall grant to the Company as distributor a license to use and reproduce trademarks and trade names that are associated with any Groupe Product, owned by the Seller or its Affiliates, as necessary for the sole purpose of allowing the Company, as distributor, to promote and market the Groupe Products pursuant to the terms of such distribution agreement, for which the Company shall not pay any royalty or other fees.

(c)     **Transition Services**. During the period commencing at the Closing and ending on the date which is six months from the Closing (i) the Company and its Affiliates shall provide to Seller and its Affiliates, for no

additional compensation, any and all information and services, including the services of the Retention Pay Employees and the Transferred Employees, for the equivalent of one day per calendar week for each such employee as reasonably requested by the Seller and its Affiliates for the purposes of assisting the Seller and its Affiliates with establishing the Foreign Affiliate Dairy Business; and (ii) the Seller and its Affiliates shall provide to the Company, for no additional compensation, telephone, e-mail and Blackberry server services.

(d) **Commercial Pricing Matters**.

(i)     During the period commencing at the Closing and ending on the date which is six months from the Closing, the price to the Company of each SKU bearing a Foreign Affiliate Brand purchased from a Foreign Affiliate of Seller shall be calculated so as to allow the Company to receive the full margin per SKU realized by the Company as of August 31, 2014 (assuming no reduction in the Company's resale price).

(ii)     During the period commencing on the day after the date which is six months from the Closing and ending on the date which is one year from the Closing, the price to be paid by the Company for each SKU bearing a Foreign Affiliate Brand purchased from a Foreign Affiliate of Seller and picked up by the Company from such Foreign Affiliate of Seller's warehouse shall be calculated using the Company's warehouse pick-up price as of August 31, 2014 (as may be adjusted from time to time by Seller in its sole discretion) for its least favored customer, minus a discount of 15% applied to such price.

(iii)     During the period commencing on the date which is day after the date which is one year from the Closing and ending on the date which is ten years from the Closing, the price to the Company of each SKU bearing a Foreign Affiliate Brand purchased from a Foreign Affiliate of Seller and picked up by the Company from such Foreign Affiliate of Seller's warehouse shall be calculated using the Company's warehouse pick-up price as of August 31, 2014 (as may be adjusted from time to time by Seller in its

sole discretion) for its least favored customer, minus a discount of 10% applied to such price.

(e)     **Promotions and Marketing Support**. During the period commencing at the Closing and ending on the date which is six months from the Closing, the Company shall maintain its trade promotions for the Foreign Affiliate Brands at levels which are consistent with the levels maintained by the Company in the Ordinary Course of Business prior to the Closing Date, and during such period, the Company shall spend at least 3% of the Company's gross sales of the Foreign Affiliate Brands for advertising and promotions as Seller shall direct for such Foreign Affiliate Brands.

VI.20.    **Cut and Wrap Services**.

(a)     **Most Favored Terms**. During the period commencing at the Closing and ending on the date which is one year from the Closing, at the request of Seller or its Affiliates, (A) the Company shall "cut and wrap" products with respect to the cheese brands of Seller and its Affiliates and provide services related to the sale of such products by Seller and its Affiliates in the United States on such commercially reasonable terms as agreed between the Company and Seller or its Affiliates, and (B) the Company (and its Affiliates) shall not at any time provide such "cut and wrap" services to a different customer at prices below, or terms more favorable, than those provided to the Seller or its Affiliates; provided that if the Company or its Affiliates charge a different customer a lower price for such "cut and wrap" services or provide such customer with more favorable terms, the Company and its Affiliates shall provide Seller and its Affiliates with such more favorable terms on a going forward basis for three years after the Closing Date.

(b)     **Right of First Refusal to Provide Services**. During the period commencing at the Closing and ending on the date which is one year from the Closing, the Company shall have a right of first refusal to "cut and wrap" any Seller product (or product of an Affiliate of Seller) to be cut or wrapped in the United States.  If the Seller (or an Affiliate of Seller) receives an offer from any Person to provide "cut and wrap" services that Seller (or its

Affiliate) desires to accept, and each time Seller (or its Affiliate) receives such an offer, Seller (or its Affiliate) shall, within ten Business Days of receipt of the offer from such Person, give written notice to the Company stating that it has received such offer from such Person and specifying the terms and conditions offered to Seller (or its Affiliate) by such Person.  Upon receipt of such notice, the Company shall have five Business Days to elect to provide such "cut and wrap" services (directly, or though an Affiliate) to the Seller (or its Affiliate) on the terms and conditions specified in such notice.

VI.21.    **Limitation on Disposition**. Except as permitted by this Agreement, the Company shall not, nor shall it permit any of its Affiliates to, directly or indirectly, sell, convey, license, transfer, assign, lease, abandon or otherwise dispose of the Cut and Wrap Business to any Person during the period commencing on the Closing Date and ending on the first anniversary of the Closing Date.

VI.22.    **Right of First Refusal**. At any time until the first anniversary of the Closing, the Seller (or its Affiliate) shall have a right of first refusal to purchase the Cut and Wrap Business from the Company if the Company receives an offer from any Person with respect to the purchase of such Cut and Wrap Business, and the Company shall first offer to sell the Cut and Wrap Business to the Seller in accordance with the following provisions of this Section V.22.  The Company shall give written notice (the "Offering Notice") to the Seller stating that it has received a bona fide offer from a Person to purchase the Cut and Wrap Business and specifying: (x) the name of the person or entity who has offered to purchase such business; (y) the purchase price and the other material terms and conditions of such purchase, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (z) the proposed date, time and location of the closing of such purchase, which shall not be less than 60 Business Days from the date of the Offering Notice. The Offering Notice shall constitute the Company's offer to sell the Cut and Wrap Business to the Seller, which offer shall be irrevocable until five Business Days after the Company's receipt of the Offering Notice (the

"ROFR Notice Period"). Upon receipt of the Offering Notice, the Seller shall have until the end of the ROFR Notice Period to elect to purchase the Cut and Wrap Business by delivering a written notice (a "ROFR Offer Notice") stating that it offers to purchase such business on the terms specified in the Offering Notice. If the Seller and the Buyer fail to reach a binding, written agreement for the purchase and sale of the Cut and Wrap Business within sixty days, then the Seller may sell the Cut and Wrap Business to such Person offering to purchase such business on terms and conditions generally specified in the Offering Notice. If the Seller fails to deliver a ROFR Offer Notice in accordance with this Section V.22, the Company may, during the sixty day period immediately following the expiration of the ROFR Notice Period, sell and transfer the Cut and Wrap Business to such Person offering to purchase such business on terms and conditions no more favorable to such Person than those set forth in the Offering Notice. If the Company does not sell the Cut and Wrap Business within such period, the rights provided hereunder shall be deemed to be revived and the Cut and Wrap Business shall not be transferred or sold to such Person unless the Company or its Affiliates sends a new Offering Notice in accordance with, and otherwise complies with, this Section V.22.

VI.23.    **Financing Matters**. ECB shall provide the Company with a line of credit in an amount of at least $4,000,000.00 as necessary until the first anniversary of the Closing Date, in accordance with documents in form and substance reasonably satisfactory to ECB.

VI.24.    **Purchase of Toscana Loan**.  At Closing the balance sheet of Company shall reflect a net balance in the bank accounts of Company of the amount of $1,500,000.00.  This amount shall represent consideration for the assignment by Company to Seller of all right, title and interest in the loan receivable the Company has from Toscana (the "Toscana Receivable").

VI.25.    **Guarantee of Toscana Loan**.  Voss shall furnish to Seller a guarantee secured by the outstanding shares in Voss Enterprises, Inc. or such other collateral as Voss and Seller may agree (the "Voss Guaranty").

VI.26.   **Compliance with Law**.  Alain Voss shall operate the business of the Company in compliance with all Laws, including, but not limited to Anti-Trust Compliance.

**Article VII**

**CONDITIONS TO CLOSING**

VII.1.   **Conditions to Obligations of the Buyer**. The obligations of the Buyer to effect the transactions contemplated hereby are subject to the satisfaction or waiver by the Buyer, at or prior to the Closing, of the following conditions:

(a)   **Representations and Warranties**. (i) The representations and warranties of the Seller shall be true and correct in all material respects on the date hereof and at the Closing; and (ii) the Buyer shall have received at the Closing a certificate signed on behalf of the Seller by an executive officer of Seller to the effect that the condition set forth in this Section has been satisfied.

(b)   **Performance of Obligations of Seller**. The Seller shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing, and the Buyer shall have received a certificate signed on behalf of the Seller by an executive officer to such effect with respect to obligations regarding the Seller.

(c)   **Debt**.   The Indebtedness of the Company owing to Citibank shall have been paid or satisfied in full, and the Indebtedness owed by the Company to the Seller (or its Affiliates) shall have been contributed to the capital of the Company without the receipt by the Seller or its Affiliates of any Equity Interest in the Company for the contribution of such Indebtedness as equity. At the Closing shall Seller and/or its Affiliates shall provide evidence to the Company that, as of the Closing Date, the Company has no outstanding Indebtedness owing to Citibank or the Seller or its Affiliates, and the Buyer shall have received at the Closing a certificate signed on behalf of the Seller by

an executive officer of the Seller to the effect that the Seller's conditions to Closing have been satisfied.

VII.2.    **Conditions to Obligations of the Seller**. The obligations of the Seller to effect the transactions contemplated hereby are subject to the satisfaction or waiver by the Seller, at or prior to the Closing, of the following conditions:

(a)    **Representations and Warranties**. (i) The representations and warranties of the Buyer shall be true and correct in all material respects on the date hereof and at the Closing; and (ii) the Seller shall have received at the Closing a certificate signed on behalf of the Buyer by an executive officer of the Buyer to the effect that the condition set forth in this Section has been satisfied.

(b)    **Performance of Obligations of Buyer**. The Buyer shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing, and the Seller shall have received a certificate signed on behalf of the Buyer by an executive officer to such effect with respect to obligations regarding the Buyer.

(c)    **Collateral Documents**. The Buyer, the Seller and the Company, as applicable, shall have entered into the Security Agreement and the Stock Pledge Agreement, on terms and conditions acceptable to both parties.

VII.3.    **Conditions to Obligations of the Seller and the Buyer**. The obligations of the Seller and the Buyer to effect the transactions contemplated hereby are subject to the satisfaction or waiver by the Seller and the Buyer, at or prior to the Closing, of the following conditions:

(a)    **Governmental Consents**. All Governmental Consents, if any, shall have been made or obtained without the imposition of any term, condition, restriction or consequence that would, individually or in the aggregate, reasonably be likely to materially adversely affect Schratter Foods after the Closing; and shall not be subject to vacation, reversal, annulment, suspension or modification.

(b)    **No Significant Event**. From the date hereof until the Closing, there shall not have occurred any of the following events (each, a "Significant Event"): (i) the loss by the Company of a customer whose purchases account for 15% or more of the Company's annual sales; (ii) the incapacitation or death of Voss; or (iii) a Force Majeure Event.

## Article VIII

### CLOSING

VIII.1.    **Closing**.  A closing of the transactions contemplated by this Agreement (the "Closing") shall be held on December 29, 2014, at the offices of Morgan, Lewis & Bockius LLP, 200 S. Biscayne Blvd., Suite 5300, Miami, Florida  33131-2339, or remotely by the electronic exchange of executed documents and other deliverables, including by facsimile or e-mail, to be held in escrow by respective counsel for the parties until such counsel authorize release of such documents and deliverables at Closing, or at such other time or on such other date or at such other place as Seller and Buyer may mutually agreed upon in writing (the day on which the Closing takes place being the "Closing Date"). The Closing shall be effective as of the Effective Date.

VIII.2.    **Closing Deliveries**. At the Closing,

(a)    The Seller shall deliver to the Buyer:

(i)    The original certificate(s) representing the Shares, free and clear of all Encumbrances, duly endorsed in blank or accompanied by the Stock Powers;

(ii)    all agreements, documents, instruments or certificates required to be delivered by the Seller pursuant to this Agreement; and

(iii)    a certificate of the Seller that there has been no Significant Event (as set forth in Section VI.3(b)) from the date hereof through the date of Closing

(b)    The Buyer shall deliver to the Seller:

(i)     the Closing Date Purchase Price by wire transfer of immediately available funds to an account of the Seller to be designated in writing by the Seller to the Buyer no later than two Business Days prior to the Closing Date; and

(ii)    all agreements, documents, instruments or certificates required to be delivered by the Buyer to the Seller at or prior to the Closing Date.

## Article IX

## INDEMNIFICATION

IX.1.   **Indemnification**.

(a)     From and after the Closing, the Seller (the "<u>Seller Indemnifying Party</u>") shall defend, indemnify and hold harmless the Buyer, its Affiliates (including, following the Closing, the Company) and their respective officers, directors, stockholders employees, agents, successors, assigns and representatives (the "<u>Buyer Indemnified Parties</u>") from and against any debt, claim, action, litigation, loss, damage, liability, fine, penalty, judgment, settlement or expense (including, without limitation, attorneys' fees and costs at all trial and appellate levels) ("<u>Loss</u>"), incurred by the Buyer Indemnified Parties arising from, out of or in connection with, or related to (i) the inaccuracy or willful breach of any of the representations, warranties, covenants or agreements of Seller contained in this Agreement; or (ii) notwithstanding any provision set forth in Article III, any and all liability for the following, even if it involves a Commercial Matter and even if Seller has no Knowledge thereof (each a "<u>Specific Indemnification</u>"):

(i)     Taxes, even if it involves tax withholding for employees, with respect to any taxable period of the Company or any of its Subsidiaries (or any predecessors) for all taxable periods ending on or before the Closing Date ("<u>Pre-Closing Tax Period</u>") and with respect to any Straddle Period, for the portion thereof ending on the Closing Date except to the extent such Taxes have otherwise been taken into account under this Agreement, as a

purchase price adjustment or otherwise, and any and all liability (as a result of Treasury Regulation Section 1.1502-6 or otherwise) for Taxes of Seller or any other person (other than Company or any of its Subsidiaries) which is or has ever been affiliated with Company or any of its Subsidiaries or with whom Company or any of its Subsidiaries otherwise joins or has ever joined (or is or has ever been required to join) in filing any consolidated, combined, unitary or aggregate Tax Return, prior to the Closing Date;

(ii)     the failure of the Company to have complied with the Environmental Laws as a result of an act or omission that took place prior to the Closing Date (the "Pre-Closing Environmental Period"); and

(iii)     the failure of the Company to have complied with the Customs Laws as a result of an act or omission that took place prior to the Closing Date (the "Pre-Closing Customs Period");

(iv)     the failure of the Company to have complied with any Laws as a result of an act or omission that took place prior to the Closing Date (the "Pre-Closing Enforcement Period"), provided, however, that the Loss under this paragraph (iv) shall have resulted from an enforcement action initiated by a Governmental Entity that does not concern an Employee Matter.

(b)     From and after the Closing, the Buyer shall defend, indemnify and hold harmless the Seller, its Affiliates and their officers, directors, stockholders, employees, agents, successors, assigns and representatives from and against any Loss incurred by the Seller arising from, out of or in connection with or related to the inaccuracy or willful breach of any of the representations, warranties, covenants or agreements of the Buyer contained in this Agreement.

(c)     From and after the Closing, the Seller shall defend, indemnify and hold harmless the Indemnified Parties from and against any Loss incurred by the Buyer or its officers, directors, employees and agents arising from, out of or in connection with, or related to the Ortiz Case.

IX.2.     **Certain Limitations**. The party making a claim under this Article VIII is referred to as the "Indemnified Party", and the party against

whom such claims are asserted under this Article VIII is referred to as the "Indemnifying Party". The indemnification provided for in Section VIII.1 shall be subject to the following limitations:

   (a) The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section VIII.1(a) or Section VIII.1(b), as the case may be, until the aggregate amount of all Losses in respect of indemnification under Section VIII.1(a) or Section VIII.1(b) exceeds $100,000 (the "Deductible"), in which event the Indemnifying Party shall only be required to pay or be liable for Losses in excess of the Deductible.

   (b) The aggregate amount of all Losses relative to fiscal matters (i.e. matters relating in any way to taxes, including but not limited to tax liabilities, tax penalties, tax fines, tax interest, or legal or accounting fees relative to claims for taxes, as set forth in Section III.9 or Section III.15 ("Fiscal Matters"), for which an Indemnifying Party shall be liable pursuant to Section VIII.1(a) shall not exceed the sums of money already paid to the Seller by the Buyer pursuant to this Agreement on the date of any award to the Buyer by a court Order with respect to this provision, or on the date of actual payment to the Buyer by the Seller, with respect to this provision.

   (c) The aggregate amount of all Losses for matters other than Fiscal Matters and Anti-Trust Compliance for which an Indemnifying Party shall be liable pursuant hereto, shall not exceed $1,500,000.00.

   (d) Where the Loss involves Anti-Trust Compliance, the Loss shall be payable as follows:  The Buyer and the Seller shall share equally the amount of all Losses up to and including $1,000,000.  All such Losses in excess of $1,000, 000 shall be payable only by the Seller.

   (e) Any Losses payable by the Seller to the Buyer Indemnified Parties shall first by offset by any Deferred Installment Payment otherwise payable to the Seller by the Buyer.

   (f) Payments by an Indemnifying Party in respect of any Loss shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution

or other similar payment received or reasonably expected to be received by the Indemnified Party (or the Company) in respect of any such claim. The Indemnified Party shall use its commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements for any Losses prior to seeking indemnification under this Agreement.

(g)    In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple.

(h)    Each Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

IX.3.    **Indemnification Procedures**.

(a)    **Third-Party Claims**. If any Indemnified Party receives notice of the assertion or commencement of any action, suit, claim or other legal proceeding made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "Third-Party Claim") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if

reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third-Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense. In the event that the Indemnifying Party assumes the defense of any Third-Party Claim, subject to Section VIII.3(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right, at its own cost and expense, to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party elects not to compromise or defend such Third-Party Claim or fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, the Indemnified Party may, subject to Section VIII.3(b), pay, compromise, defend such Third-Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third-Party Claim. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third-Party Claim, including making available records relating to such Third-Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third-Party Claim.

(b)    **Settlement of Third-Party Claims**. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed), except as provided in this Section VIII.3(b). If a firm offer is made to settle a Third-Party Claim without leading to liability or the

creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third-Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense pursuant to Section VIII.3(a), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).

(c)     **Direct Claims**. Any claim by an Indemnified Party on account of a Loss which does not result from a Third-Party Claim (a "Direct Claim") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have 30 days after its receipt of such notice to respond in writing to such Direct Claim. During such 30-day period, the Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any

amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Company's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such 30-day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

IX.4.  **Tax Treatment of Indemnification Payments.**  The parties agree to use their  best efforts to treat in a consistent manner all indemnification payments made under this Agreement, unless otherwise required by Law.

IX.5.  **Exclusive Remedies**. Subject to Section XI.14, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article VIII. Nothing in this Section shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to Section XI.14.

IX.6.  **Survival After Closing**.  Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is eighteen months from the Closing Date; provided that (a) the representations and warranties in Sections III.1, III.2, III.4, III.5 shall survive indefinitely, (b) the representations and warranties in IV.1 and X.1 shall survive until the date that is three years from the Closing Date, (c) the Seller's indemnification obligations with regard to Environmental Matters shall survive until the date that is eighteen months from the Closing Date; (d) the Seller's

indemnification obligations with regard to Customs Matters shall survive until the date that is two years from the Closing Date, and (e) the Seller's indemnification obligations with regard to Tax Matters and Anti-Trust Compliance shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 30 days. All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.

### Article X
### TERMINATION

X.1.     **Termination by Mutual Consent**.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing by mutual written consent of the Buyer and the Seller.

X.2.     **Termination by Seller**. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing by the Seller if there has been a breach of any material representation, warranty, covenant or agreement made by the Buyer in this Agreement, and which has not been cured by the Buyer within 10 Business Days after receipt of written notice from the Seller requesting such breach to be cured; provided, however, that no such cure period shall be available or applicable to any such breach which by its nature cannot be cured, and further provided, that the right to terminate this Agreement pursuant to this Section IX.2 will not be available if the failure to fulfill any of Seller's obligations under this Agreement has been the primary cause of, or resulted in, such breach

X.3.     **Termination by Buyer**. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing by the Buyer if there has been a breach of any material representation, warranty, covenant or agreement made by the Seller in this Agreement, and which has not been cured by the Seller within 10 Business

Days after receipt of written notice from the Buyer requesting such breach to be cured; provided, however, that no such cure period shall be available or applicable to any such breach which by its nature cannot be cured, and further provided, that the right to terminate this Agreement pursuant to this Section IX.3 will not be available if the failure to fulfill any of Buyer's obligations under this Agreement has been the primary cause of, or resulted in, such breach..

X.4.     **Effect of Termination and Abandonment**. In the event of termination of this Agreement and the abandonment of the transactions contemplated hereby in accordance herewith, this Agreement shall become void and of no effect with no liability on the part of any party hereto (or of any of its directors, officers, employees, agents, stockholders, or legal and financial advisors); provided, however, except as otherwise provided herein, no such termination shall relieve any party hereto of any liability or damages resulting from any willful breach of this Agreement.

## Article XI
## BROKERS

XI.1.     **Brokers, Finders and other Intermediaries**.  The Buyer and the Seller each represent to the other that neither the Buyer nor the Seller has dealt with any broker in connection with the transactions contemplated hereby, or that if a broker, finder or intermediary was utilized by the Buyer or the Seller, then only the party contracting with such broker, finder or intermediary shall be responsible for any brokerage or finder fee in the purchase and sale of the Shares.

## Article XII
## MISCELLANEOUS PROVISIONS

XII.1.     **Amendment and Modification**.  Subject to applicable law, this Agreement may be amended, modified and supplemented only by written and signed agreement of the parties.

XII.2.   **Entire Agreement**.   This Agreement, including the Schedules and Exhibits hereto, and the documents, certificates and instruments referred to herein, embodies the entire agreement and understanding of the parties in respect of the transactions contemplated by this Agreement and supersedes all prior agreements, representations, warranties, promises, covenants, arrangements, communications and understandings, oral or written, express or implied, between the parties with respect to such transactions. There are no agreements, representations, warranties, promises, covenants, arrangements or understandings between the parties with respect to such transactions, other than those expressly set forth or referred to herein.

XII.3.   **Notices**.   All notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given when delivered by hand or mailed, first class certified mail with postage paid or by overnight receipted courier service, or by electronic mail (with confirmation of receipt):

(a)   If to the **Buyer**:

Claude BLANDIN

c/o Ets Claude Blandin & Fils

Immeuble entre Deux Mers

Rue Claude Emmanuel Blandin

Zac de Moudong Sud

97122 BAIE-MAHAULT

FRANCE

Tel : 0590389393 - Fax : 0590268316

E.mail: bblandin@ecb.gp, cblandin@ecb.mq,

aleoni@ecb.gp

and to:

Alain VOSS

235 Upper Shad Road

Pound Ridge, NY 10576

USA

with a copy to:

Richard Freeman Associates, LLC

Eleven Island Avenue, Suite 711

Miami Beach, FL 33139

USA

Att'n:  Richard A. Freeman, Esq.

(917) 769-8199 (direct)

richard.a.freeman@att.net

(b)    If to the **Seller**:

ZNHC, Inc.

300 Martin Luther King Blvd.

Suite B

Wilmington, DE 19801

USA

Facsimile: (302) 655-0791

E-mail: lew.gitlin@sbmsincusa.com

Attention: General Counsel

With a copy to:

Morgan, Lewis & Bockius LLP

1701 Market Street

Philadelphia, PA 19103-2921

USA

Facsimile: (215) 963-5001

E-mail: bshander@morganlews.com

Attention: Barbara J. Shander

(c)   If to the **Guarantor**

Zausner Foods Corp.

400 S. Custer Avenue

New Holland, PA  17557

USA

Attn: Chief Financial Officer

Facsimile: (717) 355-8511

Email: doug.kirchoff@zausnerfoods.com

With a copy to:

President

Zausner Foods Corp.

400 S. Custer Avenue

New Holland, PA  17557

USA

or to such other person or address as the Buyer shall furnish by written notice to the Seller.

XII.4.   **Assignment**.  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors, heirs, legal representatives and permitted assigns. Neither party may directly or indirectly assign any of its rights or delegate any of its obligations under this Agreement,

by operation of law or otherwise, without the prior written consent of the other party. Any purported direct or indirect assignment in violation of this Section shall be null and void *ab initio*. Notwithstanding the foregoing, the Buyer may assign any of its rights and/or delegate any of its obligations under this Agreement to one or more of its Affiliates without the consent of the Seller or the other parties to this Agreement, but no such assignment shall relieve the Buyer of any of its obligations hereunder.

XII.5.    **Applicable Law and Attorneys' Fees**.  This Agreement shall be governed by, construed and enforced in accordance with the internal laws of the State of Florida applicable to contracts made and to be wholly performed within such State.  Any action or proceeding in connection with this Agreement shall be brought in a court of record of the State of Delaware in and the City of Wilmington or in the United States District Court in such county, the Buyer and the Seller hereby consenting to the exclusive jurisdiction thereof.  Service of process may be made upon the Seller or the Buyer by mailing a copy thereof to it, by certified or registered mail, at its addresses or the addresses of its counsel to be used for the giving of notices under this Agreement.  As used in this Agreement, "Attorneys Fees" shall mean all attorneys' fees, costs and expenses, including such fees, costs and expenses incurred at the trial and appellate court levels as well as those fees, costs and expenses incurred in connection with pre-trial matters, bankruptcy matters and post-judgment proceedings.  In the event of any litigation arising out of this Agreement, the prevailing party shall be entitled to recover Attorneys' Fees.

XII.6.    **Expenses**.  Except as otherwise specifically provided in this Agreement, the Seller, on the one hand, and the Buyer, on the other hand, shall bear their respective expenses, costs and fees (including attorneys', auditors' and financing fees, if any) in connection with the transactions contemplated hereby, including the preparation, execution and delivery of this Agreement and compliance herewith, whether or not the transactions contemplated hereby is effected; provided, that Seller shall be responsible for any attorneys', tax advisors' and financial advisors' fees of the Company

incurred in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and all such expenses, costs and fees payable by the Company shall be paid and satisfied in full by Seller prior to the Closing.

XII.7.    **Binding Effect**.  This Agreement shall not be construed so as to confer any right or benefit upon any Person other than the signatories to this Agreement and each of their respective successors and permitted assigns.

XII.8.    **Delays or Omissions**.   No delay or omission to exercise any right, power or remedy accruing to any party hereto, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party hereto of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

XII.9.    **Severability**.    Unless otherwise provided herein, if any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

XII.10.   **Headings**. The article, section and other headings contained in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of any or all of the provisions of this Agreement.

XII.11.   **Construction**.   The parties acknowledge that each party has reviewed and revised this Agreement and that the normal rule of construction

to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

XII.12.   **Counterparts**.  This Agreement may be executed in two or more counterparts, and by fax or .pdf, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

XII.13.   **Transfer Taxes**.   Any Transfer Taxes shall be borne by the Seller. The party so required by applicable Law shall file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by the applicable Law, the other parties shall, and shall cause their Affiliates, to join in the execution of any such Tax Returns and other documentation.

XII.14.   **Specific Performance**.   The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

XII.15.   **Guaranty**. ZAUSNER FOODS CORP., a Delaware corporation ("ZAUSNER") hereby unconditionally (subject to written notice delivered to the Guarantor pursuant to the notice provisions of this Agreement within thirty days of a claim arising hereunder), irrevocably and absolutely guarantees to Buyer and the Buyer Indemnified Parties, the obligations of the Seller, and covenants and agrees to be jointly and severally liable with Seller for, the payment obligations of the Seller  under Article IX (Indemnification) of this Agreement. The liability of ZAUSNER under this Section shall be absolute, irrevocable and unconditional (subject to notice as provided in this Agreement) irrespective of: (a) any modification, extension or waiver of any of the terms of this Agreement and (b) any change in the time, manner, terms or place of payment of or in any other term of, all or any of the obligations guaranteed hereunder or any other amendment or waiver of or any consent to departure from this Agreement or any other agreement or instrument executed in

connection therewith.  There are no conditions precedent to the enforcement of the guarantee under this  Section, except as expressly contained herein.  It shall not be necessary for Buyer or any Buyer Indemnified Parties, in order to enforce payment by ZAUSNER under this Section, to exhaust any remedies against the Seller.  This Section is a guarantee of payment.  ZAUSNER hereby waives: (i) notice by Buyer's Indemnified Parties of acceptance of this guarantee, notice of the creation or existence of any of the obligations guaranteed hereunder; (ii) notice of any amendments, supplements or modifications to this Agreement or any waiver of consent hereunder, including waivers of the payment and performance of the obligations hereunder; (iii) notice of any increase, reduction or rearrangement of Seller's obligations under Section IX (Indemnification) of this Agreement or notice of any extension of time for the payment of any sums due and payable to Buyer or any Buyer Indemnified Parties under this Agreement; and (iv) any requirement that suit be brought against, or any other action by Buyer or any Buyer Indemnified Parties be taken against, or any notice of default or other notice be given to, or any demand be made on, Buyer or any other person (other than ZAUSNER), or that any other action be taken or not taken as a condition to ZAUSNER'S liability for the obligations guaranteed hereunder or as a condition to the enforcement of this guarantee against ZAUSNER.

**Article XIII**

**DEFINITIONS**

XIII.1.   **Definitions**. As used in this Agreement the following terms shall have the following respective meanings:

"Action" shall mean a decision to act or not to act.

"Affiliate" shall mean with respect to any Person, a Person that directly or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with such Person.

"Agreement" has the meaning set forth in the preamble.

"Anti-Trust Compliance" shall mean that the Company has not entered into any agreements with a competitor to fix prices or allocate business.

"Audited Financial Statements" has the meaning set forth in Section III.7.

"Benefit Plans" has the meaning set forth in Section III.10.

"Binding Closing Net Equity" has the meaning set forth in II.4(a)(iv).

"Business" has the meaning set forth in the recitals.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble.

"Code" has the meaning set forth in Section III.10.

"Claims" has the meaning set forth in Section V.15.

"Closing" has the meaning set forth in Section VII.1.

"Closing Date" has the meaning set forth in Section VII.1.

"Closing Date Purchase Price" has the meaning set forth in Section II.1.

"Closing Net Equity" means the net equity of the Company at December 31, 2014 as determined in accordance with US GAAP, including satisfaction, contribution to equity, and / or payoff to the Company's Indebtedness owing to Citibank, the Seller and/ or its Affiliates. For purposes of the calculation, the line item "Deferred Tax Asset" shall be equal to $7,235,351, the line item "Deferred Tax Liability" shall be equal to  $1,591,000, and the line item "Goodwill" shall be equal to $4,419,237. Any differences in these amounts as a result of the US GAAP presentation taken into account shall be adjusted as applicable back into equity for the Binding Closing Net Equity calculation.  An illustrative of Closing Net Equity" is set forth on Exhibit "D" to this Agreement.

"Closing Net Equity Statement" has the meaning set forth in Section II.4.

"Commercial Matter" means any matters affecting the Company's sales, marketing, product conversion, warehousing or distribution.

"Company" has the meaning set forth in the preamble.

"Company Benefit Plan" has the meaning set forth in Section V.8.

"Company Material Adverse Effect" shall mean (i) an effect that would prevent the ability of the Seller to consummate the transactions contemplated hereby or (ii) a material adverse effect on the financial condition, properties, assets, liabilities, business or results of operations of the Company, taken as a whole, excluding any such effect to the extent resulting from (A) changes or conditions (including political and legal conditions) generally affecting the U.S. or global economy or financial, debt, credit or securities markets; (B) declared or undeclared acts of war, terrorism, outbreaks or escalations of hostilities, sabotage or civil strife; (C) weather-related conditions; or (D) any change in US GAAP or applicable Laws or regulatory or enforcement developments except to the extent such change disproportionately affects the Company.

"Company Continuing Employee" has the meaning set forth in Section V.8.

"Company Net Operating Losses" has the meaning set forth in Section V.6

"Consolidated Income Tax Return" means a Tax Return related to income Taxes filed on a consolidated, combined, unitary or aggregate basis.

"Contract" means any agreement, contract, lease, obligation, promise, commitment, or undertaking (whether written or oral and whether express or implied).

"Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Consolidated Income Tax Group" means any consolidated, combined, unitary or similar tax return group that includes (i) the Company and (ii) the Seller or any Affiliate of the Seller (other the Company or any Subsidiary of the Company.

"Constantin 2014 Audited Financials" means the audited financial statements of the Company as of December 31, 2014 duly signed by Constantin, Chartered Accountants and Registered Auditors.

"Customs Laws" means any applicable Law relating to the importation of products into the United States as enforced by the U.S. Customs and Border Protection Agency.

"Cut and Wrap Business" means the Company's business, operated at the Company's facility known as Cognati in Moonachie, New Jersey, of (i) acquiring through purchase, consignment or otherwise, finished cheese products in various sizes, (ii) rendering such products into smaller sizes, including but not limited to, wedges, bricks, squares, slices, shreds and grates, (iii) packaging such products in paper, wooden, plastic, cellophane or other packaging, and (iv) selling or delivering such repackaged products.

"Deductible" has the meaning set forth in Section VIII.2.

"Deferred Installment Payment" has the meaning set forth in Section II.1.

"Disputed Amounts" has the meaning set forth in Section II.4.

"Direct Claim" has the meaning set forth in Section VIII.3.

"Dollars or $" means the lawful currency of the United States.

"ECB" shall have the meaning set forth in the preamble.

"Effective Date" shall mean 00:00 a.m. E.S.T. on January 1, 2015 (ie, the moment between December 31, 2014 and January 1, 2015)

"Employee Matter" means any matters directly or indirectly affecting current or former employees or other workers of the Company.

"Employment Letters" means (i) that certain employment offer letter of Alain Voss, dated as of June 30, 2014, with respect to his employment by the Company; and (ii) that certain employment offer letter of Alain Voss, dated as of June 30, 2014, with respect to his employment by Corman Ship Supplies.

"Encumbrance" (including, with correlative meaning, the term "Encumber") means any lien, pledge, charge, claim, encumbrance, security interest, option, lease, license, mortgage, easement or other restriction or third-

party right of any kind, including any right of first refusal or restriction on voting.

"Environmental Law" means any applicable Law relating to (i) the protection of the environment (including air, water, soil and natural resources) or (ii) the use, storage, handling, release or disposal of any Hazardous Substance or waste, in each case as presently in effect.

"Equity Interests" means (i) any capital stock of a corporation, any partnership interest, any limited liability company interest or any other equity interest; (ii) any security or right convertible into, exchangeable for, or evidencing the right to subscribe for, any such stock, equity interest or security referred to in clause (i); (iii) any stock appreciation right, contingent value right or similar security or right that is derivative of any such stock, equity interest or security referred to in clause (i) or (ii); and (iv) any contract to grant, issue, award, convey or sell any of the foregoing.

"ERISA" has the meaning set forth in Section III.16.

"Excluded Assets" shall mean the Foreign Affiliate Dairy Business, the Excluded USDA Import Licenses and all of the Company's rights and interest in the ILE DE FRANCE brand and any brands not reflected on Schedule III.12.

"Excluded USDA Import Licenses" means the licenses issued by the United States Department of Agriculture for the importation of blue mold cheese from Europe, butter from Europe and Italian type cheese from Argentina.

"Financial Statements" has the meaning set forth in Section III.7.

"Force Majeure Event" means an external event that is unpredictable, unavoidable, uncontrollable and that prevents the Company from operating its business.

"Foreign Affiliate Dairy Business" means the Company's business of purchasing, importing into the United States, reselling and distributing products all over the world, which products are (i) manufactured by certain foreign Affiliates of the Company (each, as determined at August 31, 2014, a "Foreign Affiliate"), and/or (ii) delivered to the Company in packaging bearing a

brand owned by, or licensed to, any Foreign Affiliate (each, a "Foreign Affiliate Brand"), which products may be imported pursuant either the Excluded USDA Import Licenses or other licenses issued by the United States Department of Agriculture and owned by the Company (each, a "Foreign Affiliate Dairy Product").

"US GAAP" means U.S. generally accepted accounting principles in effect from time to time.

"Governmental Consents" means all notices, reports and other filings required to be made prior to the Closing by Seller or Purchaser or any of their respective Subsidiaries with, and all consents, registrations, approvals, permits, clearances and authorizations required to be obtained prior to the Closing by Seller or Purchaser or any of their respective Subsidiaries from, any Governmental Entity in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

"Governmental Entity" mean any domestic (including federal, state, local and municipal), foreign or multinational governmental or regulatory authority, agency, commission, body, court, tribunal or other governmental entity, including, without limitation, the U.S. Customs and Border Protection Agency, the U.S. Food and Drug Administration, or the United States Department of Agriculture.

"Intellectual Property" shall mean any or all of the following that may exist and any worldwide common law and statutory rights that may exist in, arise out of, or be associated therewith: (i) multinational statutory invention registrations, patents, patent registrations, and patent applications therefor including without limitation any utility patents, design patents, and design registrations, and including all reissues, divisions, renewals, extensions, provisionals, reexaminations, continuations and continuations-in-part, and all rights therein provided by multinational treaties or conventions thereof; (ii) inventions (whether patentable or not), invention disclosures, improvements, trade secrets, proprietary information, know how, quality control data, technology, technical data and customer, supplier and vendor lists, and all

documentation relating to any of the foregoing; (iii) copyrights, copyrights registrations and applications therefor and renewals thereof, and all other rights corresponding thereto throughout the world; (iv) [intentionally left blank]; (v) domain names, and other names and locators associated with the internet including without limitation any social media identifications and tags; (vi) industrial designs and any registrations and applications therefor; (vii) trade dress, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor and all goodwill associated therewith, together with all renewals, translations, adaptations, derivations, and combinations relating thereto (collectively, "Trademarks"); (viii) all databases and data collections specific to the Company and all rights therein; and (ix) all moral and economic rights of authors and inventors, however denominated, and (x) any common law rights to any of the foregoing (as applicable).

"Hazardous Substance" means any substance that is (i) listed, classified or regulated pursuant to any Environmental Law; (ii) any petroleum product or by-product, asbestos-containing material, lead-containing paint or plumbing, polychlorinated biphenyls, mold, radioactive material or radon; and (iii) any other substance which may be the subject of regulatory action by any Governmental Entity in connection with any Environmental Law.

"Indebtedness" means (i) all liabilities for borrowed money, whether current or funded, secured or unsecured, all obligations evidenced by bonds, debentures, notes or similar instruments, and all liabilities in respect of mandatorily redeemable or purchasable capital stock or securities convertible into capital stock; (ii) all liabilities for the principal amount of the deferred and unpaid purchase price of real property and equipment that have been delivered; (iii) all liabilities in respect of any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which liabilities are required to be classified and accounted for under US GAAP as capital leases; (iv) all liabilities for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction securing

obligations of a type described in clauses (i), (ii) or (iii) above to the extent of the obligation secured; and (v) all liabilities as guarantor of obligations of any other Person of a type described in clauses (i), (ii), (iii) or (iv) above, to the extent of the obligation guaranteed.

"Indemnified Party" has the meaning set forth in Section VIII.2.

"Indemnifying Party" has the meaning set forth in Section VIII.2.

"Independent Accountants" has the meaning set forth in Section II.4.

"Initial Deferred Payment" has the meaning set forth in Section II.1.

"Interim Financial Statements" has the meaning set forth in Section III.7.

"Knowledge" means the actual knowledge of the Seller.

"Laws" has the meaning set forth in Section III.11.

"Liabilities" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including, whether arising out of any contract or tort based on negligence or strict liability) and whether or not the same would be required by US GAAP to be reflected in financial statements or disclosed in the notes thereto.

"Loss" has the meaning set forth in Section VIII.1.

"Offering Notice" has the meaning set forth in Section V.22.

"Order" means any award, writ, decision, injunction, judgment, ruling or verdict entered, issued, made or rendered by any Governmental Entity or arbitrator.

"Ordinary Course of Business" means an Action  taken by a Person will be deemed to have been taken in the Ordinary Course of Business only if that Action  (a) is consistent in nature and amount with the past practices of such Person and is taken in the ordinary course of the normal, day-to-day operations of such Person and (b) does not require authorization by the board of directors of such Person (or by any Person or group of Persons exercising

similar authority) and does not require any other separate or special authorization of any nature.

"Ortiz Case" means that certain case known or referred to as adv. XL Insurance Company Limited, Succursale francaise master policy, RB No. 10/70537 (insurance coverage for the Mark Ortiz matter)  decided in a 7 February 2013 decision by the Commercial Court of Paris and on appeal with the Court of Appeals Declaration of Appeal No. 13/06642, No. RG: 13/05720, Pole 2, Chambre 5 (Paris, France).

"Person" means any individual, corporation (including not-for-profit), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, Governmental Entity or other entity of any kind or nature.

"Post-Closing Adjustment" has the meaning set forth in Section II.4.

"Prime Rate" means, a variable rate of interest per annum equal, on any day, to the rate of interest published on the first day of the calendar quarter (namely, January 1, April 1, July 1 and October 1) applicable to such day (or, if such day is not a business day, the next succeeding business day) in the Eastern Edition of *The Wall Street Journal* as the average prime lending rate for 70% of the United States' 30 largest commercial banks, or if the Eastern Edition of *The Wall Street Journal* or such rate is not published on such day, such rate as last published in the Eastern Edition of *The Wall Street Journal*.

"Purchase Price" has the meaning set forth in Section II.1.

"Releasees" has the meaning set forth in Section V.17.

"Releasors" has the meaning set forth in Section V.17.

"Retention Pay Employees" means B. Andersen, G. Bowen, B. Proust and E. Rapone.

"Review Period" has the meaning set forth in Section II.4.

"Resolution Period" has the meaning set forth in Section II.4.

"ROFR Notice Period" has the meaning set forth in Section V.22.

"ROFR Offer Notice" has the meaning set forth in Section V.22.

"Schratter Foods" has the meaning set forth in the preamble.



"Security Agreement" has the meaning set forth in Section II.3(a).

"Seller" has the meaning set forth in the preamble.

"Seller Disclosure Letter" means the schedules attached to the Stock Purchase Agreement in accordance with the provisions hereof.

"Shares" has the meaning set forth in the recitals.

"Statement of Objections" has the meaning set forth in Section II.4.

"Stock Pledge Agreement" has the meaning set forth in Section II.3(b)

"Stock Powers" has the meaning set forth in Section I.2.

"Target Net Equity" has the meaning set forth in Section II.4.

"Tax" (including, with correlative meaning, the terms "Taxes" and "Taxable") means all U.S. federal, state and local and non-U.S. income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions.

"Taxing Authority" means a Governmental Entity or any subdivision, agency, commission or authority thereof or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or imposition of any Tax (including the IRS).

"Tax Return" means all returns and reports (including elections, declarations, disclosures, schedules, estimates, and information returns) required to be supplied to a Taxing Authority relating to Taxes.

"Third-Party Claim" has the meaning set forth in Section VIII.3.

"Transfer Taxes" means any and all transfer Taxes (excluding Taxes measured in whole or in part by net income or gain), including sales, use, excise, stock, stamp, documentary, filing, real estate transfer, recording, permit, license, authorization and similar Taxes.

"Transferred Employees" means C. Bertrand, JP Chesse, R. Martin-Cocher, A. Mirabel, C. Ng, M. Miller and R. Pottle.

"VE" has the meaning set forth in the preamble.

"Visa Employee" has the meaning set forth in Section V.5.

"Voss" has the meaning set forth in the preamble.

XIII.2.     **Other Definitional Provisions; Interpretation**. For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Seller Disclosure Letter and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The Seller Disclosure Letter and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have made and entered into this Agreement on the date first above written.

<u>**BUYER**</u>:

**VOSS ENTERPRISES, INC.**

By: _____
Name: **ALAIN VOSS**
Title: **President**

**ECB USA, INC.**

By: _____
Name: Claude **BLANDIN**
Title: **Chairman**

<u>**SELLER**</u>:

**ZNHC, INC.**

By: _____
Name: LEWIS GITLIN
Title: Corp Secy

_____
**ALAIN VOSS**

**SCHRATTER FOODS INCORPORATED**

By: _____
Name: ALAIN VOSS
Title: PRESIDENT

[Signature Page to SPA]

**GUARANTOR:**

**ZAUSNER FOODS CORP.**

By: _____
Name: PIERRE RAGNET
Title:

[signature page to SPA]

**EXHIBIT A**

**STOCK POWERS**

**IRREVOCABLE STOCK POWER**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to ECB USA, Inc., a Florida corporation, the following shares of common stock (the "Shares"), par value $0.01 per share, of Schratter Foods Incorporated, a Delaware corporation:

| No. of Shares | Certificate No. |
|---|---|
| 550 | 7 |

and irrevocably appoints the Secretary of Schratter Foods Incorporated as its agent and attorney-in-fact to transfer all or any part of the Shares and to take all necessary and appropriate action to effect any such transfer. The agent and attorney-in-fact may substitute and appoint one or more persons to act for him.

**ZNHC, INC**

By: _____
Name:
Title:

**IRREVOCABLE STOCK POWER**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to Voss Enterprises, Inc., a New York corporation, the following shares of common stock (the "Shares"), par value $0.01 per share, of Schratter Foods Incorporated, a Delaware corporation:

| No. of Shares | Certificate No. |
|---|---|
| 450 | 7 |

and irrevocably appoints the Secretary of Schratter Foods Incorporated as its agent and attorney-in-fact to transfer all or any part of the Shares and to take all necessary and appropriate action to effect any such transfer. The agent and attorney-in-fact may substitute and appoint one or more persons to act for him.

**ZNHC, INC**


By:_____
Name:
Title:

**EXHIBIT B**

**SECURITY AGREEMENT**

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of January 1, 2015 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), made by and between Schratter Foods Incorporated, a Delaware corporation (the "**Grantor**"), in favor of ZNHC, Inc., a Delaware corporation (the "**Secured Party**").

WHEREAS, on the date hereof, the Secured Party has agreed to sell to Voss Enterprises, Inc, a New York corporation ("**VE**"), and ECB USA, Inc., a Florida corporation ("**ECB**" and together with VE, the "**Buyers**"), and the Buyers have agreed to purchase from the Secured Party, all of the authorized, issued and outstanding shares of common stock, par value $0.01 per share, of Grantor, pursuant to that certain Stock Purchase Agreement, by and among the Secured Party, as seller, the Buyers, the Grantor, Zausner Foods Corp., a Delaware corporation, and for certain purposes set forth therein, Alain Voss, an individual (the "**Stock Purchase Agreement**");

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations; and

WHEREAS, it is a condition to the obligations of the Seller to consummate the transaction under the Stock Purchase Agreement that the Grantor execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  Definitions.

    (a)     Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement.

    (b)     Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

    (c)     Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Stock Purchase Agreement.

    (d)     For purposes of this Agreement, the following terms shall have the following meanings:

    "**Collateral**" has the meaning set forth in *Section* 2.

    "**Event of Default**" means the Buyer's failure to timely pay the Initial Deferred Payment as required by the Stock Purchase Agreement.

"**First Priority**" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject.

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC.

"**Secured Obligations**" has the meaning set forth in *Section* 3.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Delaware or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.     Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

        (a)     all inventory and accounts receivable of the Grantor, as they may exist from time to time during the pendency of this Agreement; and

        (b)     all Proceeds of the foregoing, all accessions to, substitutions and replacements for each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

3.     Secured Obligations. The Collateral secures the due and prompt payment of the Initial Deferred Payment in accordance with the Stock Purchase Agreement (the "**Secured Obligations**").

4.     Perfection of Security Interest and Further Assurances.

        (a)     The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, immediately take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable. All of the foregoing shall be at the sole cost and expense of the Grantor.

        (b)     The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section promptly to the Secured Party upon request.

(c)     The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may request, in order to perfect and protect any security interest granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5.     Representations and Warranties. The Grantor represents and warrants as follows:

(a)     None of the Collateral constitutes, or is the proceeds of, "farm products" as defined in section 9-102(a)(34) of the UCC. The Grantor is not a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of the Collateral.

(b)     To the knowledge of the Grantor (without due inquiry or investigation), at the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement.

(c)     To the knowledge of the Grantor (without due inquiry or investigation), the security interest created hereby in the Collateral pursuant to this Agreement shall constitute a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(d)     It has full power, authority and legal right to create a security interest in the Collateral pursuant to this Agreement.

(e)     Each of this Agreement and the Stock Purchase Agreement has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms.

(f)     To the knowledge of the Grantor (without due inquiry or investigation), no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the Stock Purchase Agreement and this Agreement by the Grantor or the performance by the Grantor of its obligations thereunder.

(g)     To the knowledge of the Grantor (without due inquiry or investigation), the execution and delivery of the Stock Purchase Agreement and this Agreement by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(h)     To the knowledge of the Grantor (without due inquiry or investigation), the Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104,

3

9-105, 9-106 and 9-107 of the UCC, as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

6.      Voting, Distributions and Receivables.  If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.      Covenants. The Grantor covenants as follows:

(a)      The Grantor will not, without providing at least 30 days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b)      The Grantor will take all actions required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)      The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)      Other than in the Ordinary Course of Business, the Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for herein or in the Stock Purchase Agreement or with the prior written consent of the Secured Party; provided, however, for so long as the Secured Obligations remain outstanding, the Grantor shall not permit the aggregate fair market value of the Collateral to be less than $22,500,000, and the Grantor shall provide to the Secured Party a monthly statement setting forth its calculation of such value.

(e)      The Grantor will keep the Collateral in good condition, and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located.

(f)      The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

(g)      The Grantor will use its best efforts to continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended,

and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

8.    Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9.    Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; *provided that* the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10.    Reasonable Care. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11.    Remedies Upon Default. If any Event of Default shall have occurred and be continuing:

(a)    The Secured Party may, subject to prior written notice to the Grantor at least fifteen days prior to any action, assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be

entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. Grantor hereby waives and releases to the fullest extent permitted by law all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto.  The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b)     Any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of reasonable expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(c)     If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.     No Waiver and Cumulative Remedies. The Secured Party shall not by any act (except by a written instrument pursuant to *Section* 14), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

13.     Security Interest Absolute. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)     any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument;

(b)     any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any waiver, amendment or other modification of the Stock Purchase

Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)     any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

(d)     any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations; or

(e)     any default, failure or delay, wilful or otherwise, in the performance of the Secured Obligations.

14.     Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15.     Addresses For Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the Stock Purchase Agreement, and addressed to the respective parties and their attorneys at their addresses as specified on the signature pages hereof and thereof or as to either party at such other address as shall be designated by such party in a written notice to each other party.

16.     Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to *Section* 17, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; *provided that* the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment in accordance with Section XII.4 of the Stock Purchase Agreement, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17.     Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at its own cost and expense, terminate its security interest in the Collateral by filing any and all necessary termination statements and other documents necessary to effectuate the termination, and shall deliver to the Grantor and its attorney proof of filing of such termination statements. The Secured Party shall procure, deliver and/or execute and deliver to the Grantor, from time to time, all further releases, termination statements, certificates, instruments and documents, each in form and substance satisfactory to the Grantor and its counsel, and take any other actions, as may be reasonably requested by the Grantor or its counsel, or which are required to evidence the consummation of the release of such security interest. The foregoing shall not limit the Grantor's right to prepare and file applicable

UCC-3 termination statements or otherwise terminate the Secured Party's security interest following payment in full of the Initial Deferred Payment.

18.      GOVERNING LAW. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the State of Delaware. The other provisions of Section XII.5 of the Stock Purchase Agreement (other than the first sentence of Section XII.5) are incorporated herein, *mutatis mutandis*, as if a part hereof.

19.      Counterparts. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the Stock Purchase Agreement constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

[SIGNATURE PAGE FOLLOWS]

## SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SCHRATTER FOODS
INCORPORATED, as Grantor

By: _____

Name:

Title:

Address for Notices:

[To be added by Alain Voss]

[Copies of any Notices to the Grantor shall also be sent to:

Richard A. Freeman, Esq., Eleven Island Avenue, Suite 711, Miami Beach, FL 33139, e-mail: richard.a.freeman@att.net

[Signature Page to Security Agreement]

ZNHC, INC., as Secured Party


By: _____

Name:

Title:

Address for Notices:

ZNHC, Inc.
300 Martin Luther King Blvd.
Suite B
Wilmington, DE 19801
Facsimile: (302) 655-0791
E-mail: lew.gitlin@sbmsincusa.com
Attention: General Counsel

[Signature Page to Security Agreement]

# EXHIBIT C

## STOCK PLEDGE AGREEMENT

## STOCK PLEDGE AGREEMENT

This Stock Pledge Agreement (this "**Agreement**"), dated as of January 1, 2015, is made by and among Voss Enterprises, Inc, a New York corporation ("VE"), ECB USA, Inc., a Florida corporation ("**ECB**" and together with VE, jointly and severally, the "**Pledgor**"), in favor of ZNHC, Inc., a Delaware corporation ("Secured Party").

WHEREAS, on the date hereof, Secured Party has agreed to sell to VE, and VE has agreed to purchase from Secured Party, 450 shares of common stock (the "**VE Shares**"), par value $0.01 per share, of Schratter Foods Incorporated (the "**Company**"), pursuant to that certain Stock Purchase Agreement, by and among Secured Party, as seller, Pledgor, as buyer, Zausner Foods Corp., a Delaware corporation, and for certain purposes set forth therein, Alain Voss, an individual, and the Company (the "**Stock Purchase Agreement**");

WHEREAS, on the date hereof, Secured Party has agreed to sell to ECB, and ECB has agreed to purchase from Secured Party, 550 shares of common stock (the "**ECB Shares**"), par value $0.01 per share, of the Company, pursuant to the Stock Purchase Agreement;

WHEREAS, this Agreement is given by Pledgor in favor of Secured Party to secure the payment and performance of all of the Secured Obligations; and

WHEREAS, it is a condition of the obligations of Secured Party under the Stock Purchase Agreement that Pledgor execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   <u>Definitions</u>.

(a)   Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Stock Purchase Agreement.

(b)   Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement.

(c)   Unless otherwise defined herein or in the Stock Purchase Agreement, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

(d)   For purposes of this Agreement, the following terms shall have the following meanings:

"**Collateral**" has the meaning set forth in *Section* 2.

"**Pledged Shares**" means ninety (90%) percent of the VE Shares and the ECB Shares, as applicable (which together comprise all of the issued and outstanding shares of common stock,

par value $0.01 per share, of the Company), and the certificates, instruments and agreements representing the Pledged Shares, including any securities or other interests, howsoever evidenced or denominated, received by Pledgor in exchange for or as a dividend or distribution on or otherwise received in respect of the Pledged Shares, and the Pledgors shall pledge, or cause to be pledged, all of the shares of capital stock of the Company on a fully diluted basis for so long as the Secured Obligations remain outstanding.

"**Proceeds**" means "proceeds" as such term is defined in Section 9-102 of the UCC.

"**Secured Obligations**" has the meaning set forth in *Section* 3.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Delaware or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.      Pledge. Pledgor hereby pledges, assigns and grants to Secured Party, and hereby creates a continuing first priority lien and security interest in favor of Secured Party in and to all of its right, title and interest in and to the Pledged Shares and all Proceeds of the foregoing, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**").

3.      Secured Obligations. The Collateral secures the obligations of Pledgor from time to time arising under the Stock Purchase Agreement with respect to the due and prompt payment of the Deferred Installment Payments and any interest accrued thereon, when and as due (the "**Secured Obligations**").

4.      Perfection of Pledge.

(a)      Pledgor shall, from time to time, as may be required by Secured Party with respect to all Collateral, immediately take all actions as may be requested by the Secured Party to perfect the security interest of Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of Section 8-106 of the UCC.  All of the foregoing shall be at the sole cost and expense of Pledgor.

(b)      Pledgor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, without the signature of Pledgor where permitted by law.  Pledgor agrees to provide all information required by Secured Party pursuant to this Section promptly to the Secured Party upon request.

5.      Representations and Warranties. Pledgor represents and warrants as follows:

(a)      At the time the Collateral becomes subject to the lien and security interest created by this Agreement, according to the Stock Pledge Agreement, the Pledgor will, to the Pledgor's knowledge (without investigation) be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement.

2

(b)     To the Pledgor's knowledge (without investigation), the pledge of the Collateral pursuant to this Agreement creates a valid and perfected first priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(c)     Pledgor has full power, authority and legal right to pledge the Collateral pursuant to this Agreement.

(d)     Each of this Agreement and the Stock Purchase Agreement has been duly authorized, executed and delivered by Pledgor and constitutes a legal, valid and binding obligation of Pledgor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(e)     To the knowledge of Pledgor (without investigation), no authorization, approval, or other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for the purchase of the Pledged Shares under the Stock Purchase Agreement and the pledge by the Pledgor of the Collateral pursuant to this Agreement or for the execution and delivery of the Stock Purchase Agreement and this Agreement by the Pledgor or the performance by the Pledgor of its obligations thereunder and hereunder.

(f)     To the knowledge of Pledgor (without investigation), the execution and delivery of the Stock Purchase Agreement and this Agreement by Pledgor and the performance by Pledgor of its obligations thereunder and hereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to Pledgor or any of its property, or the organizational or governing documents of Pledgor or any agreement or instrument to which Pledgor is party or by which it or its property is bound.

(g)     To the knowledge of the Pledgor (without investigation), the Pledgor has taken all action required on its part for control (as defined in Section 8-106 of the UCC) to have been obtained by Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than Secured Party has control or possession of all or any part of the Collateral. Without limiting the foregoing, all certificates, agreements or instruments representing or evidencing the Pledged Shares in existence on the date hereof have been delivered to the Secured Party in suitable form for transfer by delivery.  Without limiting the foregoing, all certificates, agreements or instruments representing or evidencing the Pledged Shares in existence on the date hereof have been delivered to the Secured Party in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank.

6.     <u>Dividends and Voting Rights.</u>

(a)     Secured Party agrees that unless Pledgor shall have failed to remit any Deferred Installment Payment, when and as due, Pledgor may, to the extent Pledgor has such right as a holder of the Pledged Shares, vote and give consents, ratifications and waivers with respect thereto, except to the extent that, in Secured Party's reasonable judgment, any such vote,

3

consent, ratification or waiver could detract from the value thereof as Collateral or which could be inconsistent with or result in any violation of any provision of the Stock Purchase Agreement or this Agreement.

(b)     It is understood by the Secured Party and the Pledgor that, notwithstanding any provision to the contrary herein or in the Stock Purchase Agreement, unless the Pledgor has failed to remit any Deferred Installment Payment to the Secured Party, the Pledgor shall be entitled to vote all the Shares, to declare any and all dividends thereon, and to make any investments, without restrictions whatsoever. Secured Party agrees that Pledgor may, unless Pledgor shall have failed to remit any Deferred Installment Payment, when and as due, receive and retain all cash dividends and other distributions with respect to the Pledged Shares.

7.     Further Assurances.

(a)     Pledgor has purchased the Collateral from the Secured Party, and its title to the Collateral is derivative from the Secured Party. Pledgor shall, at its own cost and expense, defend title to the Collateral and the first priority lien and security interest of Secured Party therein against the claim of any person claiming against or through Pledgor and shall maintain and preserve such perfected first priority security interest for so long as this Agreement shall remain in effect; however, any claim against the Collateral deriving from a date prior to the date hereof shall be defended by the Secured Party, at its own cost and expense, in accordance with the provisions of the Stock Purchase Agreement.

(b)     Pledgor agrees that at any time and from time to time, at the expense of Pledgor, Pledgor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that Secured Party may request, in order to perfect and protect any security interest granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

(c)     Pledgor will not, without providing at least 30 days' prior written notice to Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. Pledgor will, prior to any change described in the preceding sentence, take all actions requested by Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

8.     Transfers and Other Liens. Pledgor agrees that it will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for herein or with the prior written consent of Secured Party.

9.     Secured Party Appointed Attorney-in-Fact. Pledgor hereby appoints Secured Party as Pledgor's attorney-in-fact, with full authority in the place and stead of Pledgor and in the name of Pledgor or otherwise, from time to time during the continuance of a failure to remit any

4

Deferred Installment Payment in Secured Party's discretion to take any action and to execute any instrument which Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, to receive, endorse and collect all instruments made payable to the Pledgor representing any interest payment or other distribution in respect of the Collateral or any part thereof, but excluding dividends, and to give full discharge for the same (but Secured Party shall not be obligated to and shall have no liability to Pledgor or any third party for failure to do so or take action). Such appointment, being coupled with an interest, shall be irrevocable. Pledgor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof, provided that Secured Party acts reasonably.

10.     Secured Party May Perform. If Pledgor fails to perform any obligation contained in this Agreement, Secured Party may itself perform, or cause performance of, such obligation, and the expenses of Secured Party incurred in connection therewith shall be payable by Pledgor; *provided that* Secured Party shall not be required to perform or discharge any obligation of Pledgor.

11.     Reasonable Care. Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which Secured Party accords its own property, it being understood that Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve Pledgor from the performance of any obligation on Pledgor's part to be performed or observed in respect of any of the Collateral.

12.     Remedies. If Pledgor fails to remit any Deferred Installment Payment, when and as due pursuant to the Stock Purchase Agreement:

(a)     Secured Party may, subject to prior written notice to the Pledgor at least fifteen days prior to any action, assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. So long as the sale of the Collateral is made in a commercially reasonable manner, Secured Party may sell such Collateral on such terms and to such purchaser(s) as Secured Party in its absolute discretion may choose, without assuming any credit risk. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such

5

sale. Pledgor hereby waives and releases to the fullest extent permitted by law all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. Neither Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b)     All rights of Pledgor to (i) exercise the voting and other consensual rights it would otherwise be entitled to exercise pursuant to *Section* 6(a) and (ii) receive the dividends and other distributions which it would otherwise be entitled to receive and retain pursuant to *Section* 6(b), shall immediately cease, and all such rights shall thereupon become vested in Secured Party, which shall have the sole right to exercise such voting and other consensual rights and receive and hold any dividends and other distributions that may be declared or made thereafter as Collateral.

(c)     Any cash held by Secured Party as Collateral and all cash Proceeds received by Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by Secured Party to the payment of expenses incurred by Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as Secured Party shall elect. Any surplus of such cash or cash Proceeds held by Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to Pledgor or to whomsoever may be lawfully entitled to receive such surplus. Pledgor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by Secured Party to collect such deficiency.

(d)     If Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section, Pledgor agrees that, upon request of Secured Party, Pledgor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

13.    No Waiver and Cumulative Remedies. Secured Party shall not by any act (except by a written instrument pursuant to *Section* 15), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any failure by Pledgor to remit any Deferred Installment Payment, when and as due. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

14.    Security Interest Absolute. All rights of Secured Party and liens and security interests hereunder, and all Secured Obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of:

(a)     any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument;

6

(b)     any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the Stock Purchase Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations;

(c)     any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral for all or any of the Secured Obligations;

(d)     any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations; or

(e)     any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations.

15.     <u>Amendments</u>. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by Pledgor therefrom shall be effective unless the same shall be in writing and signed by Secured Party and Pledgor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

16.     <u>Addresses For Notices</u>. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the Stock Purchase Agreement, and addressed to the respective parties and their attorneys at their addresses as specified on the signature pages hereof and thereof or as to either party at such other address as shall be designated by such party in a written notice to each other party.

17.     <u>Continuing Security Interest; Further Actions</u>. This Agreement shall create a continuing first priority lien and security interest in the Collateral and shall (a) subject to **Section 18**, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Pledgor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; *provided that* the Pledgor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

18.     <u>Termination; Release</u>. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at its own cost and expense: (a) duly assign, transfer and deliver to or at the direction of the Pledgor, the Collateral, and (b) execute and deliver to the Pledgor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

19.     <u>GOVERNING LAW</u>. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the State of Delaware. The provisions of Section 9.10 of the Stock Purchase Agreement are incorporated herein, *mutatis mutandis*, as if a part hereof.

DB1/ 81168158.9

20.     Counterparts. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the Stock Purchase Agreement constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

[SIGNATURE PAGE FOLLOWS]

8

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**PLEDGOR:**

**Voss Enterprises, Inc.**


By: _____

Name: Alain Voss

Title: President

Address for Notices:

Alain VOSS
235 Upper Shad Road
Pound Ridge, NY 10576


**ECB USA, INC.**


By: _____

Name: Bruno Blandin

Title: Manager

Address for Notices:

Claude BLANDIN
c/o Ets Claude Blandin & Fils
Rue Claude Emmanuel Blandin
Zac de Moudong Sud
97122 BAIE-MAHAULT
Tel : 0590389393 - Fax : 0590268316
E.mail: bblandin@ecb.gp, cblandin@ecb.mq


[Signature Page to Stock Pledge Agreement]

With copies sent to:

Richard A. Freeman, Esq., Eleven
Island Avenue, Suite 711, Miami
Beach, FL 33139, e-mail:
richard.a.freeman@att.net

[Signature Page to Stock Pledge Agreement]

**SECURED PARTY:**

**ZNHC, Inc.**

By: _____

Name:

Title:

Address for Notices:

ZNHC, Inc.
300 Martin Luther King Blvd.
Suite B
Wilmington, DE 19801
Facsimile:     (302) 655-0791
E-mail: lew.gitlin@sbmsincusa.com
Attention: General Counsel

[Signature Page to Stock Pledge Agreement]

# EXHIBIT D

## ILLUSTRATIVE DETERMINATION OF CLOSING NET EQUITY

Exhibit D
Schratter Foods, Inc.
For Exhibit Purposes Only

| Dr/(Cr) | 10/31/2014 | move tax provision for July to Sogs from DTA to Current Receivable 10/31/2014 | tax provision on October Loss was not recorded, so record here 10/31/2014 | Retained Earnings: convert from IFRS to US GAAP 12/31/2013 | Nov to Dec 2014 Operating Loss, Estimated 12/31/2014 | Sale of Toscana Note 12/31/2014 | Sale of trademark brands 12/31/2014 | Change in Working Capital Estimate to October Balance 12/31/2014 | Sale of "import business" for goodwill value 12/31/2014 | ZNHC will lend funds to pay off Citibank line 12/31/2014 | SFI's tax benefit for July to Dec will be Reversed 12/31/2014 | ZNHC will convert SFI's debt to equity to result in Zero Debt 12/31/2014 | Closing Balance at December 31, 2014 for Exhibit D Purposes Only | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | 555 328 | | | | | | | | | | | | 1 065 328 | = Oct 31 balance |
| AR, net | 15 540 250 | | | | 1 500 000 | | | 2 000 000 | | | | | 17 540 250 | = Oct 31 balance |
| Other Receivables | 5 767 237 | | | | | (1 500 000) | | | | | | | 4 267 237 | = Oct 31 balance |
| DTA | 8 663 244 | (1 427 893) | | | | | | | | | | | 7 235 351 | = Juna bal in DTA |
| Inventory, net | 15 717 886 | | | | | | | (3 000 000) | | | | | 15 717 886 | = Oct 31 balance |
| Prepaid Taxes, Others | 2 090 049 | 1 427 893 | 123 652 | | | | | | | | (1 828 045) | | 2 090 049 | = Oct 31 balance |
| Deposits | 588 332 | | | | | | | | | | | | 588 332 | = Oct 31 balance |
| Goodwill | 4 397 237 | | | 976 860 | 560 000 | | (283 500) | | (555 000) | | | | 4 412 237 | = Oct 31 balance |
| Fixed Assets | 2 695 537 | | | (78 631) | | | | | | | | | 2 616 906 | = Oct 31 balance |
| Total Assets | 58 515 243 | | | | | | | | | | | | 56 131 579 | |
| | | | | | | | | | | | | | | |
| AP | (12 376 015) | | | | | | | | | | | | (12 376 015) | |
| Credit Line | (4 000 000) | | | | (1 500 000) | | | | | 4 600 000 | | | - | |
| Other Current Liab | (17 844 782) | | | 25 000 | | | 810 000 | 1 000 000 | 555 000 | | | | (17 844 782) | |
| NP - ZNHC | (24 600 000) | | | | (1 500 000) | | | | | (4 600 000) | | 28 835 000 | - | |
| DTL | (1 016 000) | | | | | | | | | | | | (1 501 000) | |
| Total Liabilities | (59 836 796) | | | | | | | | | | | | (31 811 796) | |
| | | | | | | | | | | | | | | |
| CS | (10) | | | | | | | | | | | | (10) | |
| PIC | (3 099 990) | | | | | | | | | | | (26 835 000) | (29 934 990) | |
| RE | (5 063 521) | | | (923 229) | | | | | | | | | (5 696 750) | |
| Net Loss / (Income) | 9 384 075 | | (123 652) | | 1 040 000 | | (526 500) | | | | 1 828 045 | | 11 901 968 | |
| Total Equity | 1 220 554 | | | | | | | | | | | | (24 319 783) | |
| | | | | | | | | | | | | | | |
| Total Liabilities & Equity | (58 616 243) | | | | | | | | | | | | (56 131 579) | |
| | | | | | | | | | | | | | | |
| Pre-tax Loss / (Income) | 14 246 806 | | | | 1 600 000 | | (810 000) | | | | | | 15 026 805 | |
| Tax prov / (Benefit) | (4 862 730) | | (123 652) | | (560 000) | | 283 500 | | | | 1 828 045 | | (3 434 837) | |
| Net Loss | 9 384 075 | | (123 652) | | 1 040 000 | | (526 500) | | | | 1 828 045 | | 11 601 968 | |
| Net Loss, 2014 | | | | | 10 300 423 | | | | | | | | | |

# Exhibit D

<u>AMENDMENT NO. 1 TO STOCK PURCHASE AGREEMENT</u>

Amendment No. 1 to Stock Purchase Agreement (this "Amendment"), dated as of June 16, 2015, by and among ZNHC, Inc., a Delaware corporation ("ZNHC"), Voss Enterprises, Inc., a New York corporation ("VEI"), ECB USA, Inc., a Florida corporation ("ECB"), Atlantic Ventures Corp, a Florida corporation, as successor to VEI and ECB ("Atlantic Ventures" and, together with VEI and ECB, the "Buyer Parties"), Alain Voss, individually, Schratter Foods Incorporated, a Delaware corporation (the "Company"), and Zausner Foods Corp., a Delaware corporation.

WHEREAS, ZNHC, VEI, ECB, Atlantic Ventures, Alain Voss and the Company have entered into a Stock Purchase Agreement, dated December 6, 2014 (the "Purchase Agreement");

WHEREAS, on April 8, 2015, ZNHC received a letter from Richard Freeman Associates, LLC, on behalf of the Buyer Parties, relating to Schratter Foods Inc.—Closing Net Equity Statement (together with all correspondence and discussions related to the Closing Net Equity Statement and the Closing process among the parties hereto, the "CNES Correspondence"), and as a result, the parties hereto desire to amend the Purchase Agreement and set forth certain agreements regarding the Purchase Agreement on the terms and conditions set forth herein; and

WHEREAS, pursuant to Section XII.1 of the Purchase Agreement, any amendments of the Purchase Agreement must be by a written agreement signed by all the parties to the Purchase Agreement.

NOW, THEREFORE, in consideration of the premises set forth above and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>Definitions</u>. Capitalized terms used and not defined in this Amendment shall have the respective meanings given them in the Purchase Agreement.  The adjustments referred to in Paragraphs 2, 3 and 4, below, are referred to collectively as the "Purchase Price Adjustments."

2.      <u>Post-Closing Adjustment</u>. The Post-Closing Adjustment determined pursuant to Section II.4(a) of the Purchase Agreement shall be zero and there shall be no corresponding adjustment to the Purchase Price.

3.      <u>Adjustment for Deferred Tax Asset; Amendment to Deferred Installment Payment Provision</u>. The adjustment for the Deferred Tax Asset determined pursuant to Section II.4(b) of the Purchase Agreement shall be $3,900,000 and, in accordance with such Section II.4(b), the aggregate amount of the Deferred Installment Payments shall be reduced from $10,000,000 in cash to $6,100,000 in cash. The first sentence of Section II.1(c) of the Purchase Agreement shall correspondingly be amended as follows:

"(c)   $6,100,000.00 in cash, payable in four annual installments of $1,525,000.00 on December 31, 2016, $1,525,000.00 on December 31, 2017, $1,525,000.00 on December 31, 2018 and $1,525,000.00 on December 31, 2019 (the "Deferred Installment Payments")."

4.    Goodwill Adjustment. The adjustment for the Cognati Goodwill determined pursuant to Section II.4(c) of the Purchase Agreement shall be zero and there shall be no corresponding adjustment to the Purchase Price.

5.    No Other Adjustments. Other than the adjustment for the Deferred Tax Asset described in Section 3 of this Amendment, the Buyer Parties and their Affiliates shall not seek any further Purchase Price Adjustments and hereby release and discharge ZNHC and their Affiliates from any and all Claims that such Buyer Parties and their Affiliates had, have or may have against ZNHC or its Affiliates referenced in or relating to the CNES Correspondence insofar as it relates to Purchase Price Adjustments, or relating to the Company's cash position at Closing; provided, however, that, for the avoidance of doubt, the Seller Indemnifying Party shall remain liable for any and all indemnification obligations that may arise pursuant to Section IX of the Purchase Agreement, as amended by this Amendment.

6.    Other Amendments to the Purchase Agreement. The Purchase Agreement is hereby amended as follows:

(a)    Section XIII.1 of the Purchase Agreement is hereby amended by inserting the following new definition in the appropriate alphabetical order:

""Escheat Claim" has the meaning set forth in Section IX.2(c) of the Purchase Agreement."

(b)    Section IX.2(c) of the Purchase Agreement is hereby amended and restated as follows:

"(c)   The aggregate amount of all Losses (as defined in Section IX.1(a) of the Purchase Agreement) for matters other than Fiscal Matters and Anti-Trust Compliance for which an Indemnifying Party shall be liable pursuant hereto, shall not exceed $1,500,000.00 (the "Defined Claim"); provided, however, that to the extent an Indemnifying Party is found liable (i) for a breach of the representation and warranty contained in Section III.11 or (ii) under the indemnification provision in Section IX.1(a)(iv) as a result of an act or omission that took place during the Pre-Closing Enforcement Period with the corresponding Loss resulting from an enforcement action initiated by a Governmental Entity that does not concern an Employee Matter, and in the case of (i) and (ii) above solely with respect to the Company's failure to comply with the laws of escheat as they existed in one or more of the states of the United States of America (any Claim under (i) or (ii), an "Escheat Claim"), the aggregate amount of all Losses for a

Defined Claim and an Escheat Claim, collectively, for which an Indemnifying Party shall be liable pursuant hereto shall not exceed $2,000,000.00; however, an Indemnifying Party shall not be liable for a Defined Claim in excess of $1,500,000.00."

(c)     Section IX.6 of the Purchase Agreement is hereby amended and restated as follows:

"Survival After Closing. Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is eighteen months from the Closing Date; provided that (a) the representations and warranties in Sections III.1, III.2, III.4, III.5 shall survive indefinitely; (b) the representations and warranties in IV.1 and X.1 shall survive until the date that is three years from the Closing Date; (c) the representation and warranty in Section III.11 and indemnification provision in Section IX.1(a)(iv), in each case solely with respect to an Escheat Claim shall survive until December 31, 2018; (d) the Seller's indemnification obligations with regard to Environmental Matters shall survive until the date that is eighteen months from the Closing Date; (e) the Seller's indemnification obligations with regard to Customs Matters shall survive until the date that is two years from the Closing Date; and (f) the Seller's indemnification obligations with regard to Tax Matters and Anti-Trust Compliance shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 30 days. All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein."

7.     Limited Effect. Except as expressly provided hereby, all of the terms and provisions of the Purchase Agreement are and shall remain in full force and effect and are hereby ratified and confirmed by the parties hereto. The amendments contained herein shall not be construed as a waiver or amendment of any other provision of the Purchase Agreement, including Section IX.1 of the Purchase Agreement relating to indemnification, or for any purpose except as expressly set forth herein or a consent to any further or future action on the part of the parties that would require the waiver or consent of any such party.

8.     Successors and Assigns. This Amendment shall inure to the benefit of and be binding upon the parties hereto and each of their respective successors and assigns.

9.     Governing Law. This Amendment shall be governed by, construed and enforced in accordance with, the internal laws of the State of Florida applicable to contracts made and to be wholly performed within such State.   Any action or proceeding in connection with this Amendment shall be brought in a court of record of the State of Delaware in the City of Wilmington or in the United States District Court in such county, the parties hereto hereby consenting to the exclusive jurisdiction thereof.

10.   Counterparts. This Amendment may be executed in any number of counterparts, all of which shall constitute one and the same agreement, and any party hereto may execute this Amendment by signing and delivering one or more counterparts. Delivery of an executed counterpart of this Amendment electronically or by facsimile shall be as effective as delivery of an original executed counterpart of this Amendment.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first above written.

ZNHC, Inc.

By: _____
Name: LEWIS GITLIN
Title: CORP SECY / GC

Zausner Foods Corp.

By: _____
Name: PIERRE RAGNET
Title: President

Voss Enterprises, Inc.

By: _____
Name:
Title:

ECB USA, Inc.

By: _____
Name:
Title: PRESIDENT

Atlantic Ventures Corp

By: _____
Name:
Title:

_____
Alain Voss

Schratter Foods Incorporated

By: _____
Name:
Title:

[Signature Page to Amendment No. 1 to Stock Purchase Agreement]

# Exhibit E

## AGREEMENT TO CENTRALIZE INTRA-GROUP TREASURY OPERATIONS

THIS AGREEMENT IS ENTERED INTO BY AND BETWEEN :

**G.I.E C2B**, a company with offices located at Rue Claude Emmanuel Blandin—Immeuble Entre Deux Mers—ZAC de Moudong Sud—97122 BAIE MAHAULT, incorporated at RCS de pointe à Pitre, number 792 365 975 by Mr. Bruno BLANDIN, having an authorized capital of 10.000 €

« la Société Centralisatrice »,

party of the first part,

and :

**SCHRATTER FOODS INC**, having a business address located at 333 Fairfield Road, Fairfield, New Jersey 07004-1961, and represented by Mr. Alain VOSS,

« la filiale » or « la société centralisée »

party of the second part,

WHEREAS, GIE C2B consists of an economic interest group having as their objective the facilitation and development of the economic and business interests of its members; and the improvement and growth of revenues through the centralization of business and financial activities of its members; and

WHEREAS, GIE C2B is the entity that has agreed with its members to coordinate all financial and business activities on a centralized basis in order to avoid redundant and unnecessary administrative expenses with a view to obtaining optimal operational financial results and credit availability and access for its members ; and

WHEREAS, SCHRATTER FOODS INC, a corporation organized pursuant to the laws of the State of Delaware, having become a member of GIE C2B, also desires to centralize its treasury operations through the aegis of GIE C2B ; and

WHEREAS, La Société Centralisée desires to assist its members through, *inter alia*, intra-corporate lending ; and

WHEREAS, La filiale desires to enter into an agreement with La Société Centralisatrice with a view to optimizing its financial results and its overall economic interests,

1

**NOW, THEREFORE,** the parties agree as follows :

### ARTICLE 1 -- MANDATE -- CASH FLOW MANAGEMENT

1.1. La Société Centralisatrice, through its own bank accounts, will assist La filiale with its cash management and its cash flows with a view to optimizing the management thereof through diminution of unnecessary expenses and maximizing the utilization of financial products to improve cash flows and treasury functions.

1.2. Cash management of La Filiale will be effectuated by the Société Centralisatrice through its own systems and methods.

1.3. La Société Centralisatrice will maintain regular books and records in accordance with the applicable law and business customs with respect to all cash management and treasury activities that it undertakes on behalf of La Filiale, and La Filiale will have access at all times to such books and records in order to ensure proper oversight of the services provided by La Société Centralisatrice.

1.4. Remuneration of current accounts will be made, *pro rata,* every six months, i.e. on 30 June and 31 December, as to all funds that have been borrowed or loaned hereunder.

1.5. The applicable interest rate will be the market rate as determined by the Euribor 3 month rate on the last working day of the applicable semester for reimbursement of treasury surpluses of the member.  The applicable interest rate for treasury borrowings will be the market rate as deterined by the Euribor 3 month rate plus 3 on the last working day of the applicable semester for reimbursement of treasury needs of the member.

1.6. The providing of credit by La Société Centralisatrice may be effectuated at any time.  The determination of the date when credit is provided by La Societe Centralisatrice shall be determined when La Societe Centralisatrice enters the credit on its books.

1.7. Withdrawals by La Filiale shall be effectuated in accordance with the treasury and cash flow needs of La Filiale ; however, La Filiale must give notice to La Societe Centralisatrice regarding anticipated withdrawals on a monthly basis, no later than the fifth day of each ensuing month.

1.8. Cash flow needs, and credit advances that are made by La Société Centralisatrice to La Filiale will be made in Euros.

### ARTICLE 2 -- CURRENCIES --FOREIGN EXCHANGE TRANSACTIONS

La Société Filiale can engage in diverse foreign currencies transactions.

In such eventuality, la Société Filiale will have the option to acquire from GIE CBI the necessary foreign currencies, the service of the Société centralisatrice is 0,01 point.

### ARTICLE 3 -- TERM OF AGREEMENT -- TERMINATION-- CANCELLATION

This Agreement shall be effective on the date that it is executed by both parties, and shall have an indefinite duration.

2

### 3.1. TERMINATION

This Agreement may be terminated at any time, upon 30 days' written notice, by either party. Written notice must be effectuated by certified letter, return receipt requested,

### 3.2. CANCELLATION

In addition, in the event that La Société Filiale no longer has any direct or indirect borrowings or financial connections with other companies within the group within the meaning of Article L.511-7 of the monetary and financial Code, la Société Centralisatrice may cancel this Agreement or terminate the cash flow management aspect of this Agreement upon written notice sent by fax or by mail to La Filiale.

### ARTICLE 4 – APPLICABLE LAW

This Agreement shall be governed by the laws of the Country of France. In the event of litigation involving this Agreement, the Tribunal de Commerce de Pointe à Pitre shall have sole jurisdiction, and shall be the sole venue, for all such matters.

IN WITNESS WHEREOF, the parties have executed this Agreement on the _12_ day of _January_, 2015 in _Pure Mahault_.

GIE C2B
Bruno BLANDIN, Administrateur

SCHRATTER FOODS INC
Alain VOSS, President

# Exhibit F

Duplicate

**DEPOSIT RECEIPT**

CLERK'S OFFICE OF THE
POINTE A PITRE MIXED
COMMERCIAL COURT

30 RUE FREBAULT

97110 POINTE-A-PITRE

PHONE. 05 90 89.69.51

G.I.E. C 2 B - Ms. Dominique DUFFES

Immeuble Entre Deux Mers
ZAC de Moudong Sud
97122 Baie Mahault

REF/V:
REF/N:      2011 C 1 / 2018-A-7988

The clerk's office of the Pointe à Pitre mixed commercial court certifies that, on 11/15/2018, it received the following documents:

   Extraordinary general meeting minutes dated 04/30/2018

   Articles of association updated on 04/30/2018
               - Assignment of shares - between
               the Company SCHRATTER FOODS, the assignor and the Company ETABLISSEMENTS
               CLAUDE BLANDIN ET FILS, the assignee

Regarding the company

      G.I.E. C 2 B
      Economic interest group
      Immeuble Entre Deux Mers
      ZAC de Moudong Sud
      97122 Baie Mahault

The filing was registered under the number 2018-A-7988 on 11/15/2018

POINTE A PITRE R.C.S. [Registre du Commerce et des Sociétés (Trade and Companies Register)] TMC 529 867 236 (2011 C 1)

                              Done IN POINTE A PITRE on 11/15/2018,
                              THE CLERK

[seal:] CLERK OF THE POINTE-A-PITRE COMMERCIAL COURT (Guadeloupe) FRENCH REPUBLIC

**C2B**

**ECONOMIC INTEREST GROUP**
**Governed by articles L 251-1 to L 251-23 of the Commercial Code**
**Registered office: Immeuble Entre Deux Mers**
**ZAC de Moudong Sud 97122 BAIE-MAHAULT**
**SIREN 529 867 236 - POINTE-A-PITRE RCS**

[stamp:] CERTIFIED COPY CONFORMING WITH THE ORIGINAL [signature]

# ARTICLES OF ASSOCIATION

**UPDATED ON APRIL 30, 2018**

# - CHAPTER I -
# [redacted] **AND DURATION - OBJECT - NAME - REGISTERED OFFICE**

[redacted] **ME**

[redacted] formative rale [sic] dated December 8, 2010, the founders formed an economic interest group governed by articles L 251-1 to L 251-23 of the Commercial Code and by all the legislative and regulatory texts likely to supplement or modify said ruling, as well as by this agreement.

**ARTICLE 2.**    **NAME**

The name of the group is: **C2B**

In all the deeds and documents emanating from the group and intended for third parties, in particular letters, invoices, announcements, and various publications, this name must always be preceded or followed by the words "Economic interest group" or the abbreviation GIE, and the statement of its registration number in the trade and companies register.

**ARTICLE 3.**    **SUBJECT MATTER**

The purpose of the economic interest group is to facilitate and develop the economic activity of its members, to improve or increase the results of this activity, in particular by organizing the financial activities of its members and the centralized management of their treasuries and the financial flows necessary for the successful completion of their activity.

And generally, the realization of all movable or immovable property operations that are a realization of the object defined above within the limits which it comprises. This object must always have an auxiliary character compared to the economic activity of the members of the group.

**ARTICLE 4.**    **REGISTERED OFFICE**

The Registered office of the group is set at **BAIE-MAHAULT (97122) - Immeuble Entre Deux Mers - Rue Claude Emmanuel Blandin - ZAC de Moudong Sud.**

It can be transferred to any other place by decision of the extraordinary general meeting of the group members.

**ARTICLE 5.**    **TERM**

The term of the group is set at ten years, from the date of its registration in the trade and companies register, except by early dissolution or extension.

# – CHAPTER II –
## CONTRIBUTIONS - CAPITAL - ASSIGNMENT - WITHDRAWAL - EXCLUSION

**ARTICLE 6.**   **CONTRIBUTIONS**

The undersigned have brought to the group the sums in cash as they appear in annex 6 of these articles of association and which together form a total amount of **€10,000.**

**ARTICLE 7.**   **CAPITAL**

The capital of the group is set in the amount of **(ten thousand) Euros.** It is divided into **1,000 (one thousand) shares of 10 (ten) €** each, numbered from 1 to 1,000, allocated to contributors, according to the distribution table in annex 7 of these articles of association.

**ARTICLE 8.**   **MODIFICATION OF THE CAPITAL**

The capital of the group may be increased by means of contributions in cash or in kind by decision of the extraordinary general meeting. The extraordinary general meeting can also decide to reduce the capital for any reason whatsoever.

**ARTICLE 9.**   **ASSIGNMENT OF SHARES - WITHDRAWAL - EXCLUSION**

**9.1.**   **Assignment of shares**

1.   The assignment of shares between members of the group or for the benefit of a third party outside the group must be authorized by the extraordinary general meeting. To obtain this approval, the proposed assignment must be notified to the group by registered letter.

The assignment authorization is deemed to have been granted if no decision of the extraordinary general meeting has been notified to the assignor member within two months. The assignor member remains liable towards third parties for the debts of the group prior to the mention of its withdrawal from the Trade and Companies Register.

2.   The assignment of shares must be recorded in writing. It is only enforceable against the group after having been notified to it or having been accepted by it in a notarized purchase deed.

The assignment of shares is only enforceable against third parties after the filing of the deed of assignment with the Trade and Companies Register.

3.   If the assignment authorization is refused by the extraordinary general meeting, the assignor member may withdraw from the group under the conditions set out below.

**9.2.**   **Withdrawal - Exclusion**

1.   Any member may withdraw from the group on the condition of making a request by registered letter, within three months before the end of the current fiscal year or of the following fiscal year if the notification refusing the approval is made less than three months before the end of the current fiscal year.

The withdrawal takes effect at the end of the fiscal year during which the withdrawal request was validly made. This withdrawal can only be effective if the withdrawing member has fulfilled all of his

commitments to the group.

The withdrawing member remains responsible for the debts of the group contracted with third parties prior to the effective date of the withdrawal.

2.    The exclusion of a member of the group may be pronounced at any time on a proposal from the board of directors by the extraordinary general meeting.

The exclusion must be justified and the member concerned heard beforehand.

In particular, infringements of this agreement and/or of the internal by-laws provided for in article 21 below are considered as grounds for exclusion, it being specified that the exclusion of a member is automatically incurred in cases of incapacity, bankruptcy reorganization or enforced liquidation, or prohibition to manage or administer a business affecting this member.

3.    The share value of the resigning or excluded member in the net assets of the group is determined by mutual agreement between him and the group.

In the absence of an agreement, this value will be determined by an expert appointed by the Presiding Judge of the "City" Court for the registered office at the request of the most diligent party.

This value will be paid to the withdrawing member within "Number" months of the effective date of the withdrawal or of the filing of the expert's report; the sums due will bear interest at the rate of 4% per annum.

4.    Members who have resigned or been excluded [illegible] all their commitments from the group and fulfill the obligations arising for them from operations carried out by the group.

They will also have to carry out the agreements and operations in progress made before their resignation or their withdrawal and will remain responsible vis-à-vis third parties and vis-à-vis the group.

5.    The withdrawal of a member entails the cancellation of their shares and, correspondingly, the reduction of the capital.

6.    When the capital of one of the group members ceases for any reason whatsoever to be in the majority, directly by ETABLISSEMENTS CLAUDE BLANDIN ET FILS or by one of its subsidiaries, said member automatically resigns. This automatic resignation entails the consequences set out in the above paragraphs.

# - CHAPTER III -
# RIGHTS AND OBLIGATIONS OF MEMBERS

<u>**ARTICLE 10.**</u>        **LIABILITY OF THE GROUP MEMBERS**

In accordance with the law, the group members are liable for their debts on their own assets. They are also joint and several, unless otherwise agreed with the third party contractors.

The creditors of the group can only pursue the payment of debts against a member after having unsuccessfully put the group in default by extrajudicial act.

In their relationships among themselves, the members of the group are liable for the debts thereof in the proportions set by the internal by-laws.

<u>**Article 11.**</u>        **RIGHTS AND OBLIGATIONS OF GROUP MEMBERS**

Each group member has the right to participate with voting rights in the general meetings of the group members and also has the right to call on the services of the group for any operation falling within the scope of the latter.

Each member of the group is required to respect the articles of association and internal by-laws of the group.

<u>**ARTICLE 12.**</u>        **ADMISSION OF NEW MEMBERS**

The admission of new members to the group is decided by the extraordinary general meeting of the group members which approves their contributions and sets the terms of the resulting capital increase.

# - CHAPTER IV -
# ADMINISTRATION - MANAGEMENT CONTROL -
# AUDITING

<u>**ARTICLE 13.**</u>        **ADMINISTRATION**

a)  The group is administered and managed by a board of directors made up of one to three directors appointed by the ordinary general meeting of the group members, which sets the term of their mandate. If the board of directors is composed of only one member, the latter takes the title of "sole director."

The directors can be natural persons or legal entities; when a legal entity is appointed director, it is required to appoint a permanent representative who incurs the same civil and criminal liabilities as if he were a director in his own name.

The directors are "ad nutum" revocable proxies.

Their functions are incompatible with those of management controller and auditor.

b)  In his relations with third parties, a director commits the group for any act falling within the scope

of the latter.

The board of directors is vested with the broadest powers to act in all circumstances on behalf of the group.

It exercises them within the limits of the purpose of the group and subject to those attributed by law and by this agreement to general meetings.

c)  The board of directors, if it is composed of several members, elects from among its members a chairman who assumes the proper functioning of the group, in accordance with the articles of association and internal by-laws. He chairs the meetings of the board of directors and general meetings.

The chairman or the sole director signs all agreements and certifies all meetings or board deliberations as being in conformity and represents the group in court and in all civil acts.

At board meetings, decisions are taken by a majority of the members present; in the event of a tie, the chairman's vote is decisive.

**ARTICLE 14.**     **MANAGEMENT CONTROL**

Management control is carried out by one or more management controllers, who must be natural persons appointed by the ordinary general meeting, which sets the term of their assignment. Their functions are incompatible with those of director or statutory auditor of the group.

The management controllers exercise permanent control over the group management by the board of directors.

Each year, they present a report on the management of the group at the annual meeting which decides on the accounts for the preceding fiscal year.

To this end, at any time of the year, they carry out the checks and controls they deem appropriate and can obtain any useful documents enabling them to exercise their mission.

Once every six months, they receive a report presented by the sole director or by the chairman of the board of directors and, within three months of the end of the fiscal year, for the purposes of verification and control, the annual accounts.

The mission of the management controller(s) is limited to the operations carried out by the group itself, without being therefore able to interfere with or take an interest, in any capacity and for any reason whatsoever, in the operations carried out on a personal basis by each of its members.

**ARTICLE 15.**     **AUDITOR**

The accounts are audited by an auditor appointed for six fiscal years by the ordinary general meeting of the group members.

The functions of auditor are incompatible with those of director. In the cases provided for by law, the functions of auditor are entrusted to a statutory auditor appointed for six fiscal years and chosen from the list of statutory auditors referred to in article 219 of the law on commercial companies.

The auditor certifies the consistency and accuracy of the annual accounts: to this end, the accounting documents, as well as the reports of the board of directors and of the management controller regarding the operations during the fiscal year are communicated to him 45 days before the date set for the annual meeting at which he presents his report. The role of the controller or statutory auditor, to the exclusion of any interference in management, is to check the books and securities of the group and to check the consistency and accuracy of the accounts. He also verifies the accuracy of the information contained in the report by the chairman of the board of directors or sole director regarding the group's accounts.

At any time of the year, he can carry out any checks and controls he deems appropriate and have all the documents useful for the performance of his mission communicated to him.

# - CHAPTER V -
# GENERAL MEETINGS

**ARTICLE 16.**     **GENERAL MEETINGS - GENERAL BY-LAWS**

The members of the group meet in so-called "extraordinary" general meetings, when their purpose is to modify the provisions of the group's agreement and/or the internal by-laws, to admit new members, and to rule on exclusions, and in so-called "ordinary" ones in all other cases.

I. - General meetings are called by the sole director or by the chairman of the board of directors. They can also be [called] by the management controller or the statutory auditor or auditor in an emergency.

The group meetings must also be called at the request of at least a quarter of the number of group members with the agenda they propose.

In the event of liquidation, they are called by the liquidator.

II. - The calls are made by letters addressed to each member of the group at least fifteen days before the date of the meeting. However, the meeting can meet without a written call if all the members of the group are present or represented.

To these calls, there must be annexed the agenda of the meeting along with the draft text of the resolutions, as well as the report of the board of directors and all documents necessary for the information of the members. In the case of the annual ordinary general meeting ruling on the annual accounts, the reports of the management controller and of the auditor, as well as the balance sheet, income statement, and annex for the preceding fiscal year are also annexed to the calls.

The agenda is set by the author of the call.

Any meeting can validly deliberate only on the questions appearing on the agenda.

III. - The general meeting is made up of all the members of the group. Legal entities are represented by their legal representatives or by proxies specially appointed by them.

A member of the group may be represented at the group meetings by another member, with a special power indicating the agenda for the meeting. Each member present can only receive one power of representation.

IV. - The meeting is chaired by the chairman of the board of directors or by the person who called it. Failing this, the meeting elects its chairman.

The meeting secretary is appointed by the meeting. They can be chosen outside of the members of the group.

V.  - The members of the group each have one vote.

VI. - The deliberations are recorded in minutes signed by the chairman of the meeting and the secretary, and brought together in a register kept at the registered office of the group.

The copies or extracts are certified by the sole director or the chairman of the board of directors.

## <u>ARTICLE 17.</u>        ORDINARY GENERAL MEETINGS

The ordinary general meeting meets at least once a year.

It can only validly deliberate if at least half of the group members are present.

Its decisions are taken by a majority of the votes of the members present or represented.

The annual ordinary general meeting called to approve the accounts for the preceding fiscal year hears the report of the board of directors (or of the sole director), the reports of the management controller, and that of the auditor. It discusses, approves, or corrects the accounts for the preceding fiscal year, deciding on the allocation of the results.

It appoints and dismisses the directors, the management controller, and the auditor and deliberates on all the questions appearing on the agenda and which are not within the competence of the extraordinary general meeting as well as on all the questions regarding the functioning of the group.

**ARTICLE 15.**    EXTRAORDINARY GENERAL MEETINGS

The extraordinary general meeting is competent to modify the articles of association and the internal by-laws of the group in all their provisions. It also rules on the early dissolution of the group or its extension, on the admission of new members, and on the exclusion of existing members.

To validly deliberate, the extraordinary general meeting must bring together at least two-thirds of the members of the group (or all of them if the group has only two members).

Decisions are taken by a two-thirds majority of the votes of the members present or represented.

However, the extraordinary general meeting cannot, except unanimously, change the nationality of the group or increase the commitments of the members.

## - CHAPTER VI -
## FISCAL YEAR - ACCOUNTS - RESULTS

**ARTICLE 18.**    **FISCAL YEAR**

The company's fiscal year begins on May 1st and ends on April 30 of each year.

**ARTICLE 19.**    **ANNUAL ACCOUNTS**

Regular accounts are kept of the group's operations. The report on the operations for the fiscal year, the inventory, the annual accounts (balance sheet, income statement, annex) are presented by the board of directors (or by the sole director) for the approval of the ordinary general meeting within six months of the end of the fiscal year after having been submitted to the management controller and the auditor and the calls given in the forms and within the deadlines prescribed in Article 14 above.

The accounts are drawn up for each company fiscal year using the same forms and using the same valuation methods, unless modifications are expressly approved by the ordinary general meeting.

Depreciation and provisions must be made in accordance with accounting practice.

**ARTICLE 20.**    **DISTRIBUTION OF RESULTS**

The purpose of the group is not to make a profit for itself; thus the positive or negative results of the fiscal year, if any, become the property or the responsibility of each member as soon as they are noted, in the proportions set by the internal by-laws.

# - CHAPTER VII -
# DISSOLUTION - LIQUIDATION

**ARTICLE 21.**     **DISSOLUTION OF THE GROUP**

The group is dissolved:

- by the expiry of the term;
- by the extinguishment or achievement of its object;
- by unanimous decision of the members;
- by court order for valid reasons;
- by the unification of all the rights of the group in the hands of a single person or when, following withdrawals, the group would only include one member.

It is not dissolved by the death of a natural person or by the dissolution of a legal entity that is a member of the group.

Likewise, the group is not dissolved if one of its members is incapacitated, becomes personally bankrupt, or is prohibited from directing, managing, administering, or controlling a commercial enterprise, whatever its form, or a non-commercial private law legal entity.

The group then continues among the other members. The member to whom one of the above events has occurred is considered to have resigned with effect from the day of the occurrence of the event, but the reimbursement due will be made as in the event of withdrawal or exclusion under the conditions set by the internal by-laws.

**ARTICLE 22.**     LIQUIDATION

The group is in liquidation from the moment of dissolution for any reason whatsoever.

The legal personality of the group subsists for the needs of its liquidation and until its closure.

The liquidators are appointed by the extraordinary general meeting or by the court decision which pronounced the dissolution. The liquidators have all the powers to realize the assets, pay the liabilities, and distribute the available balance among the members. This distribution is made in accordance with the provisions of article 18 above and under the conditions provided for in the internal by-laws.

The functions of the director(s) cease with the appointment of the liquidators, but the management controller and the auditor continue their missions.

After the payment of debts and the reimbursement of the amount of members' current accounts as well as their contributions, the surplus assets are distributed among the members as provided for above. In the event of insufficient assets, the surplus liabilities are borne by the members of the group in the same proportions.

**ARTICLE 23.**     **INTERNAL REGULATIONS**

Internal by-laws will be established to govern the practical modalities of group functioning; these by-laws must be approved unanimously by the members; it can only be modified by a decision of the extraordinary general meeting.

**ARTICLE 24.**     **DISPUTES**

Any disputes that may arise during the term of the group or its liquidation concerning the interpretation or execution of this agreement or relating to common affairs between the members or between the members and the group, will be judged in accordance with the law and submitted to the competent courts of the place of the group's registered office.

In the event of a dispute, any interested party must consequently elect domicile within the jurisdiction of the court of the place of said registered office and any summons or notification is regularly made to this elected domicile.

In the absence of an Election of domicile, the summons and notifications are validly made to the Public Prosecutor's Office of the Republic at the High Court of the registered office's location.

**ARTICLE 25.**     **COMMITMENTS CONTRACTED BEFORE THE GROUP'S REGISTRATION**

The statement established on "Date" by "Name of member" is annexed to this formation agreement, recapitulating the acts previously exercised on behalf of the group being formed, with an indication of the commitments which will result from it for the group.

The signing of this formation agreement will result in the group taking over the said commitments, which will be deemed to have been subscribed by it from the outset and this from the registration of the group in the Trade and Companies Register.

In addition, the undersigned give mandate to "Name of the Principal," in order to make the following commitments on behalf of the group:

"List these commitments"

The registration of the group in the Trade and Companies Register will result in the said group taking over the aforementioned commitments. It is annexed to this agreement

**ARTICLE 27.**     **PUBLICATIONS**

All powers are conferred on the Chairman of the Board of Directors with the power to delegate to exercise all legal publicity formalities in the name of this group.

ANNEX 7

**COMPOSITION OF THE CAPITAL AFTER APPROVED MOVEMENTS ON APRIL 30, 2018**

| CONTRIBUTORS | NUMBERED SHARES | NUMBER OF SHARES |
|---|---|---|
| ETS CLAUDE BLANDIN ET FILS | 962 shares numbered from 1 to 961 and 963 | ci, 962 shares |
| ECB AMERICA INC | 1 share numbered 962 | ci, 1 share |
| ECB USA INC | 1 share numbered 964 | ci, 1 share |
| ATLANTIC VENTURES CORP | 1 share numbered 965 | ci, 1 share |
| GIORDANO ANTILLES 2006 | 1 share numbered 967 | ci, 1 share |
| CARIBEL FREBAULT | 1 share numbered 968 | ci, 1 share |
| CHOFO ANTILLES 2006 | 1 share numbered 969 | ci, 1 share |
| D'LOCHO | 5 shares numbered 966 and 970 to 973 | ci, 5 shares |
| B.D.A | 1 share numbered 974 | ci, 1 share |
| BLANDIN SAS | 1 share numbered 975 | ci, 1 share |
| BLANDIN MARTINIQUE ENERGIE | 1 share numbered 976 | ci, 1 share |
| BLANDIN GUYANE ENERGIE | 1 share numbered 977 | ci, 1 share |
| GENERAL MATERIEL CARAIBE | 1 share numbered 978 | ci, 1 share |
| ELECTRIC ANTILLES | 1 share numbered 979 | ci, 1 share |
| LES PARFUMEURS REUNIS | 1 share numbered 980 | ci, 1 share |
| NINA DES ILES | 1 share numbered 981 | ci, 1 share |
| NINA MARTINIQUE | 1 share numbered 982 | ci, 1 share |
| CHOFO ANTILLES 2008 | 1 share numbered 983 | ci, 1 share |
| BLANDIN AUTOMOBILES | 3 shares numbered 984, 988, and 989 | ci, 3 shares |
| BLANDIN CONCEPT AUTOMOBILES | 1 share numbered 985 | ci, 1 share |
| BLANDIN CONCEPT CARS | 1 share numbered 986 | ci, 1 share |
| BCAM | 1 share numbered 987 | ci, 1 share |
| AUTOS ISLANDS | 1 share numbered 990 | cl, 1 share |
| ENERGY CARAIBES SERVICES | 1 share numbered 991 | ci, 1 share |
| CHOFO ANTILLES 2007 | 1 share numbered 992 | ci, 1 share |
| ASSISTANCE 97 GUADELOUPE | 1 share numbered 993 | ci, 1 share |
| ASSISTANCE 97 MARTINIQUE | 1 share numbered 994 | ci, 1 share |
| LEROY SOMER CARAIBES SERVICES | 1 share numbered 995 | ci, 1 share |
| SOFECA | 1 share numbered 996 | ci, 1 share |
| ELECTRIC ANTILLES MARTINIQUE | 1 share numbered 997 | ci, 1 share |
| BLANDIN AGRICULTURE | 1 share numbered 998 | ci, 1 share |
| LOGISTIC 971 | 1 share numbered 999 | ci, 1 share |
| CUM PLUS | 1 share numbered 1,000 | ci, 1 share |

Or a total equal to the number of shares making up the capital....1,000 shares

# G.I.E. C2B

**Economic Interest Group**
**With a capital of €10,000**
**Registered office: Immeuble Entre Deux Mers**
**ZAC de Moudong Sud 97122 BAIE-MAHAULT**
**SIREN S29 867 236 - POINTE-A-PITRE RCS**

---

## EXTRAORDINARY GENERAL MEETING

**DATED APRIL 30, 2018**

---

**The year TWO THOUSAND EIGHTEEN, on April 30,**

The members of the GIE met for an Extraordinary General Meeting at the registered office.

The attendance sheet is signed by all members, present or represented, entering the meeting.

The meeting appoints its administration:

  − Chairman: Mr. Bruno BLANDIN
  − Scrutineer: Messrs. Patrick BLANDIN and Claude BLANDIN
  − Secretary: Ms. Dominique DUFFES.

The attendance sheet, verified and certified as accurate by the members of the administration, notes that all the members of the Group are present.

The Chairman notes that the General Meeting, regularly called and constituted, can validly deliberate.

The Meeting is declared open by the Chairman who recalls that the General Meeting has met to deliberate on the following agenda:

  − *Approval of a share assignment,*
  − *Corresponding modification of the articles of association,*
  − *Miscellaneous questions,*
  − *Powers and formalities.*

It explains that the company SCHRATTER FOODS is in the process of the assignment of its assets and liabilities, and that it has been decided that the share of the GIE C.2.B that it currently holds would be retroceded to the company ETABLISSEMENTS CLAUDE BLANDIN ET FILS.

This share assignment should therefore be approved.

After an exchange of observations, Mr. Bruno BLANDIN proposes to put the following resolutions of the General Meeting to the vote successively:

## FIRST RESOLUTION

The General Meeting,

Decides to approve, in accordance with article 9.1 of the articles of association;

**The transfer of share no. 963 by the company SCHRATTER FOODS to the company called ETABLISSEMENTS CLAUDE BLANDIN ET FILS,** whose registered office is located at BAIE MAHAULT (Guadeloupe) - ZAC de Moudong Sud - Rue Claude Emmanuel Blandin - Immeuble Entre Deux Mers, and for which a deed of share assignment is envisaged.

**This resolution is adopted unanimously.**

## SECOND RESOLUTION

The General Meeting,

Decides to modify the articles of association accordingly, and in particular Annex 7, a copy of which is annexed hereto.

**This resolution is adopted unanimously.**

## THIRD RESOLUTION

The General Meeting,

Delegates all powers to the bearer of a copy or extract hereof to exercise all legal formalities.

**This resolution is adopted unanimously.**

\*\*\*

With nothing more on the agenda, the meeting is closed after the writing and signing of these minutes.

| | |
|---|---|
| **The Chairman** | **The meeting secretary** |
| Bruno BLANDIN | Dominique DUFFES |
| [signature] | [signature] |
| | |
| **A Scrutineer** | **A Scrutineer** |
| Patrick BLANDIN | Claude BLANDIN |
| [signature] | [signature] |

*C2B 2018 04 30* AGE
*SFI HBL share assignment approval*

**ANNEX 7**
**COMPOSITION OF THE CAPITAL AFTER APPROVED MOVEMENTS ON APRIL 30, 2018**

| CONTRIBUTORS | NUMBERED SHARES | NUMBER OF SHARES |
|---|---|---|
| ETS CLAUDE BLANDIN ET FILS | 962 shares numbered from 1 to 961 and 963 | ci, 962 shares |
| ECB AMERICA INC | 1 share numbered 962 | ci, 1 share |
| ECB USA INC | 1 share numbered 964 | ci, 1 share |
| ATLANTIC VENTURES CORP | 1 share numbered 965 | ci, 1 share |
| GIORDANO ANTILLES 2006 | 1 share numbered 967 | ci, 1 share |
| CARIBEL FREBAULT | 1 share numbered 968 | ci, 1 share |
| CHOFO ANTILLES 2006 | 1 share numbered 969 | ci, 1 share |
| D'LOCHO | 5 shares numbered 966 and 970 to 973 | ci, 5 shares |
| B.D.A | 1 share numbered 974 | ci, 1 share |
| BLANDIN SAS | 1 share numbered 975 | ci, 1 share |
| BLANDIN MARTINIQUE ENERGIE | 1 share numbered 976 | ci, 1 share |
| BLANDIN GUYANE ENERGIE | 1 share numbered 977 | ci, 1 share |
| GENERAL MATERIEL CARAIBE | 1 share numbered 978 | ci, 1 share |
| ELECTRIC ANTILLES | 1 share numbered 979 | ci, 1 share |
| LES PARFUMEURS REUNIS | 1 share numbered 980 | ci, 1 share |
| NINA DES ILES | 1 share numbered 981 | ci, 1 share |
| NINA MARTINIQUE | 1 share numbered 982 | ci, 1 share |
| CHOFO ANTILLES 2008 | 1 share numbered 983 | ci, 1 share |
| BLANDIN AUTOMOBILES | 3 shares numbered 984, 988, and 989 | ci, 3 shares |
| BLANDIN CONCEPT AUTOMOBILES | 1 share numbered 985 | ci, 1 share |
| BLANDIN CONCEPT CARS | 1 share numbered 986 | ci, 1 share |
| BCAM | 1 share numbered 987 | ci, 1 share |
| AUTOS ISLANDS | 1 share numbered 990 | ci, 1 share |
| ENERGY CARAIBES SERVICES | 1 share numbered 991 | cl, 1 share |
| CHOFO ANTILLES 2007 | 1 share numbered 992 | ci, 1 share |
| ASSISTANCE 97 GUADELOUPE | 1 share numbered 993 | ci, 1 share |
| ASSISTANCE 97 MARTINIQUE | 1 share numbered 994 | ci, 1 share |
| LEROY SOMER CARAIBES SERVICES | 1 share numbered 995 | ci, 1 share |
| SOFECA | 1 share numbered 996 | ci, 1 share |
| ELECTRIC ANTILLES MARTINIQUE | 1 share numbered 997 | ci, 1 share |
| BLANDIN AGRICULTURE | 1 share numbered 998 | ci, 1 share |
| LOGISTIC 971 | 1 share numbered 999 | ci, 1 share |
| CLIM PLUS | 1 share numbered 1,000 | ci, 1 share |

**Or a total equal to the number of shares making up the capital....1,000 shares**

[signature]
[signature]
[signature]
[signature]

# GIE C2B

**with a capital of 10,000 €**
**Registered office:**
**Rue Claude Emmanuel BLANDIN**
**Immeuble Entre Deux Mers - ZAC de Moudong Sud**
**97122 BAIE-MAHAULT**
**SIREN 529 867 236 - POINTE-A-PITRE RCS**

* * *

# EXTRAORDINARY GENERAL MEETING

## OF APRIL 30, 2018

————————

# ATTENDANCE SHEET

| *OF APRIL 30, 2018* | | |
|---|---|---|
| **Bruno BLANDIN for:** | | |
| *ETABLISSEMENTS CLAUDE BLANDIN ET FILS* | *961* | |
| Companies represented by E.C.B. | | |
| *LES PARFUMEURS REUNIS* | *1* | |
| *BLANDIN DISTRIBUTION ANTILLES* | *1* | |
| *ENERGY CARAIBES SERVICES* | *1* | |
| *BLANDIN AUTOMOBILES* | *3* | |
| Companies represented by B.D.A. | | |
| *BLANDIN AGRICULTURE* | *1* | |
| *BLANDIN SAS* | *1* | |
| *BLANDIN MARTINIQUE ENERGIE* | *1* | [signature] |
| *BLANDIN GUYANE ENERGIE* | *1* | |
| *GENERAL MATERIEL CARAIBE* | *1* | |
| *ELECTRIC ANTILLES* | *1* | |
| *CUM PLUS* | *1* | |
| | | |
| Companies represented by E.C.S. | | |
| *ASSISTANCE 97 GUADELOUPE* | *1* | |
| *LEROY SOMER CARAIBES SERVICES* | *1* | |
| **Patrick BLANDIN for:** | | |
| Companies represented by BLANDIN AUTOMOBILES | | |
| *BLANDIN CONCEPT AUTOMOBILES* | *1* | |
| *BLANDIN CONCEPT CARS* | *1* | [signature] |
| *BCAM* | *1* | |
| | | |
| **Claude BLANDIN for:** | | |
| *SCHRATTER FOODS* | *1* | |
| *ECB AMERICA* | *1* | |
| *ECB USA INC* | *1* | [signature] |
| *ATLANTIC VENTURES CORP* | *1* | |
| | | |
| **Fréderic BANCET for:** | | [signature] |
| *AUTOS ISLANDS* | *1* | |
| | | |
| **Fréderic NESTY for:** | | |
| *SOFECA* | *1* | [signature] |
| *ASSISTANCE 97 MG* | *1* | |
| | | |
| **Emmanuel BAUCHET for:** | | |
| *ELECTRIC ANTILLES MARTINIQUE* | *1* | [signature] |
| *LOGISTIC 971* | *1* | |

| Luc TORUS for: | | |
|---|:---:|---|
| *NINA DES ILES* | *1* | [signature] |
| *NINA MARTINIQUE* | *1* | |
| *CARIBEL FREBAULT* | *1* | |
| | | |
| *Nicolas BIDAULT DES CHAUMES for:* | | |
| | | [signature] |
| *CHOFO ANTILLES 2006* | *1* | |
| *GIORDANO ANTILLES 2006* | *1* | |
| *CHOFO ANTILLES 2007* | *1* | |
| *CHOFO ANTILLES 2008* | *1* | |
| *D'LOCHO* | *5* | |
| | | |
| *TOTAL SHARES* | *1000* | |

NUMBER OF MEMBERS AT THE MEETING PRESENT OR REPRESENTED: **33**
NUMBER OF MEMBERS NOT TAKING PART IN THE VOTE: **0**
TOTAL NUMBER OF SECURITIES REGISTERED: **1,000**

**The Chairman**
Bruno BLANDIN
[signature]

**The meeting Secretary**
Dominique DUFFES
[signature]

**A Scrutineer**
Patrick BLANDIN
[signature]

**A Scrutineer**
Claude BLANDIN
[signature]

# ASSIGNMENT OF COMPANY SHARE

**DATED APRIL 30, 2018**

**BETWEEN THE UNDERSIGNED:**

The company named **SCHRATTER FOODS,** whose registered office is located at MIAMI FL-33178 (UNITED STATES, Florida), 11421 NW 107th Street-Suite 1.

Said company represented by its Chairman, Mr. **Claude BLANDIN.**

- THE PARTY OF THE FIRST PART
Hereinafter referred to as THE ASSIGNOR

**And**

The company named **ETABLISSEMENTS CLAUDE BLANDIN ET FILS,** a limited liability company with a capital of €41,126,782 whose registered office is located at POINTE A PITRE (Guadeloupe), 17 rue Achille René-Boisneuf, and registered in the POINTE-A-PITRE Trade and Companies Register under the number 303 121 289.

Said company represented by its Manager, **Mr. Bruno BLANDIN.**

- THE PARTY OF THE SECOND PART
Hereinafter referred to as THE ASSIGNEE

**IT HAS BEEN DECLARED AND AGREED AS FOLLOWS:**

# I- DECLARE

Under the name **GIE C2B,** there is an economic interest group with a capital of €10,000.00, divided into 1,000 shares of €10.00 each, whose registered office is at BAIE MAHAULT (Guadeloupe), ZAC de Moudong Sud, Rue Claude Emmanuel Blandin, Immeuble Entre Deux Mers, and whose purpose is to facilitate and develop the economic activity of its members, to improve or increase the results of this activity, in particular by organizing the financial activities of its members and the centralized management of their treasuries and the financial flows necessary for the successful completion of their activity.

The company SCHRATTER FOODS is the owner of a share in this EIG.

**THIS HAVING BEEN STATED, IT WAS AGREED AS FOLLOWS:**

[signature]

# II - <u>AGREEMENT</u>

ARTICLE 9.      ASSIGNMENT

The ASSIGNOR hereby assigns and transfers, under the ordinary and legal guarantees, to the ASSIGNEE who accepts it, 1 share at TEN EUROS (€10.00) of nominal value and numbered 963.

THE ASSIGNEE will be the owner of the share assigned from this day, with all the rights and obligations attached to it.

THE ASSIGNEE will participate in or contribute to the social rights, in proportion to the rights attached to the share assigned starting from the same day.

By the effect of this assignment, THE ASSIGNEE is subrogated to the ASSIGNOR in all the rights and obligations attached to the assigned share.

**<u>ARTICLE 2.</u>**      **PRICE**

This assignment is made and accepted by THE ASSIGNEE for the price of **TEN EUROS (€10.00)** payable today, i.e. the sum of **TEN EUROS (€10.00)** in total.

**<u>ARTICLE 3.</u>**      **ORIGIN OF OWNERSHIP**

THE ASSIGNOR is the owner of the share assigned after having acquired it from the company ETABLISSEMENTS CLAUDE BLANDIN ET FILS, under the terms of a deed of assignment dated February 13, 2015.

**<u>ARTICLE 4.</u>**      **APPROVAL**

THE ASSIGNOR has justified the approval granted to this share assignment, under the terms of an extraordinary general meeting on this day, by presenting to the ASSIGNEE a copy certified by the Director, of the minutes of the deliberations of the G.I.E. whose share is assigned.

**<u>ARTICLE 5.</u>**      **DECLARATION OF THE ASSIGNOR**

THE ASSIGNOR declares that the share assigned is free of all pledges, seizures, or other measures that may hinder the assignment.

**ARTICLE 6.     STATEMENT OF TRUTH**

The undersigned certify that the price stipulated above corresponds to the full price agreed.

They point out, as necessary, that the share assigned represents a contribution in cash and that this share does not confer on its possessor the right to the enjoyment of immovable rights; they consequently request the application of article 726 of the CGI [Code Général des Impôts (General Tax Code)] on the assignment price of the share.

**ARTICLE 7.     FEES AND FORMALITIES**

All the costs, rights, and fees hereof and those which will be the result or the consequence thereof will be borne by THE ASSIGNEE who undertakes to do so, including the notification of this deed to GIE C2B, in accordance with article 1690 of Civil Code, unless the articles of association provide for an exemption from this formality by filing an original of the deed at the registered office.

Done in FIVE (05) ORIGINAL COPIES, including one for Registration, two for filing with the Clerk's Office, and one for each party.

IN BAIE MAHAULT (Guadeloupe)
on April 30, 2018

**SCHRATTER FOODS**                          **ETS CLAUDE BLANDIN ET FILS**
Claude BLANDIN                               Bruno BLANDIN
[signature]                                  [signature]


[signature]



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Amended Articles of Association**" is, to the best of my knowledge and belief, a true and accurate translation from French into English.

Jacqueline Yorke
(Currently situated in the County of New York)

Sworn to before me remotely this
November 24, 2020

Signature, Notary Public
(Currently situated in the County of New York)

Stamp, Notary Public

# Exhibit G

Filing # 79072284 E-Filed 10/09/2018 01:08:30 PM

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO.: 2018-013998-CA-01

In Re:  Assignment for the Benefit of Creditors of

SCHRATTER FOODS INCORPORATED,

    Assignor,

To:

LESLIE S. OSBORNE,

    Assignee.

_____/

### NOTICE OF FILING AMENDED CLAIMS REGISTER

    Assignee, LESLIE S. OSBORNE, by and through undersigned counsel, hereby files

the attached AMENDED CLAIMS REGISTER.

    I  HEREBY  CERTIFY  that  a  true  copy  of  the  foregoing  has  been  furnished

electronically where available or by regular mail to the interested parties listed below on this,

the 9th day of October, 2018.

                    RAPPAPORT OSBORNE & RAPPAPORT, PLLC
                    Attorney for Assignee
                    Suite 203, Squires Building
                    1300 North Federal Highway
                    Boca Raton, Florida 33432
                    Telephone:  (561) 368-2200


                    BY:___/s/_____
                        LES S. OSBORNE, ESQ.
                        FL Bar No. 823139

Service List:

Schratter Foods Incorporated, Assignor
Eyal Berger, Esquire
AkermanSenterfitt
Las Olas Centre II
350 East Las Olas Blvd., Ste. 1600
Fort Lauderdale, FL  33301
E-service:  eyal.berger@akerman.com;
jeanette.martinez@akerman.com;
kimberly.shinder@akerman.com

Counsel for Voss Enterprises, Inc.
Jacqueline Calderin, Esquire
Agentis PLLC
501 Brickell Key Drive, Suite 300
Miami, FL  33131
E-service: jc@agentislaw.com;
cbs@agentislaw.com;
nvillegas@agentislaw.com;
service@agentislaw.com;
bankruptcy@agentislaw.com;bss@agen
tislaw.com

Florida Plantation Cold Storage, Inc.
Jeffrey J. Needle, Esquire
The Needle Law Group
5300 N.W. 33rd Avenue, Suite 206
Fort Lauderdale, Florida 33309
E-service:  jeffrey@needlelaw.com
courtfiling@needlelaw.com;
paralegal1@needlelaw.com

Ravi Batta, Esq.
Rosenfeld Stein Batta, P.A.
21490 W Dixie Hwy.
Aventura, FL 33180-1144
E-service:  erin@rslawpa.com;
legal@rslawpa.com;
reception@rslawpa.com

Ronald M. Emanuel, Esq.
Emanuel & Zwiebel, PLLC
Attorneys for U.S. Bank National
Association
E-service:  eservice@emzwlaw.com;
laura.bolinsky@emzwlaw.com;
wendy.moses@emzwlaw.com

Steven B. Sprechman, Esq.
Sprechman & Fisher, P.A.
Attorneys for Select Staffing; and,
Professional Drivers of Georgia
2775 Sunny Isles Blvd., Suite 100
Miami, FL 33160
E-service:
pleadings@sprechmanlaw.com;
efiling@sprechmanlaw.com

Davide Proietti, Esq.
Marko & Magolnick, PA
3001 SW 3rd Avenue
Miami, FL 33129
E-service:  proietti@mm-pa.com

David S. Willig, Esq.
Attorney for ELVIR, S.A.S./S.A. Corman
2837 SW 3rd Avenue
Miami, FL 33129
E-Service: interlawlink@aol.com;
dswillig@aol.com

## CLAIMS REGISTER

| | VENDOR'S NAME | DATE REC'D | AMOUNT CLAIMED $$/€€ | AMOUNT SCHEDULED |
|---|---|---|---|---|
| 1 | Accurate Pest Control<br>143 Landing Rd<br>Landing, NJ 07850 | 5/14/18 | $1,682.22 | $1,682.22 |
| 2 | Sweet Grass Dairy<br>(Blue Elephant Farms d/b/a Sweet Grass Dairy)<br>19635 US Hwy 19 N<br>Thomasville, GA 31792 | 5/14/18 | $3,026.40 | $2,835.40 |
| 3 | Wiscon Corporation<br>2050 N 15th Ave<br>Melrose Park, IL 60160 | 5/14/18 | $41,227.59 | $42,864.00 |
| 4 | Gordon Food Service, Inc.<br>1300 Gezon Pkwy, SW<br>POB 2244<br>Grand Rapids, MI 49501-2244 | 5/14/18 | $13,518.73 | $4,995.95 |
| 5 | Midland Information Systems<br>2130 Platinum Rd<br>Apopka, FL 32703 | 5/14/18 | $3,536.70 | $3,536.70 |
| 6 | Innovative Energy Inc.<br>10654 W 181st Ave<br>Lowell, IN 46356 | 5/14/18 | $266.53 | $266.53 |
| 7 | Bluline Leasing, LLC<br>3957 Pembroke Rd<br>Hollywood, FL 33021 | 5/14/18 | $5,400.00 | $770.40 |
| 8 | Dimensional Communications Inc<br>1595 MacArthur Blvd<br>Mahwah, NJ 07430 | 5/14/18 | $113,687.90 | $83,567.70 |
| 9 | The Ambriola Company, Inc.<br>7 Patton Dr<br>West Caldwell, NJ 07006 | 5/14/18 | $50,653.40 | $44,918.94 |
| 10 | Savencia Cheese USA, LLC<br>Coface North America Insco<br>650 College Rd East, Suite 2005<br>Princeton, NJ 08540 | 5/17/18 | $3,255,879.47 | $2,237,664.94 |
| 11 | Mantequerias Arias, S.A<br>Coface North America Insco<br>650 College Rd East, Suite 2005<br>Princeton, NJ 08540 | 5/17/18 | €100,977.37 | $120,330.47 |
| 12 | Lakeview Cheese Co<br>Coface North America Insco<br>650 College Rd East, Suite 2005<br>Princeton, NJ 08540 | 5/18/18 | $118,315.17 | $117,981.30 |
| 13 | Champignon North America, Inc<br>Coface North America Insco<br>650 College Rd East, Suite 2005<br>Princeton, NJ 08540 | 5/18/18 | $209,356.68 | $201,953.82 |
| 14 | Entremont Alliance<br>Coface North America Insco<br>650 College Rd East, Suite 2005<br>Princeton, NJ 08540 | 5/18/18 | €187,589.79 | $213,355.31 |
| 15 | Les Fromageries Occitanes<br>Coface North America Insco<br>650 College Rd East, Suite 2005<br>Princeton, NJ 08540 | 5/18/18 | €32,876.41 | $25,259.85 |

| | VENDOR'S NAME | DATE REC'D | AMOUNT CLAIMED $$/€€ | AMOUNT SCHEDULED |
|---|---|---|---|---|
| 16 | GIE Pasquier<br>Coface North America Insco<br>650 College Rd East, Suite 2005<br>Princeton, NJ  08540 | 5/18/18 | €43,423.03 | $23,491.02 |
| 17 | World Import<br>65 Ramapo Valley Rd #209<br>Mahwah, NJ  07430 | 5/18/18 | $8,396.67 | $8,216.70 |
| 18 | CPS Business Products Inc<br>POB 831<br>New City, NY  10956 | 5/18/18 | $430.87 | $430.87 |
| 19 | Mammen Cheese A/S<br>Coface North America Insco<br>650 College Rd East, Suite 2005<br>Princeton, NJ  08540 | 5/21/18 | €215,068.21 | $147,670.23 |
| 20 | Peak-Ryzex Inc<br>10330 Old Columbia Rd<br>Columbia, MD 21046 | 5/21/18 | $5,924.63 | $5,924.63 |
| 21 | You Technology, LLC<br>1000 Marina Blvd, #300<br>Brisbane, CA  94005 | 5/21/18 | $1,031.36 | $1,000.00 |
| 22 | AirTech Inc<br>301 Veterans Blvd<br>Rutherford, NJ  07070 | 5/21/18 | $941.60 | $941.60 |
| 23 | Angel Salami and Truffles LLC<br>5621 Palmer Way Ste B<br>Carlsbad, CA  92009 | 5/21/18 | $1,562.40 | $1,562.40 |
| 24 | Sierra Nevada Cheese Company<br>6505 County Rd 39<br>Willows, CA  95988 | 5/21/18 | $5,078.38 | $5,078.38 |
| 25 | Hanson Faso Sales & Marketing Inc<br>1919 S Highland Ave #2040<br>Lombard, IL  60148 | 5/22/18 | $1,225.75 | $114.08 |
| 26 | Met Speed Label<br>POB 850<br>Levittown, PA 19058 | 5/22/18 | $11,373.13 | $8,001.67 |
| 27 | Upstate Niagra Cooperative<br>Joseph M Shur, Esq<br>Relin, Goldstein & Crane LLP<br>28 E Main St, #1800<br>Rochester, NY  14614 | 5/24/18 | $257,963.16 | $235,758.96 |
| 28 | Riviera Finance of Texas Inc<br>1000 Mansell Exchange<br>Bldg 300, Ste 340<br>Alpharetta, GA  30022 | 5/24/18 | $33,610.38 | $71,845.34 |
| 29 | Cleannet of Southern California, Inc<br>9861 Broken Land Pkwy #208<br>Columbia, MD  21046 | 5/29/18 | $1,800.00 | $2,000.00 |
| 30 | Schenker, Inc<br>3 Gateway Center<br>100 Mulberry St<br>Newark, NJ 07102 | 5/29/18 | $2,573.73 | $762.58 |
| 31 | Omega Marketing LLC<br>7000 E 47th Ave Dr, Unit 850<br>Denver, CO  08216 | 5/29/18 | $1,050.43 | $1,456.54 |
| 32 | City Fire & Safety, Inc<br>3503 S York Rd<br>Gastonia, NC  28052 | 5/29/18 | $802.32 | $802.32 |

| | VENDOR'S NAME | DATE REC'D | AMOUNT CLAIMED $$/€€ | AMOUNT SCHEDULED |
|---|---|---|---|---|
| 33 | S.A.Q. Pallet Repair, Inc<br>2205 Enterprise St<br>Los Angeles, CA 90021 | 5/29/18 | $1,377.41 | $625.31 |
| 34 | Aliments Triumph, Inc.<br>1020 Michele-Boboc<br>Blairville, QC<br>Canada J7C 5E2 | 5/30/18 | $239,108.71 | $233,349.51 |
| 35 | Parmareggio SPA<br>Euler Hermes as Agent<br>800 Red Brook Blvd #400C<br>Owings Mills, MD  21117 | 6/4/18 | €549,112.54 | $495,062.48 |
| 36 | Finlandia Cheese, Inc<br>2001 Rt 46, Suite 303<br>Parsippany, NJ 07054 | 6/4/18 | $25,580.88 | $3,374.00 |
| 37 | Ines Rosales SA<br>Euler Hermes as Agent<br>800 Red Brook Blvd #400C<br>Owings Mills, MD  21117 | 6/4/18 | $14,843.28 | $14,201.2 |
| 38 | Allied Dairy Products Inc<br>Euler Hermes as Agent<br>800 Red Brook Blvd #400C<br>Owings Mills, MD  21117 | 6/4/18 | $102,069.12 | |
| 39 | Summar Financial, LLC<br>Euler Hermes as Agent<br>800 Red Brook Blvd #400C<br>Owings Mills, MD  21117 | 6/4/18 | 23,540.00 | |
| 40 | AJ Jersey Inc<br>125 St Nicholas Ave<br>South Plainfield, NJ  07080 | 6/4/18 | $925.54 | $925.54 |
| 41 | Prairie Farms Dairy, Inc<br>POB 4493<br>247 Research Parkway<br>Davenport, IA 52808 | 6/4/18 | $15,005.75 | $15,005.75 |
| 42 | GIE C2B<br>Immeuble Entre Deus Mers<br>ZAC de Moudong Sud<br>97122 Bahie Mahault<br>Guadaloupe | 6/7/18 | $12,315,575.00 | $12,315,575.00 |
| 43 | Jackson-Mitchell, Inc<br>POB 934<br>Turlick, CA  95381-0934 | 6/11/18 | $7,260.00 | $7,260.00 |
| 44 | Emilio Mauri SPA<br>Via Provinciale, 11-23818<br>Pasturo (LC)<br>ITALY | 6/11/18 | €8,469.99 | $9,013.08 |
| 45 | Friesland Campina Export<br>c/o Jessica M Wilde Esq<br>Nicoll Davis & Spinella LLP<br>95 Rt 17 South, Ste 316<br>Paramus, NJ  07652 | 6/12/18 | $216,281.20 | $194,201.48 |
| 46 | Island Dairy LLC<br>240 NE 71st St<br>Miami, FL  33138 | 6/12/18 | $46,692.00 | $46,692.00 |
| 47 | FS3 Building 7, LLC<br>c/o Cushman & Wakefield U.S., Inc.<br>9960 NW 116 Way, Suite 2<br>Medley, FL  33178 | 6/19/18 | $32,785.23 | |

| | VENDOR'S NAME | DATE REC'D | AMOUNT CLAIMED $$/€€ | AMOUNT SCHEDULED |
|---|---|---|---|---|
| 48 | Ecolab Inc.<br>655 Lone Oak Dr. – A1<br>Eagan, MN  55121-1645 | 6/19/18 | $1,173.90 | $1,173.90 |
| 49 | J Matone Inc., Electrical Contractor<br>52 Crescent Avenue<br>Cliffside Park, NJ  07010 | 6/21/18 | $4,606.51 | $1,462.36 |
| 50 | FS3 Building 7, LLC<br>c/o Cushman & Wakefield U.S., Inc.<br>9960 NW 116 Way, Suite 2<br>Medley, FL  33178 | 6/22/18 | $32,785.23 | |
| 51 | Parmareggio<br>Euler Hermes as Agent<br>800 Red Brook Blvd #400C<br>Owings Mills, MD  21117 | 6/25/18 | $7,4250.00 | |
| 52 | Rossbach International Florida<br>201 S Biscayne Bldv, 28th Fl<br>Miami, FL  33131 | 6/25/18 | 185,720.76 | $185,720.00 |
| 53 | Belton Farm Ltd<br>Whitechurch<br>Shropshire SY13 IJD<br>United Kingdom | 6/26/18 | €184, 577.40 | $262,600.57 |
| 54 | Blue River Logistics, Inc.<br>3200 NW 67th Ave<br>Bldg 6, Suit 600<br>Miami, FL  33122 | 6/29/18 | $250.00 | $250.00 |
| 55 | New Jersey Department of Labor and Workforce Devel.<br>Kevin A. Roach, Supervising Tax Examiner<br>Employer Accounts Bankruptcy Unit<br>POB 379<br>Trenton, NJ  08625-0379 | 7/2/18 | $402.91 | $448.66 |
| 56 | Lustenberger & Durst, AG<br>AXA Winterthur as Agent<br>Thurgauerstrasse 36/38<br>PO Box 6938<br>CH-8050 Zürich | 7/5/18 | $114,355.88 | $109,513.12 |
| 57 | TC Trading Company, Inc.<br>1755 Boblett Street<br>Blaine, WA  98230 | 7/6/18 | $133,510.06 | $113,491.06 |
| 58 | TIAA Commercial Finance, Inc.<br>fka Everbank Commercial Finance, Inc.<br>10 Waterview Blvd.<br>Parsippany, NJ  07054 | 7/9/18 | $10,389.50 | $12,417.24 |
| 59 | U.S. Bank, N.A. dba U.S. Bank Equipment Finance<br>1310 Madrid St.<br>Marshall, MN  56258 | 7/9/18 | $52,917.92 | $2,637.40 |
| 60 | IGOR Srl<br>Strata Natale Leonardi, 32<br>28062 Cameri (Novara)<br>ITALY | 7/11/18 | €117,120.32 | $134,690.98 |
| 61 | Alliance Industrial Refrigeration Services, Inc.<br>20311 Paseo Del Prado<br>Walnut, CA  91789 | 7/12/18 | $13,616.25 | $3,926.90 |
| 62 | Pitney Bowes Inc<br>27 Waterview Dr, 3rd Floor<br>Shelton, CT 06484 | 7/12/18 | $894.97 | |

| | VENDOR'S NAME | DATE REC'D | AMOUNT CLAIMED $$/€€ | AMOUNT SCHEDULED |
|---|---|---|---|---|
| 63 | All-Ways Forwarding<br>701 Newark Avenue<br>Elizabeth, NJ 07208 | 7/13/18 | $31,964.26 | $36,240.94 |
| 64 | Insight Direct USA, Inc.<br>6820 S Harl Ave.<br>Tempe, AZ 85283 | 7/26/18 | $37,612.94 | $22,472.85 |
| 65 | Atalanta Corporation<br>Attn: Thomas Gellert<br>One Atalanta Plaza<br>Elizabeth, NJ 07206 | 8/3/18 | $392,279.93 | |
| 66 | B&G Foods, Inc.<br>4 Gatehall Drive<br>Parsippany, NJ 07054 | 8/9/18 | $16,545.900 | $16,545.60 |
| 67 | Voss Enterprises, Inc.<br>235 Upper Shad Road<br>Pound Ridge, NY 10576 | 8/16/18 | $743,061.25 | |
| 68 | Waste Management Inc. of Florida<br>2625 W. Grandview Rd Ste 150<br>Phoenix, AZ 85023 | 8/17/18 | $4,689.39 | |
| 69 | ELVIR S.A.S.<br>c/o David S. Willig, Esq.<br>2837 SW 3rd Avenue<br>Miami, FL 33129 | 8/21/18 | $614,062.48 | $188,060.69 |
| 70 | TOTAL QUALITY LOGISTICS, LLC<br>Attn: Joseph B. Wells, Counsel<br>4289 Ivy Pointe Blvd.<br>Cincinnati, OH 45245 | 8/23/18 | $22,744.00 | $22,744.00 |
| 71 | Iron Mountain Information Management, LLC<br>1 Federal Street<br>Boston, MA 02110 | 8/23/18 | $19,705.49 | $12,022.64 |
| 72 | Bertrand Proust<br>c/o Mark J. Beutler, Esq.<br>9100 S. Dadeland Blvd.<br>Miami, FL 33156 | 8/28/18 | $215,293.00 | |
| 73 | Brandywine Packaging, LLC<br>3513 Fawn Trl<br>Austin, TX 78746 | 8/28/18 | $8,778.79 | $3,476.06 |
| 74 | Deloitte Transactions and Business Analytics LLP<br>200 Berkeley Street, Suite 400<br>Boston, MA 02116 | 8/28/18 | $324,644.66 | $304,808.00 |
| 75 | SA CORMAN<br>Rue De La Gileppe, 4<br>4834 Limbourg Belgium | 8/28/18 | $205,740.00 | |
| 76 | FROMAGERIE GUILLOTEAU<br>Le Planil, CS 60058<br>42410 Pélussin FRANCE | 8/28/18 | €10,329.40 | $9,469.45 |
| 77 | United Healthcare Insurance Company, Inc.<br>185 Asylum Street<br>ATT: CDM 03B<br>Hartford, CT 06103 | 8/28/18 | $1,835.81 | |
| 78 | Cole, Scott & Kissane, P.A.<br>c/o Edward Polk, Esq.<br>9150 S. Dadeland Blvd., 14th Floor<br>Miami, FL 33156 | 8/28/18 | $6,481.50 | |

| | VENDOR'S NAME | DATE REC'D | AMOUNT CLAIMED $$/€€ | AMOUNT SCHEDULED |
|---|---|---|---|---|
| 79 | TOTAL QUALITY LOGISTICS Attn.: Joseph B. Wells, Assistant Corp. Counsel 4289 Ivy Pointe Blvd. Cincinnati, OH 45245 | 8/28/18 | $22,744.00 | $22,744.00 |
| 80 | Coface North America Insurance Company 650 College Road Ease, Suite 2005 Princeton, NJ 08540 | 8/28/18 | $52,694.00 | |
| 81 | The Dannon Company, Inc. c/o Lowenstein Sandler LLP One Lowenstein Drive Roseland, NJ 07068 | 8/28/18 | $162,409.05 | $121,674.28 |
| 82 | Archive America, Inc. 3455 NW 54 Street Miami, FL 33142 | 8/28/18 | $101,019.09 | $5,178.99 |
| 83 | ETL Group, Inc. 115 West 25th Street, 2nd Floor New York, NY 10001 | 8/28/18 | $38,284.00 | $27,724.95 |
| 84 | PAC Finance 1, LLC a Delaware Limited Liability Company 1800 Wazec St., Suite 500 Denver, CO 80202 | 8/28/18 | $550,149.75 | $542,171.81 |
| 85 | Carolina Handling, LLC 3101 Piper Lane Charlotte, NC 28208 | 8/28/18 | $42,920.45 | $2,889.92 |
| 86 | Coach Farm Enterprises 2700 Westchester Avenue, Suite 309 Purchase, NY 10577 | LATE 9/4/18 | $32,679.82 | $32,679.82 |
| 87 | Best Cheese Corp. 2700 Westchester Avenue, Suite 309 Purchase, NY 10577 | LATE 9/4/18 | $73,837.71 | $73,837.71 |
| 88 | Florida Plantation Cold Storage, Inc. Attn.: Needle Law Group 5300 NW 33rd Ave., #206 Fort Lauderdale, FL 33309 | 5/31/18 | $691,412.05 | $687,500.04 |
| 89 | Professional Drivers of Georgia, Inc. d/b/a Prodrivers P.O. Box 102409 Atlanta, GA 30368-2409 | 7/3/18 | $111,185.52 | |
| 90 | Select Staffing P.O. Box 512007 Los Angeles, CA 90051-0007 | 7/3/18 | $75,956.27 | $62,016.88 |